Filed 8/9/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S062180 |
| v. | ) | |
| | ) | |
| RICHARD VALDEZ, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. BA108995 |
| _____ | ) | |

A jury convicted defendant Richard Valdez of five counts of first degree murder (Pen. Code, §§ 187, subd. (a), 189)[1] and, as to each count, found true special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) and gang and weapon enhancement allegations (§§ 186, subds. (b)(1), (b)(2), 12022, subd. (a)(1), 12022.5, subd. (a).) The jury returned a verdict of death as to each of the victims. The trial court denied the automatic application to modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death for the five murders. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

---

[1] All further unlabeled statutory references are to the Penal Code.

1

## I. FACTS

### A.  Guilt Phase

On April 22, 1995, the bodies of three adults – Anthony "Dido" Moreno, his sister, Maria Moreno, and Gustavo "Tito" Aguirre – and two of Maria's children – five-year-old Laura Moreno and six-month-old Ambrose Padilla – were found at Maria's apartment on Maxson Road in El Monte, California.[2]  The evidence presented at trial established that defendant, who was a member of the Sangra street gang, shot and killed Anthony and Gustavo while his codefendant and fellow Sangra gang member Jimmy Palma shot and killed Maria and the children.

#### 1.  Prosecution Evidence

The Mexican Mafia was formed in 1957 as a prison gang and, by 1977, controlled most of the criminal activity inside California's prisons.  Eventually, it extended its influence outside of the prison system and came to exert control over virtually all Hispanic street gangs in Southern California, including Sangra and El Monte Flores.  Hispanic gang members are essentially "soldiers" of the Mexican Mafia and would probably be beaten up or killed for refusing to carry out a Mexican Mafia order.  Mexican Mafia members take a "blood oath" when they join and "death is the only way out"; those who attempt to leave the gang are eventually killed, even 10 or 15 years after their disassociation.  Dido was a member of the Mexican Mafia from 1973 until he dropped out in the mid 1980's.  In January 1995, Raymond Shyrock, a Mexican Mafia leader, stated at a Mexican Mafia meeting:  "I don't know if you have ever heard of this brother Dido.  He

---

[2]  For simplicity and to minimize confusion, we will generally refer to the victims by their nicknames or first names.

2

dropped out a long time ago. He's in an apartment where I was living. The mother fucker was living right downstairs but never showed his face. All kinds of people in the pad, bunch of young sisters and kids, all kinds of shit. So I'm trying to figure out how to – I need a silencer is what I need."

On April 22, 1995, Dido and Maria were living in Maria's apartment along with her children. In the afternoon, a car parked in Maria's driveway. Simultaneously, a Jeep containing four Hispanic men stopped in front of a neighbor's driveway and idled. Early that afternoon, Sangra gang member Anthony "Scar" Torres had borrowed a Jeep for about 10-20 minutes from Sangra gang member Victor Jimenez. Four tall, bald, Hispanic men wearing white t-shirts exited the car. One of them had a tattoo on his neck with chain letters. Another had a heavy build. The four men walked toward Maria's residence.

About 2:30 p.m., Luis Maciel, who was a Mexican Mafia member and a former member of El Monte Flores, approached Dido and his brother – Witness No. 15[3] – in Maria's driveway. With him were two younger men, one of whom had an El Monte Flores gang tattoo on his arm. When the men arrived, Tito, who was at the apartment, ran inside and hid. Tito, who was a drug user, had robbed several Hispanic drug dealers, including at least one who was paying "taxes" to the Mexican Mafia. This would have subjected him to being killed by the Mexican Mafia. Maciel spoke with Dido and Witness No. 15 for about 30 minutes. He seemed nervous and unusually talkative. As he spoke, he faced the apartment's door and periodically looked inside, enabling him to see Maria and her children. He asked about Witness No. 15's family and Tito's whereabouts. At some point, he offered Dido and Witness No. 15 heroin, which the latter found

---

[3]    As later explained in more detail, many of the trial witnesses were identified in the written record by number to protect their safety.

3

"suspicious" because, in his experience, "people don't normally give away drugs." Maciel and his companions eventually returned to the car and drove off. Maciel later met with Palma, Witness No. 14, who was an El Monte Flores gang member, and another gang member known as "Diablo," at Maciel's house. Palma arrived in a Nissan Maxima owned by fellow Sangra gang member Danny "Tricky" Logan. Maciel told Palma, "if anything happens to me, go ahead and contact Diablo." Palma stated he "was going to take care of some business" for Maciel and was "strapping," meaning he was carrying a gun. At Maciel's direction, Witness No. 14 gave Palma a small amount of heroin that Maciel had retrieved from his house.

In the late afternoon, Palma asked fellow Sangra gang member Witness No. 16 for a ride to his sister's house. While the two men drove around, Palma said he was expecting a page and, after receiving it, would need Witness No. 16 to take him to the Alhambra house of fellow Sangra gang member Torres. Palma said "they had to take care of something" and "the brothers wanted him."

Witness No. 13, who was Torres's sister, arrived at Torres's house about 7:00 or 7:30 p.m. A short time later, two men arrived looking for Torres; one had a "Sangra" tattoo on his neck and said his name was Jimmy. Jimmy Palma had a "Sangra" tattoo on his neck. Torres was not at home, and the two men left. Torres later arrived at the house accompanied by defendant, who was a Sangra gang member known as "Primo." They went into Torres's room and started making telephone calls. More Sangra gang members, including Palma, Logan, Jose "Pepe" Ortiz, "Creepy,"[4] and Witness No. 16, subsequently arrived and went into Torres's room. At some point, Ortiz, who seemed to be in charge, stated that there

---

[4] "Creepy" was never identified at trial by his real name.

4

was "a problem in El Monte" and that they had to go there "to take care of something." Witness No. 16 understood Ortiz's comment to mean they were going to kill someone. While in Torres's room, Ortiz and Palma took methamphetamine and Palma shaved his head.

Sometime before 9 p.m., the men left for El Monte in two groups. Logan drove in his Nissan Maxima with defendant, Palma and Torres, and Witness No. 16 followed in his Ford Thunderbird with Ortiz and Creepy. When they arrived in El Monte, Logan pulled into, or stopped in front of, Maria's driveway on Maxson Road and turned off his headlights. Witness No. 16 drove a few blocks further down the street, pulled over, and turned off the car and the headlights. Ortiz exited the Thunderbird, walked back toward Maxson Road and looked up and down the street. According to several witnesses who were visiting Maria's neighbors that night, the driver of the Nissan remained in the car while three Hispanic men exited and walked down Maria's driveway. After six to eight gunshots rang out, the three men – one holding a handgun – ran back to the Nissan, which then drove away with its lights off. Witness No. 8, who was one of Maria's neighbors, also heard several gunshots at Maria's apartment. A short time later, Maria's six- or seven-year old son – crying, screaming, and covered in blood – came to Witness No. 8's house and said his mother and siblings had been shot. Witness No. 8 then called the police.

Ortiz returned to Witness No. 16's car as police began to arrive and said "Let's go," "Let's get out of here." When they returned to Torres's house, Logan's Nissan was already in the driveway and defendant, Palma, Logan and Torres were inside listening to a police scanner "to see if the people were dead." The men began discussing the shootings on Maxson Road. In front of defendant, Palma said that, while he showed a man some heroin, "Primo had shot him in the head." He also said that, "after the man had got shot," "the lady with the baby said

5

that it wasn't her problem," at which point he "pulled out the gun and shot her and let off rounds on the kids." Defendant confirmed Palma's statements, explaining that "he had shot one guy in the temple and another guy running away from him." Torres said he had "stood by the door with the shotgun making sure nobody would walk up." Logan drove the Nissan and waited in the car while the murders took place.

Responding to Witness No. 8's call, police arrived at the scene of the shooting about 10:40 p.m. They found Dido lying on the ground in a pool of blood just outside of the door to Maria's apartment. Inside the door, Maria was lying face down on the floor in a pool of blood. Next to her, Laura was lying face down in a pool of blood and Ambrose was lying on his back with a gunshot through his eye. Tito was lying face down between the bed and the wall. A three- or four-year-old girl was hiding in the corner.

Dido died from a single gunshot to the head. The bullet entered his skull near the right ear and exited from the left side. A contact wound to the skin indicated that the gun had been pressed to his head when fired. Tito died from a gunshot to the top of the head. A contact wound indicated that the gun had been pressed to his head when fired. Tito also had a nonfatal gunshot wound through his left shoulder. The position of his body was consistent with his having been shot while he was lying at least partially on the bed. Maria died from a gunshot to the head, which had been fired from a distance of a few inches to one foot. She also had a nonfatal gunshot wound to her right buttock. Laura died from a gunshot to her torso, which had entered her back, punctured her lung, and exited from her chest. The angle of the wound suggested she was probably seated or lying down or slightly bent over when she was shot. Ambrose died from a gunshot that entered his right eye and traveled through his mouth, the base of his brain, and his

6

spinal cord before exiting from the back of his neck. A hole in the pillow underneath him suggested he was lying on his back when shot.

During subsequent investigation, police discovered ballistics evidence linking defendant to the Maxson Road shootings. In a house he had lived in until early April 1995, they found an expended .38- or .357-caliber bullet. They recovered similar caliber bullets from a bathroom wall at Maria's apartment and from Tito's head. All three bullets had the same general rifling characteristics and had been fired from a revolver. In a condominium defendant had moved into shortly before the shootings, police found in a bedroom closet a bag of unexpended bullets, some of which were .45-caliber. They recovered two .45-caliber bullets from Maria's body and, at the crime scene, several .45-caliber bullet fragments, a complete .45-caliber bullet, and several .45-caliber shell casings. The bullets recovered from Maria's body and the bullet and bullet fragments had all been fired from the same semi-automatic weapon. In addition, the .45-caliber shell casings had at some point been chambered in the same firearm as the two unexpended .45-caliber bullets found at defendant's condominium.

Police also discovered and collected other evidence linking the various participants to each other and to the shootings. Pager and telephone records showed that Maciel was paged three times from Ortiz's residence on April 22, 1995, and five times from Torres's house that evening between 9:20 and 11 p.m. Between 11:00 p.m. and midnight that night, five calls were placed from Torres's residence to a pager registered to Veronica Lopez, who was defendant's former girlfriend. The next day, Maciel was paged once from Ortiz's residence, twice from Torres's, and three times from Palma's.

The morning of May 2, 1995, police saw Logan arrive in his Nissan at Palma's house. Defendant was in the passenger seat. They left after speaking

7

with Palma for about 2 minutes. Later, Witness No. 16 picked up Palma in his Thunderbird and took him on various errands before returning to Palma's house.

On May 15, 1995, about two hours after police arrested Palma and took him to the Los Angeles County jail, a call was placed from the jail to the condominium defendant had moved into in early April. About 10 minutes later, a call was made from the jail to Palma's residence. Less than 30 minutes later, a call was made from the condominium to Logan's residence. About 50 minutes later, a collect call was made from the jail to the condominium. After the call to Logan's residence but before the last call to the condominium, police saw Torres leave the condominium in a Jeep. They pursued Torres, who eventually abandoned the Jeep, fled on foot, and took refuge in the house of his girlfriend, Jill Steele. They surrounded the house and would not let Steele enter. She spoke with Torres by telephone and then, at his request, called defendant. Meanwhile, police spotted Logan at a nearby restaurant with another Sangra gang member. In Logan's Jeep, they found a change of clothes. Eventually, they entered Steele's house and arrested Torres.

2. *Defense Evidence*

Defendant denied any involvement in the murders. He maintained that, although he had once had been a Sangra gang member, he was not a member at the time of the murders. He attempted to elicit testimony to support this contention during cross-examination of several prosecution witnesses. He also offered a stipulation that Torres's mother, who shared her house with Torres, had not identified him from a photographic lineup. During cross-examination of other prosecution witnesses, defendant attempted to develop evidence that a gang called the Border Brothers may have committed the murders because Tito had robbed drug "connections" associated with that gang.

8

Defendant also called three witnesses. His best friend, Randi Chavers, testified that he had never seen a gun in defendant's residences and had seen defendant shoot a gun only once, at a public shooting range in 1993. Richard Valdemar, a gang expert who was also a prosecution witness, testified that, after listening to an enhanced recording of Shyrock's comments at the January 1995 Mexican Mafia meeting, he did not believe Shyrock had ordered the children killed and had not intended that they be killed. Defendant introduced this testimony to counter Valdemar's earlier testimony, based on an unenhanced recording of the meeting, that Shyrock had wanted to "silence" Maria and her children. Trent Hampton, defendant's stepfather, testified that defendant was in Utah during all of May 1995. To support this testimony, defendant introduced into evidence an airline ticket issued to Richard Valdez for an April 30 flight from Ontario, California, to Salt Lake City, Utah, and a stipulation with the prosecution that someone named Richard Valdez flew from Ontario, California, to Salt Lake City, Utah, on April 30, 1995. Defendant introduced this evidence to counter the prosecution's evidence that police had seen him at Palma's house on May 2.

Palma called one witness, David Hooker, a state prisoner who testified regarding his conversations with Witness No. 14 while they were in prison together. Witness No. 14 testified for the prosecution that, during a meeting with Maciel on April 22, 1995, Palma said he was "going to take care of some business" for Maciel and was "strapping." According to Hooker, sometime in May 1996, Witness No. 14 said he was in protective custody because the Mexican Mafia had a "green light" on him due to his "involve[ment] in a thing where some kids got killed during a murder." Witness No. 14 explained to Hooker that (1) he sold drugs in partnership with a Mexican Mafia member, (2) on the day of the murders, he threatened a customer who owed money for drugs, and (3) when the

9

customer did not pay despite the threat, he went to the Mexican Mafia member and "arranged to get some vatos from San Gabriel to take the puto out."

### B. Penalty Phase

In its case-in-chief, the prosecution presented no additional evidence in aggravation against defendant.

Through several witnesses, defendant presented evidence regarding his upbringing, including the following:  (1) he was raised and educated in the Catholic religion and received the sacraments of reconciliation and holy communion; (2) in grade school he played Pop Warner football and Little League baseball; (3) in a ninth grade electronics class, he received an A one semester and a B another semester, and in both semesters received an "O" for "outstanding citizenship"; (4) the teacher of the electronics class viewed defendant as being "very responsible," "hard working," intellectually above average, and one of his better students; (5) in 1992, he enrolled in ITT Technical Institute after receiving high scores on the entrance examination; (6) he joined the Navy Reserves and participated in naval duties; and (7) while living with his grandfather after high school, he cared for his grandfather, worked at an auto body shop and a print shop, and helped support his younger brother, who was heavily into drugs.

Defendant presented testimony from three witnesses about his ability to make a positive contribution in prison.  Dr. Ronald Fairbanks, a licensed clinical psychologist who interviewed defendant twice, testified that defendant likely had "above average" intellectual abilities and could be productive in prison if given opportunities to work or assist others with reading or obtaining library materials. Jesus Avila, who was housed in a cell near defendant's in the Los Angeles County Jail, testified that defendant had helped him with writing, spelling, speaking, and drawing, and was friendly with other prisoners.  Defendant's father testified that,

10

based on defendant's school performance, defendant "could be productive in society through a prison system" and would be able to get his G.E.D.

In rebuttal to defendant's evidence, the prosecution presented testimony from Anthony France, who had been a campus supervisor at San Gabriel High School when defendant was a student. According to France, in December 1991, he detained defendant after breaking up a fight on campus. Defendant called another supervisor his "bitch" and threatened to "kick his ass." Defendant later told France he was "going to put a bullet in [France's] head." On cross-examination, France testified he had not taken defendant's threat seriously, it was not the first time a student had threatened him at a high school, and defendant's threat to put a bullet in his head was a "standard phrase" students used when security officers broke up fights.

## II. PROCEDURAL HISTORY

On September 20, 1995, a Los Angeles County grand jury returned an indictment charging defendant, Palma, Logan, and Torres with five counts of murder in connection with the events of April 22. As to each count, the indictment also alleged a multiple murder special circumstance (§ 190.2, subd. (a)(3)) and gang and weapon enhancements (§§ 186, subds. (b)(1), (b)(2), 12022, subd. (a)(1), 12022.5, subd. (a).) In December, the grand jury returned an amended indictment containing identical charges and adding Ortiz and Maciel as defendants. In September 1996, the court ruled that defendant and Palma would be tried together before a single jury and ordered separate trials for the other defendants.

Jury selection began on September 30, 1996, and a jury was sworn on October 17, 1996. Counsel began opening statements on October 21, 1996. The jury began guilt phase deliberations on November 18, 1996, and declared an impasse on November 25, 1996. It resumed deliberations after further instructions

11

from the court. On November 27, 1996, the court excused a juror who declared she could not, under any circumstances, impose the death penalty and could not be objective during the guilt phase in light of the possibility of a penalty phase. It replaced the juror with an alternate and, on December 2, 1996, instructed the jury to begin deliberations anew. On December 4, 1996, the jury returned guilty verdicts on all counts and found all allegations true. The penalty phase began on December 9, 1996, and concluded on December 13 with jury verdicts of death. On June 11, 1997, the trial court denied motions for new trial and applications to modify the verdicts, and sentenced defendant and Palma to death. This appeal is automatic.[5] (§ 1239.)

## III. DISCUSSION

### A. Nondisclosure of Witnesses' Identities

Defendant alleges numerous errors in connection with protective orders the trial court issued delaying and limiting disclosure of the identities of certain prosecution witnesses. For reasons explained below, defendant's claims fail.

#### 1. Background

At the prosecution's request, on September 29, 1995, nine days after the return of defendant's indictment, the Hon. James Bascue, who was the presiding judge of the grand jury, ordered redaction from the grand jury transcripts of the names of 13 grand jury witnesses and certain identifying information regarding a 14th witness. He also ordered defense counsel not to show or provide copies of the transcripts to anyone absent further court order. Judge Bascue found "overwhelming good cause" for these orders based on the prosecution's showing

---

[5] Palma was killed in San Quentin State Prison on October 13, 1997. We ordered his appeal permanently abated.

that the life of anyone who testified would be "extremely and seriously in danger." On October 19, 1995, Judge Bascue issued a second order sealing the grand jury transcripts and exhibits. The order provided that each defense counsel was to receive a redacted copy of the transcripts, but could not share the transcripts with anyone absent further court order.

About six weeks later, on November 7, 1995, after transfer of the case to the superior court, Judge Robert Dukes revisited the issue upon defense counsel's motion for greater disclosure of the witnesses' identities. After conducting an in camera hearing pursuant to section 1054.7, at which the prosecution presented evidence, Judge Dukes ordered continued redaction of the witnesses' identities and addresses. However, he also ordered the prosecution to make the witnesses available for interview by defense counsel and/or their investigators or for lineups. Judge Dukes order also specified that: (1) defense counsel could not disclose to their clients, or put into any report, witness identities they discovered as a result of the interviews; (2) the prosecution could provide defense counsel with information about witnesses' prior convictions if the witnesses' identities were not revealed; and (3) defense counsel could obtain police reports regarding the crimes if the witnesses' names, addresses, and information pointing to their identities and residences were deleted. Judge Dukes invited defense counsel to return to court should they feel the order needed amending.

A few months later, Judge J. Stephen Czuleger, to whom the case was initially assigned for trial, decided to consider the issue de novo and ordered the prosecution to make a new showing to justify nondisclosure. In March 1996, after the prosecution presented evidence at an in camera hearing pursuant to section 1054.7 and the parties presented argument, Judge Czuleger issued a written order providing: (1) the identities of 10 "stranger" witnesses — those who do not know any of the defendants and who are not connected to a gang — and the identity of

13

Witness No. 13 were to remain undisclosed and "will be made available at the time the witness[es] testif[y]," and their addresses and telephone numbers were to be "permanently" undisclosed; (2) the identities, addresses, and telephone numbers of the remaining witnesses were to remain undisclosed until further court order; (3) upon 15 days' written notice, the prosecution was to make any witness available once for a recorded interview by defense counsel at the prosecution's office, the prosecution could be present during the interview if the witness so requested, and any party could memorialize the interviews by tape recording or stenographic reporter; (4) the prosecution must give defense counsel a record of any convictions suffered by the witnesses, but could redact from that record any case number or identifying information; (5) defense counsel, upon learning a witness's identity, place of residence, or place of employment could not disclose this information "to any person," but could disclose a witness's identity to the client "if such disclosure is necessary to adequately represent their client," provided that such disclosure as to the "stranger" witnesses and Witness No. 13 could not occur absent prior court order; (6) defense counsel and their investigators could review with their clients police reports, court transcripts, and grand jury proceedings, but could not give any of this material to anyone absent court order; (7) the prosecution could redact from all police reports the witnesses' names and all information that would reveal their identities, addresses, telephone numbers, or places of incarceration; (8) until further court order, the previous court-ordered redactions of the grand jury proceedings would remain in effect and the grand jury transcripts, witness lists, and exhibits would remain sealed. Judge Czuleger's order recited that it was based on "good cause having been shown as to threats and/or possible danger to the safety of witnesses."

In September 1996, after reassignment of the case for trial to the Hon. George Trammel III, the nondisclosure issue arose again in connection with

14

defense counsel's request for videotapes of witness interviews. The prosecutor explained his assumption that, under the existing orders, he would disclose the witnesses' identities to defense counsel "a day or two before they testify." Judge Trammel, after stating that he could not revisit the prior rulings absent new and previously unavailable information, stated: "I will require that at least 48 hours in advance of any witness testifying that their particular tape be actually turned over. . . . [Defense counsel has] my assurances, if the redacted portions, if you're able to show you need a mid trial continuance for the purposes of doing some . . . material investigation, you'll get it. You have my word on that."

During jury voir dire on October 2, 1996, Palma's counsel complained that the existing court orders, though allowing him to read to his client the information in the police reports and grand jury transcripts, prohibited Palma from actually looking at that material. The prosecution disagreed with defense counsel's interpretation, arguing that the court's orders precluded defendants not from reading the material, but from keeping copies of it. Judge Trammell then clarified that, under the court's orders, defendants could read the material but could not "walk away with it."

On Wednesday, October 16, 1996, five days before trial began, defendant's counsel requested that the prosecution provide the witnesses' names so he could review them with defendant. The prosecutor responded in part that the witnesses were still in danger. He also noted that defendant's counsel had received "rap sheets as far as [the witnesses'] felony convictions," and had "been given an opportunity to interview in person the vast majority of the witnesses." Judge Trammell then explained that, "to strike a balance" between the prosecution's concern for the witnesses' safety and defendant's right to a fair trial, he would "withhold [the witnesses'] names with this understanding, that when one of these witnesses takes the stand that [defense counsel] will have the right before [they]

15

begin cross examination if [they] can give a good cause reason for delaying cross examination because [they] didn't know who the person was, I will give it to you. In other words, I am not about to let . . . or make [defense counsel] start to cross examine until [they] are fully prepared." After the court's ruling, the prosecution indicated its intent to identify the witnesses "within a couple of days of their testimony." It also stated that it had no objection to giving defense counsel the names of "some of" the witnesses "on Friday with the understanding that they not tell their clients" the names of the "stranger" witnesses. The court stated that it wanted to defer its decision on the prosecution's suggestion. After addressing other matters, it concluded the day's proceedings by stating: "To the extent as the case moves on, if [the prosecution] can keep counsel apprised of who the witnesses next up will be for the next day so that they can use the evening to prepare for cross examination, again, that would be helpful."

Before opening statements began on October 21, the court asked the prosecution whether it wanted to refer to the witnesses by number or name. The prosecution responded that it wanted to use numbers, in order to keep the witnesses' identities out of the public record. It also stated that, "at this point," it was "willing to give" defense counsel the names of all unidentified witnesses, so long as defense counsel did not repeat the information to anyone "unless they can articulate a reason why they need to." Palma's counsel objected that identifying the witnesses by number instead of by name would be prejudicial. After agreeing with Palma's counsel, the court explained that defense counsel was "going to get the names" but could not reveal that information to their clients absent a showing of good cause. The prosecution then suggested that the witnesses be identified at trial by aliases.

The next morning, before opening statements resumed, the prosecutor expressed concern about using aliases and suggested that the witnesses instead be

16

identified by name in court but only by number in the transcript. During his remarks, the prosecutor noted that he had given Palma's counsel "the names of the two people who may testify today," that he had not had "an opportunity to talk to" defendant's counsel, and that "at the recess at 11:00 we are going to go over the other list of names." Later that morning, "Witness No. 9" — one of the "stranger" witnesses — began testifying. After a three-hour lunch recess, she resumed her direct testimony. She was followed by Witness No. 8, another of the "stranger" witnesses. Although given the opportunity, defense counsel declined to cross-examine either witness.

The next afternoon, October 23, the prosecution called three more of the "stranger" witnesses: "Witnesses Nos. 1, 2 and 3." Defense counsel cross-examined two of these witnesses. On October 24, the prosecution called "Witnesses Nos. 13 and 15." Witness No. 13's testimony concluded on October 28, after a three-day break. Defense counsel cross-examined both of these witnesses extensively.

The morning of Friday, October 25, the prosecution asked the court to order that defense counsel "not tell . . . their clients which witnesses are going to be testifying the next day." He explained that, on the previous Wednesday, he had informed defense counsel "in front of their clients" that Witness No. 15 would be testifying on Thursday and that there was evidence steps had thereafter been taken to have the witness killed. He further explained: "I have no problem with telling [defense counsel] the expected order that I believe we'll have for the rest of the trial. I've been letting them know the day before but I will even tell them for the rest of the trial. I have no problem with that whatsoever. *And I have told them . . . the true names of the witnesses.* But I do want an order. And the mistake I made the other day was saying it in front of the defendants, . . . and I could have cost a man his life. But I do want an order that the defendants not be told by their

17

counsel, the prospective order of witnesses." The court granted the prosecution's request and ordered defense counsel "not to divulge to their clients directly or indirectly the order in which witnesses are called." Based on the evidence, the court found that the witnesses' lives and safety "far outweigh[ed]" any detriment to the defense "in a defendant not knowing who's coming the next day."

In response to the court's ruling, defendant's counsel, after stating he was "glad" the prosecution had "been telling us the night before [so] at least we can open the book at least and prepare," asked that the court give him some time to prepare for cross-examination after a witness takes the stand. The court responded: "If it is a reasonable amount of time, certainly. If it is a couple of days, no. But if it is a matter of 10 or 15 minutes or 20 minutes, I have no problem with that. I think under the circumstances it is reasonable . . . . Again, I am not real concerned with the time on this case anymore. I am not saying that you can have several days but certainly that's not an unreasonable request and I am certainly inclined to go along with it."

Regarding the court's statement that the danger to the witnesses outweighed any detriment resulting from the defendants' failure to know who would be testifying the next day, Palma's counsel then interjected: "One additional matter so the record's clear as [to] our position on this. . . . I think what our position has been . . . in this it is not that we just don't know who the witness is going to be the day before, we don't know who the witnesses are at all. . . . We have been handcuffed all through the preparation of this case because of this restrictive order and I just want that to be part of the record." The court responded by assuring Palma's counsel that he, like defendant's counsel, would "be given a reasonable amount of time [before beginning for cross-examination] and I suppose what is reasonable would depend on the circumstances. You're not going to find me . . . to be trying to rush this case along because . . . it's moving along quite quickly."

18

Two more protected witnesses — Witnesses Nos. 14 and 16 — subsequently testified for the prosecution. The former testified on October 30, and was cross-examined by both defense counsel. The latter began his testimony on October 31 and, four days later, on November 4, returned to the stand for an extensive cross-examination by defense counsel that consumed almost the entire day of trial.

### 2. *Alleged Violation of Constitutional Rights*

Defendant asserts that, by withholding the witnesses' identities, the trial court violated his constitutional rights to due process, to a fair trial, to confront witnesses and to a reliable determination of death judgment. His assertions lack merit.

The starting point for our conclusion is *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121 (*Alvarado*), where we dealt with somewhat similar disclosure issues. There, a grand jury, based on the testimony of three inmate witnesses, returned an indictment charging two jail inmates with murdering another inmate. (*Id.* at p. 1126.) The prosecution provided the defendants with transcripts of the witnesses' grand jury testimony and information regarding their criminal histories, but refused to disclose their identities; the transcripts identified them only by witness number. (*Id.* at pp. 1127-1128.) After holding a series of in camera hearings from which it excluded the defendants, the trial court entered a protective order providing as follows: (1) the prosecution could *permanently* withhold the witnesses' identities; (2) the prosecution had to produce the witnesses for interview by defense counsel 30 days before trial, although the witnesses did not have to speak with counsel or disclose their names; (3) if defense counsel learned the witnesses' names, they could not disclose them to defendants; and (4) the witnesses did not have to disclose their names *even at trial*. (*Id.* at pp. 1128-

19

1130.)  After the Court of Appeal upheld the order, we granted review to determine whether the order violated the defendants' "constitutional rights to due process of law and to confront the witnesses against them." (*Id.* at p. 1132.)

We first held in *Alvarado* that the protective order was valid insofar as it permitted *pretrial* nondisclosure of the witnesses' identities. (*Alvarado*, *supra*, 23 Cal.4th at pp. 1134-1136.)  As a statutory matter, we explained, although the prosecution must generally disclose at least 30 days before trial the names and addresses of persons it intends to call as witnesses at trial (§§ 1054.1, subd. (a), 1054.7), "section 1054.7 establishes that a trial court has discretion to deny, restrict, or defer disclosure for good cause," which "expressly includes 'threats or possible danger to the safety of a victim or witness.' [Citation.]" (*Alvarado*, *supra*, at p. 1134.)  The trial court properly found good cause, we reasoned, based largely on evidence that the Mexican Mafia had ordered the homicide, posed an extreme danger to government witnesses, had an excellent intelligence network and, before approving a contract to kill a witness, demanded documentation identifying an individual as a government witness. (*Id.* at pp. 1128-1129, 1136.)  Constitutionally, we continued, no authority suggests that section 1054.7, insofar as it authorizes "the denial of pretrial disclosure" based on concerns for witness safety, is "unconstitutional under either the confrontation or the due process clause." (*Alvarado*, *supra*, at pp. 1135, 1134.)  Moreover, in rejecting the defendants' constitutional attacks on pretrial nondisclosure, we relied on high court decisions for the following propositions:  (1) " 'the right of confrontation is a trial right' "; (2) " '[t]here is no general constitutional right to discovery in a criminal case' "; and (3) " 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded.' " (*Id.* at pp. 1134-1135.)

However, we further held that the protective order exceeded constitutional bounds insofar as it authorized "crucial witnesses whose veracity and credibility

20

[were] likely to be central to the prosecution's case" to testify at trial without disclosing their identities during their testimony, where "nondisclosure would significantly impair the defense's ability to investigate or effectively cross-examine them." (*Alvarado*, *supra*, at pp. 1146-1147.) In reaching this conclusion, we agreed with the People that "the confrontation clause does not establish an *absolute* rule that a witness's true identity always must be disclosed." (*Id.* at p. 1146.) However, we continued, "*in every case in which the testimony of a witness has been found crucial to the prosecution's case the courts have determined that it is improper at trial to withhold information (for example, the name or address of the witness) essential to the defendant's ability to conduct an effective cross-examination*. [Citations.]" (*Ibid*.) "Thus, when nondisclosure of the identity of a *crucial* witness will preclude effective investigation and cross-examination of that witness, the confrontation clause does not permit the prosecution to rely upon the testimony of that witness at trial while refusing to disclose his or her identity." (*Id.* at p. 1151, italics added.)

As defendant concedes, the protective order here at issue did not suffer from the same constitutional infirmity that afflicted the order in *Alvarado*; it did not authorize *permanent* nondisclosure of the identity of any witness, crucial or otherwise. Indeed, the record reflects that all but one of the protected witnesses who actually testified at trial identified themselves during their testimony.[6] Nor does defendant challenge the adequacy of the prosecution's showing that the witnesses would have been in significant danger had their identities been disclosed. Indeed, the evidence the prosecution presented in this regard was similar in many respects to the evidence we found adequate in *Alvarado* to justify

---

**6** As far as the record shows, unlike the other testifying witnesses, Witness No. 1 was never asked for identifying information.

21

a pretrial nondisclosure order. Specifically, the prosecution presented evidence that the Mexican Mafia ordered at least one of the murders, posed an extreme danger to the People's witnesses, had an excellent intelligence network, and demanded documentation identifying an individual as a government witness before approving a contract to kill a witness. Thus, as *Alvarado* establishes, the record was sufficient to justify a pretrial nondisclosure order.

Nevertheless, defendant asserts, the protective order was constitutionally invalid insofar as it allowed the prosecution to withhold the witnesses' identities "until the moment [they] took the witness stand," "immediately prior to their testimony." This "belated disclosure," defendant argues, "failed to provide [him] with an adequate opportunity to investigate and prepare his defense." As to the "stranger" witnesses — those who had no connection to the defendants and saw relevant events at the victims' home from nearby locations — it prevented him from determining whether they harbored bias or prejudice against him or other defendants, whether they had reason to testify falsely, or where they were when they made their observations. As to the other protected witnesses — who defendant asserts were " 'crucial witnesses' " within the meaning of *Alvarado* — it prevented defendant from adequately investigating grounds for impeachment, i.e., their " 'reputation[s] for truthfulness or dishonesty, previous history and accuracy of providing information to law enforcement, and other motives to fabricate, such as revenge or reduction of their own charges.' " More generally, defendant asserts, nondisclosure prevented the defense from investigating a viable defense theory — that the murders were carried out not by the Sangra gang, of which defendant was a member, but by the El Monte Flores street gang — and fundamentally impaired his relationship with counsel by "prohibit[ing]" his attorney "from discussing any matter . . . that might disclose the identity of a [protected] witnesses." In these respects, defendant asserts, the court's order

22

prevented him from having "an adequate opportunity to investigate and prepare his defense" and "effectively denied [him] the ability to present potentially mitigating and exonerating evidence."

Defendant's arguments are unpersuasive. As a factual matter, the record does not support defendant's assertion that the witnesses' identities were unknown to the defense until the moment the witnesses took the stand. As detailed above, on Wednesday, October 16, 1996, five days before trial began, the prosecution indicated its intent to identify the witnesses "within a couple of days of their testimony" and stated that it was willing to disclose to defense counsel the names of "some of" the witnesses on Friday, October 18. Before opening statements began on Monday, October 21, the prosecution indicated that it was "willing to give" defense counsel the names of *all* unidentified witnesses, so long as defense counsel did not repeat the information to anyone "unless [counsel] can articulate a reason why they need to." The next morning, before opening statements resumed, the prosecution indicated that it had already given Palma's counsel "the names of the two people who may testify today," that it had not had "an opportunity to talk to" defendant's counsel, and that "at the recess at 11:00 we are going to go over the other list of names." On Friday, October 25, the prosecution indicated that it had "told" defense counsel "the true names of the witnesses," that it had been telling defense counsel "the day before" which witnesses would be testifying the following day, and that it was willing to tell defense counsel the order of witnesses "for the rest of the trial." As defendant concedes, this record supports a finding that the prosecution disclosed the identities of all witnesses by October 22, the day

the parties completed their opening statements and witnesses began to testify.[7]

Thus, the record suggests that, except as to the two "stranger" witnesses who

testified on October 22 — "Witnesses Nos. 8 and 9" — defendant knew the

protected witnesses' identities a day or more before they testified.[8] As to

---

**7** Likewise, the People assert that, "although the record is not completely clear, it appears that witness names were all disclosed by the time of opening statements."

**8** In arguing that disclosure did not actually occur until the moment the witnesses took the stand, defendant relies in part on Judge Trammell's statement on October 16, five days before trial began, that he would "withhold" the witnesses' names with the "understanding" that, "when one of these witnesses takes the stand," he would grant a continuance before proceeding with cross-examination if defense counsel "can give a good cause reason for delaying cross examination because [they] didn't know who the person was." However, as indicated above, after the court's statement, the prosecution indicated its intent to identify the witnesses "within a couple of days of their testimony" and stated that it had no objection to giving defense counsel the names of "some of" the witnesses "on Friday." The court then stated that it wanted to defer its decision on the prosecution's suggestion and concluded the day's proceedings by directing the prosecution to "keep counsel apprised of who the witnesses next up will be for the next day so that they can use the evening to prepare for cross examination." Defendant also relies on the following October 25 statement of Palma's counsel, after the court, at the prosecution's request, directed defense counsel not to tell their clients the order in which witnesses would be testifying: "[S]o the record's clear as [to] our position on this. I think what our position has been . . . in this it is not that we just don't know who the witness is going to be the day before, we don't know who the witnesses are at all." However, in context and in light of the record as a whole, this comment is best understood not as a statement that Palma's counsel still did not know the witnesses' identities, but as a reiteration — to clarify the record — of counsel's prior objection to earlier court rulings that authorized nondisclosure. Notably, defendant's counsel did not join in the comments of Palma's counsel or challenge the prosecution's representation earlier in the hearing that it had "told" defense counsel "the true names of the witnesses." Instead, defendant's counsel responded to the prosecution's representation by expressing gratitude that the prosecution had "been telling" defense counsel the order of witnesses "the night before [so] at least we can open the book at least and prepare."

Witnesses Nos. 8 and 9, the record indicates that the prosecution disclosed their identities several hours before they took the stand. As to the witnesses defendant asserts were "critical" — Witnesses Nos. 13, 14, 15 and 16 — the record indicates that defendant's counsel knew the witnesses' identities at least two days, and as much as two *weeks*, before he had to begin cross-examination.[9]

As a legal matter, governing precedent does not support defendant's constitutional claim. As the high court has explained, "[t]here is no general constitutional right to discovery in a criminal case" and " '[t]he Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded. . . .' [Citation.]" (*Weatherford v. Bursey* (1977) 429 U.S. 545, 559.) Applying these principles, the *Weatherford* court found no constitutional violation where the prosecution surprised the defendant at trial by calling to the stand a previously unidentified witness. (*Id.* at pp. 559-561.) The court rejected the argument that the lack of advanced disclosure deprived the defendant "of the opportunity to investigate [the witness] in preparation for possible impeachment on cross-examination," explaining: "[T]here was no objection at trial to [the witness's] testimony, no request for a continuance, and even now no indication of substantial prejudice from this occurrence." (*Id.* at p. 561; see also *United States*

---

[9]     On October 31, before Witness No. 16's testimony — which defendant asserts was "the cornerstone of the prosecution's case" — defendant's counsel told the court he had interviewed the witness the previous July, "obviously" knew the witness's name, and "had been referring to [the witness] by name for the last two weeks." Indeed, the record suggests that defendant's counsel may have known the identities of the protected witnesses well in advance of trial. In March 1996, Logan's counsel told the court that he "ha[d] been able to ascertain who" the witnesses were from his own investigation and from the information he had received, including the redacted grand jury transcripts and the police reports.

*v. Edwards* (7th Cir. 1995) 47 F.3d 841, 842-843 [Constitution does not require disclosure of protected witness's identity before the morning of his testimony].)

For several reasons, we similarly find no constitutional violation in this case. First, at the same time it authorized pretrial nondisclosure of the witnesses' identities, the court afforded defendant several methods of investigating those witnesses, including potential sources of impeachment evidence. As detailed above, in early November 1995, almost a year before trial began, the court directed the prosecution to make the witnesses available for interview by defense counsel, authorized the prosecution to provide defense counsel with information about the witnesses' prior convictions, and authorized defense counsel to obtain police reports regarding the incident. In March 1996, still more than six months before trial, the judge initially assigned for trial ordered the prosecution to make the witnesses available for a recorded interview by defense counsel and to give defense counsel a record of the witnesses' prior convictions. Second, by October 16, 1996, five days before trial began, defendant's counsel had in fact received information regarding the witnesses' prior convictions and had interviewed "the vast majority of the witnesses." Third, when the court issued a protective order in November 1995, it specifically invited defendant's counsel to seek amendment of the order should he determine that further disclosure was necessary.[10] Similarly, in March 1996, when Judge Czuleger revisited the issue de novo, he emphasized that the protective order was "a work in progress as this case progresses" and that

---

**10** The court stated: "[A]fter you have had a chance or an opportunity to conduct the investigation a little bit further, . . . if it is to be the request of the defense for lineups, anything of that nature, then at all times you are invited to return to court should you find, feel that there is a need or a necessity to get some further amendment to the order." "[A]s you go along if you feel there needs to be an expansion of the order, then you are invited to return to court."

26

"one of [his] largest concerns [was] that these defendants be adequately represented and be able to adequately defend themselves." Fourth, the court stated several times that it would grant defense counsel continuances during trial upon a showing that the delayed disclosure of the witnesses' identities had hampered counsel's ability to prepare for cross-examination.[11] Fifth, despite the court's offers, defendant's counsel made no attempt to demonstrate that further disclosure was necessary to his trial preparation and, during trial, never requested a continuance before beginning cross-examination.[12]

---

**11** In September 1996, the court stated to defense counsel: "You have my assurances . . . if you're able to show that you need a mid trial continuance for the purposes of doing some — not fishing but doing some material investigation, you'll get it. You have my word on that." In October 1996, it told defense counsel: "[W]hen one of these witnesses takes the stand . . . you will have the right before you begin cross examination if you can give a good cause reason for delaying cross examination because you didn't know who the person was, I will give it to you. In other words, I am not about to let you or make you start to cross examine until you are fully prepared."

**12** During trial, the court raised the possibility of a continuance specifically regarding Witness No. 16. After the prosecution completed its direct examination of the witness on Thursday, October 31, 1996, defendant's counsel moved for a mistrial, explaining in part that, although he had interviewed the witness the previous July and had known the witness's identity for at least two weeks, he did not learn information about the witness's current employment until the witness testified at trial. Counsel stated that, had he known this information, he could have investigated possible impeachment evidence, including "what type of employee [the witness] was and whether or not he is known to lie and whether or not he has covered himself by lying about other people at the time." In denying the motion, the court responded: "[I]f you need time to look into his impeachment insofar as his general character, I will give you a reasonable time. We do have three days [before trial resumes] and that's something certainly on Monday if you come in and ask for more time, I am going to probably want to know what it is you need to do and why you didn't do it over the next three days, but I mean there's no question he's material, and if you're able to show me you need additional time to pursue that particular issue, you may have my word you will get

*(footnote continued on next page)*

27

The sixth relevant factor is that the court's protective orders did not in fact "significantly impair" defendant's "ability to investigate or effectively cross-examine" the witnesses he maintains were "crucial" to the case against him: Witnesses Nos. 13-16. (*Alvarado*, *supra*, 23 Cal.4th at p. 1147.) As defendant asserts, the most crucial witness was Witness No. 16, the Sangra gang member who testified that defendant and Palma said defendant shot one man in the head and that defendant said he also shot another man who was running away. Defendant's counsel interviewed Witness No. 16 in July 1996, three months before trial began, and by his own admission, knew the witness's identity at least two weeks before the witness began testifying. At trial, Palma's counsel cross-examined the witness first, and he extensively exposed to the jury the witness's criminal background and his incentives to help the prosecution. Defendant's counsel followed with his own lengthy cross-examination, which included

---

*(footnote continued from previous page)*

it." When trial resumed the following Monday, defendant's counsel said nothing more about the issue.

By contrast, Palma's counsel, after explaining that he had served subpoenas duces tecum for employment records the previous Friday and that the records would not be available until the next day, asked the court to delay for one day the continued examination of Witness No. 16. The court asked Palma's counsel to try to "work it out" with the prosecution if possible, while reiterating: "I think I said at the beginning of the trial because you have not been given names, primarily numbers, if that necessitates a day or so or some lost time I have no problem with it." "If you need time, I promised you at the beginning you'd get it . . . ." Shortly thereafter, the direct examination of Witness No. 16 resumed. When the court invited Palma's counsel to begin cross-examination, Palma's counsel requested "a moment with" the prosecution and, after receiving it, began cross-examination. After Palma's counsel finished, defendant's counsel cross-examined the witness without in any way indicating that he needed more time to prepare.

28

questions about his July interview with the witness and the witness's grade-school association with Creepy.[13]

During closing argument, defendant's counsel took full advantage of this cross-examination, hammering hard at the witness's credibility. Counsel argued that the prosecution's case against defendant was "centered around" and depended "on the testimony of one man" — Witness No. 16 —who "smoked PCP"; who lied to the grand jury and the police regarding his own involvement in the murders, "even after being granted immunity"; who "had a purpose" and "his own agenda"; who "told you a story that would . . . separate him . . . from being an accomplice"; and who "took every step in order not to be involved even though he drove the leader of the pack to the [murder] site." Defendant's counsel also emphasized what he believed were inconsistencies in the witness's testimony, noting that, although he testified he had been to Valdez's house, he could not find it "when he drove the [sheriff's] officers around" after the murders.

Palma's counsel likewise attacked Witness No. 16's credibility during closing argument, stressing that the witness was a gang member and "a PCP

---

**13** During the cross-examination by Palma's counsel, the witness testified that the prosecution had granted him immunity in connection with the murders and would not prosecute him if he told the truth; that he had been held in jail for refusing to testify despite the grant of immunity and a judge told him he would stay in jail until he testified; that a case involving a charge of driving under the influence would be "washed out" and a pending drug charge would not be prosecuted if he testified; that he would be moved out of the area; that he had lied when he first spoke with police about the murders and told them he was not involved; and that he had refused to tell the police the truth "until after [he was] granted immunity and [he] had cut [a] deal." During his ensuing cross-examination, defendant's counsel extensively probed inconsistencies in the witness's trial testimony and his prior statements to police and during the July interview with defendant's counsel. Defendant's counsel also established that the witness was a phencyclidine (PCP) user.

---

abuser"; that "he was heavily using PCP at the time" of the murders; that he lied the first time he spoke with police about the crimes, saying he did not know anything about them and "lie[d] under oath" to the grand jury; that he initially refused to testify before the grand jury even after being "granted immunity"; that during the time he was in jail for refusing to testify before the grand jury, he was "getting his story together, his version of the truth"; that, in exchange for his trial testimony, he got "out of jail," received "complete immunity . . . from prosecution for five murders," got his "dope" and "drunk driving cases taken care of," and was "relocated out of the area" along with "his whole family." Summing up, Palma's counsel stated: "[Witness No. 16's] credibility is unbelievable and . . . you should not rely upon him. When you talk about him and when you discuss his testimony, you think about his background. . . . You talk about his lies, you talk about his motives for testifying in this case and then see if he's believable."

As to Witnesses Nos. 14 and 15, we first question defendant's assertion that these witnesses were "crucial" to the case *against him.* Neither witness provided any testimony about defendant. The latter testified about his encounter at the Maxson Road apartment some nine hours before the murders occurred (2:30 p.m.) with Maciel and two younger men, one with an El Monte Flores gang tattoo on his arm. He also testified that Tito had robbed drug dealers associated with the Border Brothers, a group that sold drugs in the El Monte area and would kill those who stole their drugs. During closing argument, defendant's counsel *relied on* this witness to argue that defendant was not involved in the murders and that members of either the El Monte Flores gang or the Border Brothers committed the murders. Witness No. 14, a member of the El Monte Flores gang, testified that on the evening of the murders, Palma said he "was going to take care of some business" for Maciel, a former El Monte Flores gang member. This testimony supported defendant's alternate theory that the El Monte Flores gang committed

30

the murders.  Thus, these witnesses may have been more crucial to defendant's defense than to the prosecution's case against him.

Consistent with his defense, defense counsel made little effort during cross-examination to impeach Witnesses Nos. 14 and 15.  Instead, he focused his efforts on developing evidence that members of the Border Brothers or the El Monte Flores gang, rather than Sangra gang members, committed the murders.  Palma's counsel, however, thoroughly cross-examined both witnesses at trial, exposing their criminal backgrounds and their extensive drug use.[14]  During closing argument, Palma's counsel later attacked Witness No. 14's credibility, arguing that he was "an admitted liar" and "a dope user" who "admitted to using dope on at least two occasions on" the day of the murders; that he was a "convicted kidnapper, a convicted robber, and a convicted dope seller" who "lied to the police when he was being interviewed the first time"; and that, as a member of the El Monte Flores gang, which was a Sangra rival, he had "an additional motive to draw a member of Sangra gang into this conspiracy."  Palma's counsel also attacked Witness No. 15's credibility, arguing:  "I am not sure there is anything

---

[14]    During cross-examination, Witness No. 14 testified that he was presently in custody for kidnapping and robbery; that he had a 1993 felony conviction for drug sales; that Dido and Tito had sold drugs for him at one time; that he used heroin twice on the day of the murders; and that he told Hooker he was involved in selling drugs with a Mexican Mafia member.  Witness No. 15 testified on cross-examination that the night before the murders, he stole several items; that on the day of the murders, three separate times he sold some of the stolen items to buy heroin; that he used heroin four different times on the day of the murders; that he had spent a substantial part of his adult life in prison; that he currently was in prison for commercial burglary; that he went to prison in 1972 for "a couple of" burglaries, in 1986 for robbery while using a buck knife, and in 1993 for petty theft; and that he had been "in and out of the county system" from 1980 to 1986.  Palma's counsel also explored inconsistencies between Witness No. 15's trial testimony and his prior statements.

that you can believe that comes out of that guy's mouth. Here is a guy committing crimes, stealing people's property, and going down and selling it for drugs and seems kind of proud of it the way he testified." Thus, even were Witnesses Nos. 14 and 15 crucial to the case against defendant, the record shows that the court's protective orders did not significantly impair the defense's ability to prepare for and cross-examine these witnesses.[15]

Also unpersuasive is defendant's assertion that Witness No. 13 was crucial to the prosecution's case against him. Witness No. 13 testified that sometime before 8:30 or 9 p.m. on April 22, 1995, defendant and Torres arrived together at Torres's house, went into Torres's room and began making telephone calls, and were later joined by other Sangra gang members, including Logan. However, Torres's mother, whose identity was not withheld from defendant, similarly testified that, beginning about 6:00 p.m. on April 22, 1995, several of Torres's friends, including defendant, arrived at Torres's house and went into Torres's room. During closing argument, defendant's counsel stated, "There's no doubt that [Torres's mother] was credible." He also stated that both Witness No. 13 and Torres's mother were "the most credible witnesses so far that have come along." Given that Witness No. 13's testimony substantially duplicated that of Torres's mother and that defendant's counsel conceded at trial that both witnesses were credible, his claim that the delayed disclosure of Witness No. 13's identity hampered his defense fails.

---

[15]    To the extent defendant now complains in his reply brief that the protective order, by prohibiting counsel from disclosing the witnesses' identities to anyone, precluded him from further inquiring into the witnesses' biases, their reputations for veracity, and their abilities to perceive, recall and describe the events to which they testified, defendant could have asked the trial court to amend its order to permit such disclosure. He did not.

Regarding the "stranger" witnesses, defense counsel conducted little or no cross-examination. However, these witnesses testified only briefly about their observations on the day of the murders, and none of them identified defendant, Palma, or anyone else. In fact, three of them testified they could not identify anyone they saw that day, and a fourth said he could not describe anyone he saw. One of the former testified she was "positive" none of the people she saw was in court. Thus, defendant's professed inability to determine whether these witnesses harbored any bias or prejudice against him or other defendants, whether they had reason to testify falsely, or where they were when they made their observations, did little, if anything, negatively to impact his case. On the contrary, although he now complains about his inability to impeach these witnesses, during closing argument at trial, he urged the jury to *rely on* Witnesses Nos. 8 and 9, stressing their failure to identify him as one of the men who visited the victims' residence the afternoon of April 22 and commenting that no reason existed to doubt their credibility. Regarding the other "stranger" witnesses, who testified that a Nissan Maxima pulled up later that night, defendant's counsel actually bolstered their testimony, commenting, "obviously, that's what had to occur."[16]

---

**16**     Moreover, defendant errs in asserting that, without address information, he had "no way to determine *where*" the two witnesses who were the victims' neighbors were when they made their observations. Under the court's protective order, defendant could have requested an interview with these witnesses and asked them where they were when they made their observations. Judge Czuleger expressly mentioned this option to defense counsel during the March 29 hearing on the disclosure issue. To the extent this information would have disclosed their identities, defendant could have sought permission from the court to obtain this information, based on his asserted need to test their ability to observe. Similarly, to the extent defendant now complains in his reply brief that the protective order, by prohibiting counsel from disclosing the witnesses' identities to anyone, precluded him from interviewing neighbors regarding the witnesses' reputation for

*(footnote continued on next page)*

33

Defendant's arguments as to why the trial court's efforts to protect his ability to put on a defense were insufficient are unpersuasive. Defendant asserts that the possibility of a continuance was "patently inadequate" given that the witnesses' identities were not disclosed until immediately before their testimony and the court indicated it would consider delaying cross-examination only for "10 or 15 or 20 minutes." However, as explained above, defendant is incorrect in asserting that the witnesses' identities were not disclosed until the moment they took the stand. Moreover, as the People assert, the record indicates that the court made its comment about delaying cross-examination for 10, 15, or 20 minutes in the context of discussing its order precluding defense counsel from disclosing the *order* of witnesses to their clients, not with respect to the disclosure of the witnesses' identities to defense counsel. With regard to the disclosure of the witnesses' identities, as explained above, in September 1996, the court gave defense counsel its "word" that it would grant "a mid trial continuance" if counsel showed they needed to investigate the witnesses after disclosure of their identities, and on October 16, 1996, just five days before trial began, it again told defense counsel: "[W]hen one of these witnesses takes the stand . . . you will have the right before you begin cross examination if you can give a good cause reason for delaying cross examination because you didn't know who the person was, I will give it to you. In other words, I am not about to let you or make you start to cross examine until you are fully prepared."[17] Given this record and defendant's failure

*(footnote continued from previous page)*

veracity, defendant could have asked the trial court to amend its order to permit such disclosure.

[17]     Even as to disclosure of the order of witnesses, defendant's view of the court's position is overly restrictive. At the same time it indicated its

*(footnote continued on next page)*

to test the court's sincerity by requesting a continuance, it is defendant's argument, not the court's promise of a continuance, that is "patently inadequate." Having declined to seek a continuance, defendant is in no position to argue he "had too little time to conduct an adequate investigation."

For several reasons, defendant also errs in arguing that, by "prohibit[ing]" his counsel "from discussing any matter with [him] that might disclose the identity of a [protected] witnesses," the court's order "[i]nevitably . . . undermined" his "confidence in his counsel," thus "fundamentally interfer[ing] with the attorney-client relationship." First, the court's order was not as restrictive as defendant asserts. As explained above, the order permitted defendant's counsel to review with defendant police reports, court transcripts, and grand jury transcripts, redacted to protect identifying information. It also provided that, upon discovering the identities of Witnesses Nos. 14, 15, and 16 — who were three of the four witnesses defendant now asserts were "crucial" — defendant's counsel could disclose that information to defendant "if such disclosure [was] necessary to adequately represent" him. Even as to the remaining witnesses — the "stranger" witnesses and Witness No. 13 — the order did not forever bar counsel, upon discovering a witness's identity, from disclosing that information to defendant; it simply required that counsel obtain a "court order" authorizing disclosure. Thus, the order only minimally inhibited communication between defendant and his

---

*(footnote continued from previous page)*

unwillingness to delay cross-examination "a couple of days" based on the defendants' lack of knowledge of the order of witnesses, it stated it would delay cross-examination "a reasonable amount of time" and explained: "I suppose what is reasonable would depend on the circumstances. You're not going to find me . . . to be trying to rush this case along because . . . it's moving along quite quickly."

counsel. Second, to the extent the order prevented information sharing, it should not have undermined defendant's confidence in counsel. Counsel could simply have explained that the court's order precluded him from sharing certain information with defendant. Though defendant might have been unhappy with the order, he would have had no basis for losing confidence in counsel as a result of the court-ordered nondisclosure.

Defendant next errs in asserting that pretrial nondisclosure prevented him from developing and pursuing a viable defense theory — that the murders were carried out not by Sangra gang members, but by members of the El Monte Flores gang. The only way in which defendant asserts that pretrial nondisclosure hampered development of this theory was by "effectively prevent[ing]" him from establishing that Witnesses Nos. 14 and 15 "were trying to falsely implicate members of the rival Sangra gang" and/or "were trying to protect fellow members of El Monte Flores (perhaps out of a sense of gang loyalty or fear of retribution)." However, Witness No. 15, who was or had been an El Monte Flores gang member, actually *supported* this defense theory by testifying at trial that Maciel and the two men who visited Moreno on the afternoon of April 22 were probably from El Monte and that one of the men had "E.M.F." tattooed on his arm, indicating the El Monte Flores gang. Nor in his trial testimony did he implicate defendant, Palma, or anyone else in the Sangra gang. Notably, during closing argument, defendant's counsel relied heavily on Witness No. 15, stressing that the witness had not identified defendant or Palma, had not otherwise indicated that anyone from Sangra was involved, and had noticed that one of the visitors that afternoon was from the El Monte Flores gang.[18] After recounting Witness No. 15's testimony,

---

[18] During his closing argument, Palma's counsel also relied on Witness No. 15's testimony to argue that the El Monte Flores gang committed the murders.

36

defendant's counsel told the jury, "so there's no indication yet during the build-up of this conspiracy as alleged by the People that Sangra was even involved in this matter." Consistent with this argument, but contrary to defendant's current assertion, during closing argument defendant's counsel explained to jurors why they *should* find Witness No. 15 *credible*, stating: "You just can't help but like a gentleman . . . [who has] spent most of his time in prison who has lost a niece, nephew, and a brother. He had no grudge. . . . He's been involved in the system enough to know that you can't lie yourself out of the system anymore. You can't lie when you were on the stand." Witness No. 14 also supported defendant's theory, by identifying Maciel as a member of the El Monte Flores gang and testifying that, on the evening of April 22, Palma said he was going to "take care of some business" *for Maciel*. The witness did not identify Palma as a member of the Sangra gang, and he testified that he was in no way identifying defendant. Indeed, during closing argument, defendant's counsel relied on Witness No. 14, stressing that the witness had not identified defendant and stating that the witness was credible because he "ha[d] nothing to beef about." Thus, defendant fails to show any way in which pretrial nondisclosure hampered development of his theory that members of the El Monte Flores gang committed the murders.[19]

Finally, defendant errs in asserting that we must reverse because the trial court, in March 1996, ordered that the addresses of the "stranger" witnesses and of Witness No. 13 be "permanently" undisclosed. As already explained, that information was "*inconsequential* to the defendant's right to a fair trial under the

---

[19] Again, had further disclosure been necessary to develop this defense, defendant could simply have sought amendment of the protective order, in accordance with the trial court's invitation. He did not.

facts presented. [Citations.]"[20] (*Alvarado*, *supra*, 23 Cal.4th at p. 1142.) For all of these reasons, defendant's constitutional claim fails. (See *People v. Lopez* (1963) 60 Cal.2d 223, 246-247 [protective order authorizing prosecution to withhold identities of witnesses until 24 hours before they testified did not deprive the defendant of a fair trial].)

### 3. Alleged Violation of Work Product Protection

Defendant asserts the trial court, by "requir[ing]" his counsel to interview the protected witnesses "in the presence of the prosecutor" and authorizing any party to memorialize the interviews, violated his counsel's work product privilege. According to defendant, "[t]he questions defense counsel . . . asked of prospective prosecution witnesses necessarily revealed the very substance of the attorney's strategies with respect to the witnesses, which information is protected under the constitutionally mandated work product privilege of a criminal defense attorney." At trial, defendant asserts, the prosecution "used the fruits of" this work product violation "to bolster the testimony of [its] witnesses," "to deter impeachment by the defense," and "to falsely insinuate that the defense had been afforded a fair and independent opportunity to investigate the case." Defendant insists that this use by the prosecution of defense counsel's interviews prejudiced his case and requires reversal.

For several reasons, defendant's argument fails. Procedurally, defendant forfeited it by failing to raise it in the trial court. In his briefs, defendant cites nothing in the record indicating that his counsel (or any codefendant's counsel)

---

[20] Moreover, during the prosecution's direct examination at trial, Witnesses Nos. 8 and 9, who were neighbors of the victims, gave their addresses on the date of the murders. Referring to a diagram, the witnesses explained precisely where they were when they made their observations and the locations of the people and vehicles they observed.

38

objected that the prosecution's attendance at defense counsel's interviews violated counsel's work product privilege, and our own search of the record reveals no such objection. Nor did defendant's counsel object at trial when, during his examination of some of the witnesses, the prosecution mentioned defense counsel's interviews. Under the circumstances, defendant may not now assert a violation of his counsel's work product privilege as a ground for reversal. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 354; *People v. Combs* (2004) 34 Cal.4th 821, 862.)

On the merits, defendant's argument fails for one simple reason: the trial court did not, as defendant asserts, mandate the prosecution's attendance at the interviews. Rather, as explained above, the trial court ruled that the prosecution could attend a particular interview *if the witness requested the prosecution's attendance.* As defendant concedes, although a criminal defendant may ask witnesses to give interviews, witnesses have no legal obligation to grant that request; they may decline to speak with a defendant. (*Reid v. Superior Court* (1997) 55 Cal.App.4th 1326, 1337, fn. 4; *People v. Pitts* (1990) 223 Cal.App.3d 606, 872; *Walker v. Superior Court* (1957) 155 Cal.App.2d 134, 139-140.) It therefore follows that a witness, short of declining a request altogether, may instead place conditions on the interview, such as insisting on the prosecution's attendance. The trial court's order did no more than recognize this power. It was not, as defendant erroneously asserts, "tantamount to advice not to speak to the defense, or at least to request the presence of the prosecutor or an investigator." Thus, to the extent the prosecution, at the witnesses' request, attended interviews conducted by defense counsel, there was no violation of the work product privilege.[21]

---

**21** The record does not contain the interviews in question or otherwise indicate how many of the protected witnesses defendant's counsel interviewed.

39

Finally, even were defendant able to assert and establish a violation of counsel's privilege, reversal would be unwarranted. As noted above, the only prejudice defendant alleges is that the prosecution "used the fruits of" this asserted violation "to bolster the testimony of" Witnesses Nos. 14 and 16, "to deter" his impeachment of these witnesses, and "to falsely insinuate" that he had had "a fair and independent opportunity to investigate the case." This was accomplished, defendant argues, by eliciting testimony from the witnesses that defense counsel had interviewed them before trial and that their trial testimony was consistent with their statements during the earlier interviews with defense counsel. However, as explained above, during closing argument, defendant's counsel *relied on* Witness No. 14, stressing that he had not identified defendant and stating that the witness was credible because he "ha[d] nothing to beef about." As also explained above, at trial, defendant's counsel and counsel for Palma thoroughly attacked Witness No. 16's credibility, stressing that he was a drug user and gang member, that he had lied to police, and that he had several motives for testifying in the prosecution's favor. Thus, the record shows that any work product privilege violation was harmless and would not entitle defendant to reversal.[22] (See *People v. Coddington* (2000) 23 Cal.4th 529, 606; *People v. Collie* (1981) 30 Cal.3d 43, 60-61.)

### 4. Alleged Nonreciprocal Discovery

Defendant argues the trial court's protective order impermissibly provided the prosecution with nonreciprocal discovery benefits. He first asserts that, by

---

[22] Given this conclusion, we need not determine whether, as defendant asserts, the prosecution's access to his counsel's interviews implicated the work product privilege because counsel's questions to the witnesses "necessarily revealed the very substance of the [his] strategies." (See *Coito v. Superior Court* (2012) 54 Cal.4th 480.)

authorizing the prosecution to attend, record and transcribe his counsel's interviews with the prosecution's witnesses (*ante*, at p. 14), the trial court "effectively required" him to provide the prosecution with discovery to which it would not ordinarily be entitled under the reciprocal discovery statutes, i.e., "statements [the defense] obtained from prosecution witnesses that it [might] use to refute the prosecution's case during cross-examination." Defendant then asserts that, by granting this discovery to the prosecution "but not providing [him] with a reciprocal right, the trial court upset the 'balance of forces between the accused and [the] accuser,' in violation of [his] right to due process under the Fourteenth Amendment."

For several reasons, defendant's argument fails. Initially, defendant's argument again overlooks the fact that, under the trial court's order, the prosecution could attend defendant's interview of a protected witness only if the witness requested the prosecution's attendance. Because, as explained above, the witnesses had a right, independent of the court's order, to refuse to talk with defendant unless the prosecution was present, the trial court's order did not "effectively require[]" defendant to disclose statements he obtained from the prosecution's witnesses.

Moreover, even were defendant correct regarding the effect of the court's order, reversal would not be required. As defendant asserts, the due process clause, though having "little to say about the amount of discovery" to which a criminal defendant is entitled, " 'does speak to the *balance of forces* between the accused and his accuser.' [Citation.]" (*Izzazaga v. Superior Court* (1991) 54 Cal.3d 356, 372-373.) However, as we have explained, because the concern of the due process clause is "the right of a defendant to a fair trial," the focus of the reciprocity inquiry under the due process clause is whether any lack of reciprocity "interferes with the defendant's ability to secure a fair trial.' [Citation.]" (*People*

41

*v. Hansel* (1992) 1 Cal.4th 1211, 1221, quoting *Wardius v. Oregon* (1973) 412 U.S. 470, 474, fn. 6.) Thus, "mere repetition of the word 'reciprocity' is not enough to show that [a defendant's] right to a fair hearing [has been] violated." (*Hansel*, *supra*, at p. 1221.) The inquiry is not whether "the procedures available to the defendant . . . precisely mirror[ed] those available to the prosecution," but whether the defendant received "a full and fair opportunity to present" a defense and whether the rules at issue "tilt[ed] the balance toward the state to any significant degree." (*Id.* at p. 1222.) To the extent, if any, that the order resulted in a lack of reciprocity, it did not compromise defendant's ability to present his defense or tilt the balance toward the state to any significant degree. As explained above, the court allowed defendant to interview the protected witnesses. Nothing prevented him from asking the witnesses during those interviews what they had told the prosecution. Moreover, for reasons already set forth, the nondisclosure of the witnesses' identities did not, as defendant asserts, "preclude[]" him "from investigating critical avenues of investigation." Finally, to the extent there was any nonreciprocity, the prosecution made "a strong showing of state interests" to justify the trial court's order. (*Wardius*, *supra*, at p. 475.) Defendant's nonreciprocity claim therefore fails.

### 5. *Lack of Notice and Opportunity to Participate*

Defendant next argues the trial court erred by conducting a series of ex parte hearings pursuant to section 1054.7 regarding the nondisclosure of the witnesses' identities. According to defendant, nothing in section 1054.7 authorized the court to proceed without providing him notice and an opportunity to be heard. Moreover, defendant asserts, in so proceeding, the trial court violated (1) his federal constitutional rights to counsel, to confront witnesses against him, to due process, and to a reliable penalty determination, and (2) "his rights under

42

the California Constitution and the California Penal Code." According to defendant, even if it was necessary to keep him and his counsel from discovering the witnesses' identities, it was not necessary to deprive him of notice and to exclude him from the hearings, because the hearings could have been conducted in his presence and the witnesses could simply have been referred to by number instead of name.

Initially, it appears defendant has forfeited this issue by failing to object and obtain a ruling in the trial court. The first ex parte hearing took place before Judge Bascue on September 29, 1995. Although the record reflects that Logan, Palma, and Torres, and their counsel received advanced notice of this hearing,[23] defendant did not. In fact, he could not have received notice because, as of the hearing date, he was not yet in custody, had not been arraigned, and did not have counsel.[24] However, a few days later, on October 3, 1995, the court appointed counsel for defendant and the prosecution informed defendant's counsel of Judge Bascue's in camera hearing and the resulting redaction order. Defendant's counsel's sole response was to request a copy of the redacted transcript; he did not object to the ex parte nature of Judge Bascue's hearing or the lack of notice.

Indeed, as far as the record discloses, during the many subsequent hearings at which Judge Bascue's redaction order was discussed, defendant's only mention of any objection that Judge Bascue had proceeded ex parte occurred during a trial-setting conference before Judge Dukes on January 30, 1996. During that

---

[23] These defendants and their counsel were present in court on September 28, 1995, when the prosecution explained that the next day, Judge Bascue would be deciding whether to redact the names of certain witnesses from the grand jury transcripts.

[24] Counsel was appointed on October 3, 1995. Defendant was arraigned on October 26, 1995.

conference, the prosecution informed Judge Dukes of "sealed motions" Judge Bascue had recently heard and decided regarding redaction of witness names from transcripts of the December 1995 grand jury proceedings involving Maciel and Ortiz. Logan's counsel, after explaining that he had received "another set of redacted statements," "object[ed] to any proceedings that are done in front of Judge Bascue as being ex parte motions." Defendant's counsel joined this objection. Judge Dukes declined to rule on the objection, explaining that Judge Czuleger would be taking over the case and that counsel could make their objections "at that time."

When the parties first appeared before Judge Czuleger a week later, defendant did not renew his objections to Judge Bascue's order or ask Judge Czuleger to rule on its validity. Instead, after Judge Czuleger announced that the prosecution would have "to make . . . a new showing" on the issue, defendant's counsel, in the course of requesting notice of and an opportunity to be present for any new hearing, merely mentioned in passing that Judge Bascue had proceeded ex parte. Nor did defendant or his counsel raise these objections to Judge Bascue's order at any other time. Because defendant failed to pursue and obtain a ruling on these objections, he may not raise them on appeal.[25] (See *People v.*

---

[25] Another pretrial ex parte hearing may have taken place before Judge Bascue in October 1995. In several discovery-related filings, the prosecution stated that, on October 19, 1995, it had "moved in camera" to supplement Judge Bascue's September 29 order. The record contains an order dated October 19, 1995, regarding nondisclosure of the witnesses' identities, but the order does not mention the holding of a hearing. The terms of the order are consistent with the ruling Judge Bascue announced orally on September 29. The record does not otherwise contain any transcript, filing, or minute order directly related to a hearing on October 19. Moreover, accompanying one of the prosecution's discovery-related filings was a declaration from the prosecutor stating that, on October 19, 1995, Judge Bascue issued "supplemental orders" regarding redaction.

*(footnote continued on next page)*

44

*Ramirez* (2006) 39 Cal.4th 398, 450 [defendant forfeited issue by failing, despite court's invitation to resolve it at a later hearing, to press for a ruling]; *People v. Danielson* (1992) 3 Cal.4th 691, 729 [defendant forfeited issue by failing to renew or request a ruling on his earlier objection].)

Another ex parte hearing took place on November 7, 1995, before Judge Dukes. Defendant received advanced notice of this hearing in several ways. First, on November 1, the prosecution filed and served on defense counsel a notice that, on November 7, it would ask the court to hold an "in camera hearing" to determine whether to extend Judge Bascue's redaction orders. Second, at the scheduled November 7 hearing, with defense counsel present, Judge Dukes began by noting the prosecution's request and the prosecution responded that it was prepared to proceed with the in camera hearing that day. Judge Dukes then invited comment on whether section 1054.7 allowed an in camera hearing. The only response of defendant's counsel was to request that the prosecution give the court a list of its likely witnesses and that the court not impose discovery restrictions that prevented the defense from preparing its case. Neither defendant's counsel nor any other defense counsel objected that the hearing should not be held ex parte or that they received insufficient notice of the hearing.

After hearing from defense counsel, Judge Dukes announced that court was "in recess" and held a relatively brief in camera hearing without defense counsel. Judge Dukes then reconvened proceedings in open court with defendants and their

*(footnote continued from previous page)*

The declaration did not indicate that there was an in camera or ex parte hearing on that date. In any event, the forfeiture analysis that applies to Judge Bascue's September 29 order applies equally to any order resulting from a hearing on October 19.

counsel present. He began by announcing that, based on an "in camera" hearing he had "conducted . . . pursuant to [section] 1054.7," he was ordering continued redaction of the witnesses' identities. He then had a series of exchanges with defense counsel regarding the terms of his order and their objections to it. None of the objections related to defense counsel's exclusion from the in camera hearing or a lack of notice.[26] After responding to the objections, Judge Dukes invited defense counsel to invoke "the writ process" should they disagree with his order. No writ petition was ever filed. Having received advanced notice of the ex parte hearing, and having failed to object either before or after the hearing, defendant may not now claim that Judge Dukes prejudicially erred in holding an ex parte hearing. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1316 (*Carasi*); *People v. Jennings* (1991) 53 Cal.3d 334, 383.)

Another ex parte hearing occurred on March 18, 1996, before Judge Czuleger. Again, defendant had ample advanced notice of this hearing. On February 7, Judge Czuleger announced in open court, with defendant's counsel present, that he would require the prosecution to make a new showing as to the need for nondisclosure. Defendant's counsel responded: "[I]f [the prosecution] has a new hearing, de novo, can defense counsel be notified, and then all be present and the court makes a decision. At least defense counsel should be present? [¶] The last time we went before the grand jury, as well as before Judge

_____

**26** Logan's counsel first stated that he "disagree[d]" with the court's ruling, and asserted that defense counsel were "entitled to have names and addresses." Palma's counsel then objected that the order was "overly restrictive," "unnecesar[ily] burdensome," and "interfere[d] with the [defense's] ability to conduct its investigations." Defendant's counsel then stated that he "join[ed] in" these objections and added that "interviewing witnesses from a conventional box where you open the curtain" was "onerous." Torres's counsel then objected that the order interfered with Torres's right to confront and cross-examine witnesses.

46

Bascue, these are all done in camera.  These are all done ex parte.  And I think now that we have all seen the transcript, I think we have a right to at least be here and the court make a decision why we should not be here.  If our clients need to be excluded, that's fine." Judge Czuleger replied:  "What I was going to do is set it down for pretrial conference in a few weeks from now and at that time pretrial conference, set it for the in camera hearing, and hopefully I will have a better idea where everything is.  My suggestion is the first week of March." After hearing from counsel regarding proposed dates, Judge Czuleger scheduled a pretrial conference for March 6.

On March 6, 1996, Judge Czuleger began the pretrial conference by talking about possible hearing dates for a discovery motion that Logan had filed and for a motion members of the media had filed to inspect grand jury records.  After Judge Czuleger indicated that March 22 was an option, the prosecution stated:  "[W]hat we are discussing for motions at that point is between now and that date we would have the in camera hearing. . . .  There are two other in camera proceedings I want you to review and my understanding is that on that date what we would basically be ruling on is your decision regarding the redaction and so forth."  Following a discussion with the prosecution, Judge Czuleger scheduled an in camera hearing for March 18 and a follow-up hearing with all counsel for March 22. At the end of the pretrial hearing, Ortiz's counsel stated:  "I take it you will not be asking us to appear on the 18th for the in camera?" The court replied:  "No. . . . It will be in camera."  Defendant's counsel did not object when the court scheduled the in camera hearing and announced that defense counsel could not attend.

As scheduled, Judge Czuleger held the in camera hearing on March 18.  On March 29, he then took up the matter before the prosecution and all defense

47

counsel.[27]   He began by explaining that he had held "an in camera hearing" on March 18 and that, based on the testimony he had heard during that hearing, he intended to order nondisclosure of the witnesses' identities.  He later explained that, in making his ruling, he had not considered anything that had happened during the in camera hearings before Judge Bascue and Judge Dukes.  Finally, he offered defense counsel an opportunity to respond.  Although raising various objections, neither defendant's counsel nor any other defense counsel objected that they had received insufficient notice or that Judge Czuleger had erred in proceeding ex parte.[28]

On this record, it appears that defendant forfeited his right to complain on appeal that Judge Czuleger erred in proceeding ex parte or that he received inadequate notice.  Although defendant's counsel at one point asked for notice and an opportunity to attend the hearing, he did not renew his request or lodge an objection when the court, without addressing the issue and in counsel's presence, first scheduled an ex parte hearing and later announced it had held an ex parte hearing, gave its ruling, and invited defense counsel to comment.  Moreover, at no point did defendant's counsel identify any basis for objecting to ex parte

---

[27]   Judge Czuleger had earlier rescheduled the March 22 hearing for March 29.
[28]   Logan's counsel complained that the order would prevent him from discussing discovered information with his client.  Maciel's counsel complained that the order would prevent him from asking the "stranger" witnesses where they were when they made their alleged observations and that certain pages of the grand jury transcript had been removed entirely.  Ortiz's counsel objected to the provision in the order that allowed the prosecution to be present during witness interviews by defense counsel.  Palma's counsel objected "to any limitation on discovery" and complained that the order interfered with the attorney-client relationship insofar as it limited counsel's ability to discuss the case with his client.  Defendant's counsel joined in this objection, but otherwise said nothing about Judge Czuleger's proposed order.

48

proceedings.  Given these circumstances, it is doubtful that defendant should be allowed to complain about an alleged lack of notice and an opportunity to be heard.

In any event, even had defendant preserved the issue for appeal, reversal would be unwarranted.  As defendant asserts, we have held that ex parte proceedings generally are "disfavored" because they typically result in " 'a shortage of factual and legal contentions.  Not only are facts and law from the defendant lacking, but the moving party's own presentation is often abbreviated because no challenge from the defendant is anticipated at this point in the proceeding.  The deficiency is frequently crucial, as reasonably adequate factual and legal contentions from diverse perspectives can be essential to the court's initial decision . . . .' [Citation.]" (*People v. Ayala* (2000) 24 Cal.4th 243, 262 (*Ayala*).)  Although ex parte proceedings are permissible if "compelling reasons justify them" (*id.* at p. 263), defendant may be correct that, at a minimum, the trial court could have addressed the prosecution's concern for the witnesses' safety by identifying the witnesses by number instead of by name – as they were identified in the redacted grand jury transcripts – and allowing defense counsel to attend.

However, contrary to defendant's assertion, even where a court errs in proceeding ex parte, the error is not reversible per se.  For example, in *Ayala*, where the defendant asserted that the prosecution had impermissibly excused prospective jurors on the basis of race or ethnicity, we held that, although the trial court had erred in allowing the prosecution to state its reasons for excusing the jurors ex parte and outside the defendant's presence, the error was harmless under the standards for judging both state law errors (reasonable likelihood of a more favorable outcome) and errors under the federal Constitution (harmless beyond a reasonable doubt).  (*Ayala*, *supra*, 24 Cal.4th at pp. 259, 264.)  Such error, we explained, "whether or not of federal constitutional dimension," "is not structural;

49

it is an error in the conduct of the trial that requires us to consider the record.  In other words, the error does not fall within the category of those that the law recognizes as reversible per se, i.e., 'affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself,' ' "transcend[ing] the criminal process" ' and 'defy[ing] analysis by "harmless-error" standards.' [Citation.]" (*Id.* at p. 266 fn. 3.)  After reviewing the record of the ex parte proceedings, we concluded in *Ayala* that the prosecution had not excused the jurors for constitutionally impermissible reasons.  (*Id.* at p. 266.)  In reaching this conclusion, we rejected the defendant's argument that the error was prejudicial because "his lack of opportunity to rebut the prosecution's justifications for the challenges resulted in an incomplete record." (*Id.* at p. 267.)  We reasoned that, although a defendant's participation in such a hearing might "in the abstract" make a difference in the ultimate ruling, the record in the case showed that "defense counsel could not have argued anything substantial that would have changed the court's rulings.  Accordingly, the error was harmless." (*Id.* at p. 268.)

Here, too, the record shows that any error in proceeding ex parte was harmless, whether we apply the test for state law error or for error under the federal Constitution.  At the first pretrial ex parte hearing on September 29, 1995, before Judge Bascue, a homicide investigator from the Los Angeles County Sheriff's Department testified, among other things, that:  (1) the investigation had shown that Sangra gang members had committed one or more of the murders at the Mexican Mafia's behest; (2) both the Sangra gang and the Mexican Mafia have a code against testifying and, to enforce that code, have been willing to kill or harm people who might cooperate with police; (3) both defendant and one of the Mexican Mafia members who ordered the hit were at large; (4) Sangra gang members had told the investigator they would kill anyone who testified in the case; (5) before acting against a witness, gang members look for validation, i.e.,

official paperwork, such as a police report or transcript, that documents a person's name with a statement the person has made to authorities or in court; and (6) were the identities of the witnesses' in question and their grand jury testimony to become known, the witnesses' lives would be in danger because Sangra gang members would try to prevent them from testifying.

At the ex parte hearing before Judge Dukes on November 7, 1995, two law enforcement officers from the Los Angeles County Sheriff's Department gave similar testimony. One, a detective with the homicide division who had investigated the murder scene, testified that: (1) the Mexican Mafia had used the Sangra gang to carry out one or more of the killings; (2) an involved member of the Mexican Mafia was still at large; (3) Witness No. 13 had come forward with information and said she was fearful for the safety of herself and her family; (4) during a search of Ortiz's house conducted while Ortiz was only an uncharged suspect and still at large, police had found a transcript of testimony that a protected witness had given during a preliminary hearing in an unrelated murder case against three Sangra gang members and a letter from one of the defendants in that case referencing the fact that the witness was testifying against the Sangra gang members; (5) police had information that witnesses in other cases against either Sangra or Mexican Mafia members had been killed, one about a week before he was to return to court and another shortly after being identified through court records; and (6) almost everyone the detective had spoken with regarding defendant's case had indicated they were fearful for their own safety and for the safety of their families as a result of talking to police. The other witness, who was a member of a task force investigating the Mexican Mafia, testified that: (1) based on debriefing of several Mexican Mafia associates, authorities had stopped 40 contract murders ordered by the Mexican Mafia, many for people referred to as snitches or informants; (2) an involved member of the Mexican Mafia was still at

51

large; (3) if the Mexican Mafia had ordered one of the killings, any witness associated with the case was in imminent danger of being hit by the Mexican Mafia to prevent their testimony; (4) if bystander witnesses names became known to the general gang community, their lives "wouldn't be worth a nickel" and, "without question," they would be in danger; and (5) redaction of a witness's name will "enhance[]" the witness's "ability to stay alive" even if it can be determined from the testimony who the witness is, because redaction will hamper the Mexican Mafia in proving the witness testified.

At the ex parte hearing on March 18, 1996, before Judge Czuleger, the homicide investigator who testified at the ex parte hearing before Judge Bascue largely repeated his earlier testimony.[29]  He added that, based on what he had learned while investigating this case – including the murder of an individual who had testified against the Sangra gang; the recent murder of Angel Carranza, which police had been told "may in fact [have been] because of his involvement in this case; and the violence that the Sangra street gang is reputed to have and has proven to have in several cases" – the lives of the witnesses in question and those of their family members would be in "grave danger" were the witnesses' identities to become known.  Judge Czuleger heard from two other witnesses at the March 18 hearing:  (1) a second homicide investigator from the Los Angeles County Sheriff's Department, who testified that an informant had told him Carranza had been murdered because he was considered a "rat" and because of his knowledge and information about the case; and (2) a sergeant with the Los Angeles County Sheriff's Department assigned to investigate prison gangs, who testified that the Mexican Mafia had sponsored the murders in this case and that the lives of the

---

[29]    The investigator did not repeat his earlier testimony that defendant and a Mexican Mafia member who ordered the hit were still at large.

witnesses in the case would be in danger were their identities to become known because the Mexican Mafia would use "any means necessary" to prevent them from testifying, including killing them and/or members of their families.

It is clear from this record that the testimony each judge heard at the ex parte hearings amply supported their respective redaction orders. It is also clear that neither defendant nor his counsel could have argued anything substantial that would have changed the court's rulings. Indeed, even now, despite knowing the witnesses' identities and having access to the transcripts of the ex parte hearings, defendant suggests no way in which he could have undermined the prosecution's substantial showing or affected the court's rulings. Accordingly, even were defendant correct that the ex parte proceedings constituted error, the error was harmless under any standard.

Any alleged error was harmless for another reason: the court's ex parte orders did not hamper defendant's ability to conduct a defense. As explained earlier, despite the discovery limitations, defendant's counsel thoroughly cross-examined those trial witnesses whose creditability was relevant to defendant's defense. As also explained earlier, although the defense conducted little or no cross-examination of the "stranger" witnesses, because (1) these witnesses testified only briefly about their observations on the day of the murders, (2) none of them identified defendant, and (3) one testified that none of the people she saw was in court, the discovery limitations did little, if anything, to impact defendant's case. Thus, even had the court permitted defendant or his counsel to participate in the ex parte hearings, and even had that participation resulted in disclosure of the witnesses' identities, the outcome of defendant's trial would have been no different. For these reasons, defendant's claim fails.

## B. Gang Evidence

Defendant next argues the trial court prejudicially erred in permitting the prosecution to rely at trial on certain gang-related evidence. Specifically, he asserts the trial court erred in admitting the following: (1) one photograph of the gang tattoos on his back (exhibit No. 57); (2) seven photographs of the gang tattoos on Palma's body (exhibits Nos. 50-56); (3) two photographs of urban gang graffiti (exhibits Nos. 72, 73); (4) eleven photographs showing various Sangra gang members, some of whom were brandishing weapons or "throwing" gang signs (exhibits Nos. 3, 7, 8, 12A (containing four photographs), 58, 78, 79, 93); and (5) two pieces of paper with the word "Sangra" written in calligraphy, one bearing the notation "touch this and you die" (exhibits Nos. 60, 92). Defendant also complains about two exhibits that, though not admitted into evidence, the prosecution used in examining witnesses at trial: (1) a district attorney's notice of determination that Sangra is a criminal street gang (marked as exhibit No. 71); and (2) a drawing of a drive-by shooting recovered during a search of Ortiz's residence (marked as exhibit No. 91). Finally, defendant appears to complain that the trial court permitted the prosecution during opening statement to show to the jury and discuss a photograph showing other Sangra gang members, on which "Sangra gang kills" was hand-written at the top and "187" — the Penal Code section for murder — was hand-written across someone's chest. According to defendant, under Evidence Code sections 352 and 1101, the trial court should have barred the prosecution from using this evidence at trial. Moreover, defendant asserts, the prosecution's use of this evidence violated his constitutional rights to due process,

a fair trial, and a reliable determination of guilt and penalty. For reasons set forth below, defendant's claims fail.[30]

### 1. Evidence Code section 1101

With certain exceptions not relevant here, Evidence Code section 1101, subdivision (a), provides that "evidence of a person's character" – whether in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct – "is inadmissible when offered to prove [the person's] conduct on a specified occasion." This prohibition, however, does not preclude "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact . . . other than [the person's] disposition to commit such an act," including "motive, opportunity, intent, preparation, [or] plan." (Evid. Code, § 1101, subd. (b).)

---

[30] Procedurally, the People assert that, by failing to object in the trial court "to the majority" of the gang-related evidence he now challenges, defendant "almost entirely forfeited" his right to challenge on appeal the prosecution's use of this evidence. According to the People, the record shows that defendant "objected specifically" only to the tattoo photographs, a photograph the trial court excluded, and the graffiti pictures from defendant's scrapbook. His "objection to 'others' was not [sufficiently] specific" and, although the court "particularly warned counsel to make a more specific objection during trial regarding the photographs," "[c]ounsel never pursued a ruling at trial." In response, defendant insists that his counsel's objections "encompassed all of the gang-related exhibits" in question.

The record makes it very difficult to assess the prosecution's forfeiture claim. In their arguments to the court about admissibility, the parties referred to the exhibits only by general description because, despite the court's request, the parties did not mark the exhibits before making their arguments. Given the ambiguities in the record, we assume defendant preserved his right to raise these claims and proceed to the merits. (See *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 ["Because the question whether defendants have preserved their right to raise this issue on appeal is close and difficult, we assume [they] have preserved their right, and proceed to the merits."].)

Defendant asserts "the only purported probative value" of the gang evidence he now challenges was to establish that he and Palma were Sangra gang members and that Sangra "was a 'criminal street gang' within the meaning of the [alleged] gang enhancement" under section 186.22. However, defendant continues, neither of these propositions "was in dispute" because both his counsel and Palma's offered to stipulate not only to the defendants' Sangra gang membership, but also "to the 'exact language' of the gang enhancement allegation," thus " 'reliev[ing] the burden of the people of proving that allegation.' " Accordingly, defendant asserts, the evidence "had no probative value as to the critical question of whether [he] had any involvement in the charged offenses" and was offered by the prosecution to convince the jury he committed the charged crimes based on his "propensity to commit" such crimes.

Initially, it appears that defendant's argument under Evidence Code section 1101 is not cognizable on appeal because he failed to object on this basis at trial. Evidence Code section 353, subdivision (a), provides that a court may not reverse a judgment based on error in admitting evidence unless "an objection to or a motion to exclude or to strike the evidence . . . was timely made and so stated as to make clear the specific ground of the objection or motion." "In accordance with this statute, we have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable. [Citations.]" (*People v. Seijas* (2005) 36 Cal.4th 291, 302.) "Although no 'particular form of objection' is required, the objection must 'fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.' [Citation.]" (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 354.) Here, in objecting to the gang-related evidence, defense counsel neither

56

mentioned Evidence Code section 1101 nor asserted that the evidence constituted inadmissible character evidence.  Defense counsel did make various *other* objections to some of the evidence in question, including that it was irrelevant, cumulative, lacking in foundation, or prejudicial.  However, these objections were insufficient to preserve for appeal the claim that the evidence was inadmissible under Evidence Code section 1101, subdivision (a).  (*People v. Doolin* (2009) 45 Cal.4th 390, 437 [trial objection that evidence "was irrelevant and unduly prejudicial under Evidence Code section 352" was insufficient to preserve for appeal claim under Evidence Code section 1101]; *People v. Demetrulias* (2006) 39 Cal.4th 1, 19-21 [trial objection that evidence was irrelevant, speculative and lacked foundation was insufficient to preserve for appeal claim under Evidence Code section 1101]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1117 [relevance objection at trial was insufficient to preserve for appeal objection that testimony was inadmissible character evidence]).

In any event, defendant's claim also fails on the merits.  As a general matter, "the prosecution may not be compelled to accept a stipulation where the effect would be to deprive the state's case of its persuasiveness and forcefulness." (*People v. Streeter* (2012) 54 Cal.4th 205, 238.) Here, defendant is simply incorrect in asserting that "the only purported probative value" of the gang evidence he now challenges was to establish the gang enhancement.  As previously explained, the prosecution's theory was that the Mexican Mafia had directed the Sangra gang to kill Dido Moreno because he had dropped out of the Mexican Mafia, and that Sangra gang members – including defendant and Palma – obeyed that order because of their own gang allegiances.  Given this theory, evidence of defendant's and Palma's membership in and level of commitment to Sangra – including their Sangra tattoos and pictures showing them with other Sangra gang members, evidence of Palma's affiliation with and allegiance to the

Mexican Mafia – including some of his other tattoos, and evidence showing the workings and activities of Sangra and the close connections among its members was relevant to both motive and identity. Thus, putting aside the gang enhancement, because the gang-related evidence at issue was "relevant to prove some fact . . . other than [defendant's] disposition to commit" crimes (Evid. Code, § 1101, subd. (b)), Evidence Code section 1101, subdivision (a), did not preclude its admission.[31] (*People v. Williams* (1997) 16 Cal.4th 153, 193-194 [gang evidence admissible to show motive and identity].)

Moreover, contrary to defendant's assertion, the record does not clearly show that defendant's counsel and Palma's counsel offered to stipulate "to the 'exact language' of" the entire gang enhancement. As it does now, at the time of the alleged crimes, section 186.22, subdivision (b)(1), prescribed an enhanced penalty for "any person convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." For purposes of this section, a "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [specified] criminal acts . . . , having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) As used in

---

[31] Defendant's offer to stipulate that he was a Sangra gang member did not render proof of his membership in and commitment to Sangra irrelevant. As part of his defense at trial, defendant attempted to persuade the jury that, at the time of the murders, he either had separated himself from Sangra and was no longer active in the gang or that he was in the process of separating himself from Sangra and becoming inactive.

this definition, a " 'pattern of criminal gang activity' " meant "the commission, attempted commission, or solicitation of two or more of [certain specified] offenses, provided at least one of those offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses are committed on separate occasions, or by two or more persons[.]" (§ 186.22, subd. (e), as amended by Stats. 1994, ch. 451, § 1, p. 2439.)

As relevant to this issue, the record shows the following: On October 21, 1996, while discussing the gang-related evidence, defendant's counsel offered to stipulate that defendant "is a Sangra street gang member." Palma's counsel then offered to stipulate that Palma was a Sangra gang member and that Sangra "is a violent street gang for the purposes of proving up the allegation." Later, after the prosecution responded that the offered stipulations did not include everything it needed to establish regarding the alleged gang enhancement, Palma's counsel indicated his willingness to stipulate that Sangra "is a street gang pursuant to the two allegations." Defendant's counsel then added: "I believe that [Palma's counsel] recited the exact allegation in the information and in the complaint that was filed against the individuals and that's what we're willing to stipulate to."

Contrary to defendant's current assertion, this record does not clearly show that defendant's counsel and Palma's offered to stipulate to the "exact language" of the entire alleged gang enhancement. The proposed stipulation that defendant and Palma were Sangra gang members would have done little, if anything, for the prosecution; under the operative statutory language, as set forth above, that fact was neither necessary nor sufficient to establish any element of the gang enhancement. (See *People v. Valdez* (1997) 58 Cal.App.4th 494, 505 ["gang membership is not an element" of gang enhancement].) Moreover, although, read in context, the proposed stipulation of Palma's counsel – which defendant's counsel apparently joined – that Sangra was "a street gang for the purposes of

59

proving up the [gang enhancement] allegation" *might arguably* have established that Sangra was a "*criminal* street gang" within the meaning of the enhancement statute, it would not have established other required elements of the enhancement, i.e., that defendant and Palma committed the murders (1) "for the benefit of, at the direction of, or in association with" a criminal street gang, (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22(b)(1).) Thus, the record does not support the claim that defendant's counsel and Palma's offered to stipulate to the exact language of the alleged enhancement.

Nor does defendant persuasively demonstrate otherwise by citing his trial counsel's statement, "I believe that [Palma's counsel] recited the exact allegation in the information and in the complaint that was filed against the individuals and that's what we're willing to stipulate to." As the preceding discussion demonstrates, Palma's counsel neither recited nor offered to stipulate to "the exact [gang enhancement] allegation"; at most, he offered to stipulate to one element – the "criminal street gang" element – of that allegation. Thus, the prosecution would still have had to prove that Palma committed the murders "for the benefit of, at the direction of, or in association with" a criminal street gang "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22(b)(1).) Insofar as defendant now asserts that his counsel's comment was an offer to go further, the comment was too "ambiguous in form" (*People v. Szeto* (1981) 29 Cal.3d 20, 29) to establish that defendant offered to stipulate to *every* element of the alleged enhancement. As noted, the prosecution did not agree to the proffered stipulation. We therefore reject defendant's claim.

## 2. *Evidence Code section 352*

Evidence Code section 352 provides that a court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review a trial court's ruling under this section for abuse of discretion and will reverse a trial court's exercise of discretion to admit evidence "only if 'the probative value of the [evidence] clearly is outweighed by their prejudicial effect.' [Citations.]" (*People v. Carey* (2007) 41 Cal.4th 109, 128.) "Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt." (*People v. Crew* (2003) 31 Cal.4th 822, 842.)

Defendant asserts that, because the prejudicial effect of the gang evidence he now challenges substantially outweighed its probative value, the trial court abused its discretion in admitting it. He first contends the evidence's "only purported probative value" was to show that he and Palma were Sangra gang members and that Sangra was a "criminal street gang" within the meaning of section 186.22. Given defense counsel's proposed stipulations, these propositions were not in dispute. According to defendant, the evidence "had no tendency to prove either motive or intent", and only "slight," "negligible," or "no probative value" regarding the "critical" issue that was in dispute: whether he was involved in the shootings. And, to the extent any of the evidence was relevant to any issue that was genuinely in dispute, the prosecution could have relied on the other, "less inflammatory" gang evidence it presented. Regarding prejudice, defendant asserts there was "a high degree of danger" and "strong likelihood" the evidence would "mislead," "confuse," "inflame," and "frighten" the jurors and lead them to

61

believe that, "because of his association with the gang," he "had the propensity to commit the kind of crimes for which he was on trial." It thus "shifted the focus from the properly admitted testimony and turned the trial into what was essentially an exercise in character assassination and guilt by association," creating the risk the jurors "would decide the case based upon inappropriate considerations" and render a guilty verdict simply to " 'punish' " him for being " 'a person of bad character,' " who had committed, and would again commit, other crimes.

Defendant's argument is unpersuasive. As explained in the preceding section, for several reasons, defense counsel's proposed stipulations did not render the evidence in question irrelevant. Nor did the prosecution's purported ability to establish the disputed matters with the other evidence render the gang evidence irrelevant. (*People v. Scheid* (1997) 16 Cal.4th 1, 16 ["it is immaterial for purposes of determining the relevance of evidence that other evidence may establish the same point"].) Relevant photographs "are admissible even if repetitive of other evidence, provided their probative value is not substantially outweighed by their prejudicial effect." (*People v. Watson* (2008) 43 Cal.4th 652, 684.) As to that proviso, defendant's argument regarding the prejudicial effect of the challenged gang-related evidence fails on the record here, which demonstrates that the prosecution introduced a raft of other gang-related evidence — mostly in the form of testimony — that defendant neither objected to at trial nor challenges on appeal. Given the extensive other evidence of defendant's Sangra gang membership and of Sangra's activities, defendant's claim that the handful of gang-related exhibits he now challenges created "a substantial danger of undue prejudice" within the meaning of Evidence Code section 352 — i.e., the challenged evidence " '*uniquely* tend[ed] to evoke an emotional bias against defendant as an individual' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320, italics added) — is untenable. Defendant's claim under Evidence Code section 352

therefore fails. (See *People v. Wright* (1985) 39 Cal.3d 576, 585 [evidence of heroin in victim's system not unduly prejudicial "[i]n light of the evidence already before the jury" that victim used heroin]; *People v. Mullens* (2004) 119 Cal.App.4th 648, 660 [testimony about kissing child "cannot be viewed as unduly inflammatory in light of the other evidence of lewd behavior"].)

### 3. *Constitutional Claims*

Defendant argues the prosecution's use of the challenged gang-related evidence violated not only his statutory rights, but also his constitutional rights to due process, a fair trial, and a reliable determination of guilt and penalty. He failed to assert these constitutional objections at trial. Because there was no statutory error, his constitutional claims, insofar as they are cognizable on appeal, fail. (*People v. Hawkins* (1995) 10 Cal.4th 920, 952.)

### C. Witnesses' Fear in Testifying

Defendant argues the trial court prejudicially erred in permitting three witnesses – Witness No. 13, Witness No. 16, and David Sandate – to testify about their fear in testifying at trial and about incidents related to that fear. Admission of this evidence, he asserts, fatally infected the trial with unfairness and violated his constitutional rights to due process, a fair trial, and a reliable penalty determination. Moreover, he contends, the prosecution heightened the testimony's prejudicial impact by referring to it during closing argument.

In making his argument, defendant acknowledges that evidence a witness is afraid to testify "may be admissible on the issue of the threatened witness's credibility." As we have explained: " 'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible.' [Citations.] An explanation of the basis for the witness's fear is likewise relevant to the jury's assessment of his or her credibility and is

63

well within the discretion of the trial court. [Citation.] For such evidence to be admissible, there is no requirement to show threats against the witness were made by the defendant personally or the witness's fear of retaliation is 'directly linked' to the defendant. [Citation.]"[32] (*People v. Guerra*, *supra*, 37 Cal.4th at pp. 1141-1142 (*Guerra*).)

Nevertheless, defendant argues, quoting *People v. Yeats* (1984) 150 Cal.App.3d 983, 986 (*Yeats*), such evidence is not admissible unless the prosecution first " 'establish[es] the relevance of the witness's state of mind by demonstrating that the witness's [trial] testimony is inconsistent or otherwise suspect.' " According to defendant, because the prosecution failed to make this required showing as to each of the three witnesses, the evidence was inadmissible.

Defendant's argument fails in light of our recent decision in *People v. Mendoza* (2011) 52 Cal.4th 1056, 1086 (*Mendoza*), which rejected the view that evidence of a witness's fear in testifying is inadmissible unless the witness's trial testimony is inconsistent with a prior statement. As we explained, "evidence that a witness testifies despite fear is important to fully evaluating his or her credibility. [Citation.] The logic of this rationale does not hinge on whether the witness gave prior inconsistent testimony." (*Ibid*.) Thus, in order to introduce evidence of the witnesses' fear, the prosecution was not required to show that their testimony was inconsistent with prior statements or otherwise suspect.[33]

---

**32** Evidence of efforts to intimidate a witness is also admissible to show a defendant's consciousness of guilt if there is evidence the defendant authorized or acquiesced in the efforts. (*People v. Hannon* (1977) 19 Cal.3d 588, 598-600.) The People do not argue the evidence at issue was admissible on this basis.

**33** We disapprove *People v. Yeats*, *supra*, 150 Cal.App.3d 983, 986, to the extent it is inconsistent with this analysis. In announcing its rule, the court in *Yeats* relied solely on *People v. Brooks* (1979) 88 Cal.App.3d 180. (*Yeats*, *supra*, at p. 986.) In *Mendoza*, we disapproved *Brooks*, explaining that it "cited no

*(footnote continued on next page)*

In any event, defendant errs in asserting that Witness No. 13's trial testimony gave rise to no credibility issues to which the evidence of her fear was relevant. In many instances, Witness No. 13 testified she could not remember details she had earlier given police. Contrary to defendant's assertion, she did not, "in every [such] instance . . . affirm[] her prior statements to investigators and her preliminary hearing testimony when the prosecut[ion] refreshed her recollection by reading them to her." At least five times during direct examination, after testifying she did not recall a prior statement, she added, "if that's what's there then that's what I said," or words to that effect. [34] These responses hardly constitute affirmations of her prior statements. Moreover, at many points during her testimony, Witness No. 13 answered the prosecution's questions, not with a

_____

*(footnote continued from previous page)*

authority for the proposition that inconsistent testimony is a prerequisite to the admission of evidence of a third party's threat or a witness's fear" and was "contrary to decisions of this court that have recognized the relevance of such evidence when inconsistent testimony was not at issue" or recanted. (*Mendoza*, *supra*, 52 Cal.4th at p. 1086.)

[34] The quoted statement was Witness No. 13's response after testifying that she did not recall previously stating she saw the words "Nissan" and "Maxima" on the car at her mother's house or that her brother was at the house when Jimmy came back the second time. After testifying she did not recall previously stating that her brother had been on the telephone at her mother's house and had received several pages, she similarly added, "But if it's there then that's what I said." At another point, after testifying she did not remember her prior statement that someone called "Tricky" (i.e., Logan) had arrived at her mother's house with two other people, she added, "That's what's there, that's what I said, but I don't recall." Finally, after testifying she did not recall previously testifying that she had seen a gun in her mother's house and that her mother, upon discovering the gun, had asked her brother to leave, Witness No. 13 added, "If that's what I said, that is what I said."

simple "yes" or a "no," but with a decidedly equivocal, "I believe so" or "I guess."[35]

Based on these answers, when defendant's counsel argued at trial that Witness No. 13 had affirmed her prior testimony — and that the court therefore should not permit the prosecution to play for the jury a tape of her prior statements — the trial court responded: "[W]e must have listened to two different trials because it is like pulling teeth from her and I don't blame her. I can understand — I can't, really understand the terror she's probably living. . . . So many times when — I mean, 'I don't remember' or 'I don't know' that must have been her testimony 40 or 50 times in answer to questions. And then when [the prosecution] would go to the transcript of something, more often than not, the answer is, 'well, if it's there, I guess it's true.' And it was — I mean, if it is testimony left as it is it would be fertile fields for the [defense counsel] to plow in argument. I mean, it's — she never really, rarely acknowledged that, in fact, she had said something and it was almost all of her testimony. It was very little of the testimony that, you know, was straightforward answer. And I don't — you know, I don't know whether she's so frightened that she trying to be deliberately vague. I mean, certainly, she hasn't come in, I don't think, and lied and said something one way before and now is saying something absolutely the opposite. I think she's doing it so many people who get in this situation and they have made some statements and now they're having to repeat it in a very serious situation. We're getting the 'I don't know' answers." Later, after defendant's counsel argued that the witness did not need rehabilitating because "most of her answers were 'I

---

**35**     For example, after playing a tape of one of Witness No. 13's prior statements, the prosecution asked, "Was that your voice on the tape?" Witness No. 13 responded, "I believe so."

believe so,' " the court responded: "This happened a lot, well, if it's there, 'I guess so' or 'I believe so.' There's a lot more to an answer than just the words. There's the body language." "It was difficult to say she was an adverse witness or hostile witness because I think she's anything but that. But, boy, she's sure, and I don't blame her, reluctant. My feeling is that that kind of answer is, basically, it's acquiescing and I think — it is part rehabilitation. In other words, her sort of being fed and her arm's being twisted type of answers I think if there are prior answers that are consistent to which you sort of begrudgingly or half acquiescing to are proper."

Given Witness No. 13's professed inability to remember her previous statements, her equivocal responses to many of the prosecution's questions, and the hesitancy and reluctance she demonstrated in answering the prosecution's questions, the trial court did not abuse its discretion in determining that evidence of her fear in testifying was relevant to the jury's assessment of her credibility. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1287-1290 [evidence of threat to witness admissible given his professed inability at trial to remember prior statements that, while preparing for his testimony earlier that morning, he said he recalled]; *Guerra*, *supra*, 37 Cal.4th at p. 1142 [evidence of witnesses' fear was admissible given their "hesitancy in responding to questions" at trial]; *People v. Avalos* (1984) 37 Cal.3d 216, 232 [testimony regarding witness's fear was admissible given her hesitation in responding when asked whether she saw in the court room the person she had identified in a lineup].)

Defendant also errs in asserting that there were no credibility issues regarding Witness No. 16 to which the evidence of his fear was relevant. During his direct testimony, Witness No. 16 admitted he had received immunity from prosecution for the murders in exchange for his truthful testimony, had initially lied to police when they interviewed him about the case, and had refused to testify

before the grand jury even after receiving immunity. It was apparent that defense counsel would attack Witness No. 16's credibility on cross-examination by suggesting he was a liar and that the promise of immunity was the motive for his testimony favorable to the prosecution. In anticipation of that attack, the prosecution was entitled to show that the witness was willing to testify against defendant and Palma despite his fear of retaliation. (See *Mendoza*, *supra*, 52 Cal.4th at p. 1085 [prosecution may introduce evidence supporting a witness's credibility on direct examination when it "reasonably anticipates a defense attack on the [witness's] credibility"]; *People v. Green* (1980) 27 Cal.3d 1, 19-20 [in anticipation of defense's attack on witness's credibility based on promise he would not be sent to prison for parole violation, prosecution could introduce evidence of witness's fear in testifying].)[36]

Insofar as defendant argues the evidence was inadmissible under Evidence Code section 352 because its potential to cause undue prejudice substantially outweighed its probative value, defendant forfeited this argument by failing to object on this basis at trial. The only objections defendant's counsel raised at trial were that the evidence was irrelevant or lacked foundation, or that the

---

**36** During his testimony, Witness No. 16 expressed "concern" about a photograph (exhibit No. 58) of himself and other Sangra gang members with his face scratched out and "187" — the Penal Code section for murder — written across his chest. Defendant asserts that, because Witness No. 16 testified he never saw the photograph "until the prosecutor showed it to him while he was on the witness stand," "it could not conceivably have had any bearing on his state of mind, or account for any supposed evasiveness or inconsistency in his testimony." However, the witness also testified that the prosecution told him of the picture's existence before he took the stand. Moreover, the photograph was relevant to support the witness's testimony about his fear. In any event, given the other testimony about the photograph, the witness's testimony that the photograph "concern[ed]" him added little to the case.

68

prosecution's questions were leading. Palma's counsel objected at one point that the evidence was "improper, calling for a conclusion." Contrary to defendant's assertion, these objections were insufficient to preserve for appeal the claim that the trial court should have excluded the evidence under Evidence Code section 352. "Although [defense] counsel's lack of express reference to Evidence Code section 352 is not itself fatal to defendant's claim, the stated bas[e]s of the objection[s] [were] insufficient to alert the trial court that this provision was being invoked." (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1014-1015 [relevance objection insufficient to preserve for review claim under Evidence Code section 352]; see also *People v. Ghent* (1987) 43 Cal.3d 739, 766 [objection that question is leading does not preserve for review claim under Evidence Code section 352]; *People v. Champion*, *supra*, 9 Cal.4th at p. 913 [relevance objection did not preserve for review claim under Evidence Code section 352].) Nor is defendant correct in asserting that, because the trial court overruled the objections defense counsel did make, an objection under Evidence Code section 352 would have been futile. Nothing about the court's rulings on counsel's objections indicates it would have been futile to object to the same evidence under Evidence Code section 352. For all of the above reasons, defendant's challenge to the evidence's admission is unavailing.

Also unavailing is defendant's claim the trial court erred in failing, sua sponte, to give a limiting instruction informing the jurors they could consider the evidence of the witnesses' fear in testifying only in assessing credibility. We have consistently held that where, as here, a defendant fails to request an instruction, a trial court "generally [has] no duty to instruct on the limited admissibility of evidence. [Citation.]" (*People v. Lang* (1989) 49 Cal.3d 991, 1020; see also Evidence Code section 355 ["When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court *upon request* shall restrict

69

the evidence to its proper scope and instruct the jury accordingly." (Italics added.)].)  Although acknowledging this rule, defendant invokes *People v. Collie*, *supra*, 30 Cal.3d at p. 64, where we hypothesized that "[t]here may be an occasional extraordinary case in which unprotested evidence . . . is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose."  Defendant's reliance on *Collie* fails because the evidence of the witnesses' fear was more than minimally relevant to a legitimate purpose – supporting the witnesses' credibility – and was not "a dominant part of the evidence against" defendant.  (*Ibid*.)  Therefore, the trial court did not err in failing to instruct, sua sponte, on the evidence's limited admissibility.

### D.  Alleged Hearsay Statements of Shyrock

Defendant asserts the trial court prejudicially erred in permitting Valdemar to testify at trial that, during a Mexican Mafia meeting in January 1995, Shyrock stated:  "I don't know if you have ever heard of this brother Dido.  He dropped out a long time ago.  He's in an apartment where I was living.  The mother fucker was living right downstairs but never showed his face.  All kinds of people in the pad, bunch of young sisters and kids, all kinds of shit.  So I'm trying to figure out how to – I need a silencer is what I need."  Defendant argues Shyrock's statement was hearsay and the trial court erred in admitting it under the hearsay exception set forth in Evidence Code section 1230, which provides in relevant part:  "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."  According to defendant, this exception was inapplicable because the prosecution failed to show that Shyrock

70

was "unavailable as a witness," that the statement was against his penal interest when he made it, and that there was sufficient indicia of the statement's trustworthiness. Defendant also argues that, because the statement does not bear particularized guarantees of reliability, its admission violated his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. "If nothing else," defendant lastly contends, the trial court erred in failing to exclude the statement under Evidence Code section 352 because it was " 'so [rife] with condemning facts against [him] that [it was] devastating or crucial to his case.' " For reasons that follow, defendant's claims fail.

### 1. Background

Before trial, the prosecution moved to admit at trial certain out-of-court statements of nontestifying witnesses. As here relevant, the prosecution argued that Raymond Shyrock's statement was admissible under Evidence Code section 1230 and as circumstantial evidence of the existence of a conspiracy. At a hearing on the motion, the prosecution argued the statement was relevant to show motive and identity and was against Shyrock's penal interest because, reasonably interpreted, it was a statement that Shyrock, a member of the Mexican Mafia, intended either to kill Dido or have him killed because he was a Mexican Mafia dropout. The court then asked, "Is he unavailable?" The prosecution responded by first asking the court "to assume" "[f]or the purpose of this proceeding" that Shyrock was unavailable, and then adding: (1) the prosecution would have Shyrock's attorney "fill out a document indicating that if [Shyrock] was called to testify he would take the Fifth [Amendment];" (2) Shyrock was a defendant in a federal RICO case and the United States Attorney had informed the prosecution that it "would oppose any motion to bring him over here either as a witness or a defendant;" and (3) "the metropolitan detention center" where Shyrock was in custody "refuses to accept the subpoena by the county authorities as to Mr. Shyrock." The court then asked if the prosecution had, in fact, attempted to

71

subpoena Shyrock. The prosecutor replied: "I have talked to them and I was told if I attempted that's what . . . would happen. [¶] So I understand the court's position, but . . . I think clearly if the court looks at it carefully I will be able to show that Mr. Shyrock is unavailable, one, because the federal authorities refuse to release him, two, because he clearly has a Fifth Amendment privilege against self-incrimination."

At this point, Ortiz's counsel interjected, "Even if [the prosecution] covered these hurdles we are discussing we still have a section 352 problem at the trial he's going to have to deal with." When Maciel's counsel interrupted and asked to speak, the court explained that it was going to give everyone a chance to respond and invited Ortiz's counsel to "go ahead." Ortiz's counsel then stated, "That was what I wanted to indicate to the court." The court replied, "All right. Mr. Bestard." Defendant's counsel responded, "Submitted at this time." Logan's counsel then argued it was unclear that the statement was against Shyrock's penal interest and that, given the ambiguity, it was inadmissible under Evidence Code section 352. Maciel's counsel then added that the statement was irrelevant because Shyrock was not a defendant in the case and that there was "a foundational problem" because "no one has ever established" that Dido "was a Mafia member." Maciel's counsel also challenged the prosecution's representations regarding Shyrock's unavailability, stating: "We need Raymond Shyrock, who I say is available and who is willing to come to this court and testify that he never intended to make those statements. [The prosecution] has asserted his Fifth Amendment right for him, but I will bet you that Raymond Shyrock will come here and testify precisely to what he said and what he meant . . . ."

The court then interjected: "I don't like to make rulings when they aren't ready to be made – at this point [the prosecution] ha[s] not been able to establish unavailability." The prosecutor responded: "I can't argue with the court." The court continued: "I am not going to rule. I don't want to – clearly, at this time as we sit here in court you have not established the unavailability of Mr. Shyrock so

72

that these statements are admissible." The prosecutor again responded, "I cannot argue," but added: "What I would simply ask the court to do is put the matter . . . over to next Monday the 9th, and I will take the steps between now and the 9th – I will take two steps. I will contact Mr. Shyrock's attorney, who I have not yet contacted, and I will also bring in somebody from the metropolitan detention center who will testify they either will or will not accept the subpoena, and we can resolve the unavailability issue next Monday and then either yourself or Judge Czuleger can determine if . . . the statements are admissible." After the prosecution and Maciel's counsel argued further about whether Shyrock was willing to testify and whether the federal authorities would accept a subpoena, the court interjected: "Hold on. I will let you be heard on the other arguments. As far as the unavailability issue, I can make a ruling subject to whether or not he's available or not so at least you can have a ruling all sides will know how to proceed on this issue."

The court then invited Maciel's counsel to address the Evidence Code section 352 issue "or any other argument you want to make." Maciel's counsel responded by discussing only Evidence Code section 352.  Palma's counsel joined in that argument and added: "It's totally hearsay. I don't believe there's any established exception to the hearsay rule that has been laid out here, and I would also object on the grounds that it's not relevant." Throughout these exchanges, defendant's counsel remained silent.

Consistent with its earlier comments, the court then stated that "the unavailability issue will be left for another time." It conditionally ruled that, if the prosecution established Shyrock's unavailability, the statement would be admissible under Evidence Code section 1230 as "a declaration against penal interest." It declined to order exclusion under Evidence Code section 352, finding that the statement was "more probative than prejudicial."

As far as the record shows, the issue of Shyrock's unavailability never arose again. At trial, when the prosecution asked Valdemar to testify regarding

73

Shyrock's statement, neither defendant's counsel nor Palma's raised any objection.

### 2. Discussion

Initially, the People contend that, by failing to object in the trial court to admission of Shyrock's statement, defendant failed to preserve this issue for appeal. In their view, the record, as set forth above, shows that defendant's counsel neither joined in the objections of cocounsel nor made an objection of his own. Moreover, the People assert, "even when co-counsel addressed the issue, they argued relevance and Evidence Code section 352, not the Evidence Code section 1230 requirements" or the constitutional issues that defendant now raises. Thus, the People argue, "there was neither a timely nor a specific objection . . . sufficient to preserve the[se] issue[s] for appeal." "[A]t the very least," the People continue, defendant forfeited his challenge to the prosecution's showing of Shyrock's unavailability by failing to raise the issue at any time after the court deferred its ruling on that question.[37]

The prosecution's forfeiture argument appears to be correct insofar as defendant now seeks to challenge the statement's trustworthiness, to question Shyrock's unavailability, and to raise constitutional objections. Regarding trustworthiness, as the preceding discussion demonstrates, at no time did anyone assert there were insufficient indicia of the statement's trustworthiness. Therefore, defendant may not raise that issue on appeal. (*People v. Hernandez* (1999) 71 Cal.App.4th 417, 425 [defendant could not argue on appeal that statements lacked sufficient indicia of reliability because "he failed to object to the statements below on this ground"].) This conclusion also defeats defendant's constitutional claims, which he did not raise in the trial court and which hinge on his assertion that the

---

[37] In his briefs, defendant offers no response to the People's forfeiture arguments.

74

statement lacks particularized guarantees of trustworthiness.  Regarding Shyrock's unavailability, as the preceding discussion also demonstrates, the trial court expressly declined to make a ruling and informed counsel that the issue would "be left for another time."  Neither defendant nor anyone else raised the issue again or objected when the prosecution offered the evidence at trial.  As we have held, "[f]ailure to press for a ruling on a motion to exclude evidence forfeits appellate review of the claim because such failure deprives the trial court of the opportunity to correct potential error in the first instance.  [Citation.]"  (*People v. Lewis* (2008) 43 Cal.4th 415, 481; see also *People v. Morris* (1991) 53 Cal.3d 152, 195 [defendant forfeited appellate challenge to admission of testimony by failing "to press for" a ruling "until he obtained one"].)  Thus, because defendant failed to press the trial court for a ruling on Shyrock's unavailability, he may not raise the issue on appeal.

However, the prosecution's forfeiture claim is arguable insofar as defendant now asserts the statement was not against Shyrock's penal interest and should have been excluded under Evidence Code section 352.  It is true that defendant's counsel did not himself raise either of these questions, and that his only comment regarding the statement's admissibility was, "Submitted at this time."  However, the record shows that, before defendant's counsel made this comment, the court itself raised the "penal interest" issue by asking the prosecution, "is this in fact a declaration against interest," "what kind of interest is it a declaration against,"  "is it a declaration against penal interest" and "what language indicates that to you." The record also shows that, shortly before defendant's counsel made his "submitted" comment, Ortiz's counsel stated, "Even if [the prosecution] covered these hurdles we are discussing we still have a section 352 problem at the trial he's going to have to deal with."  On analogous facts, courts, including ours, have declined to find forfeiture.  (See *People v. Collins* (2010) 49 Cal.4th 175, 227 [no forfeiture despite lack of objection to alleged prosecutorial misconduct where the trial court interrupted the prosecutor immediately after the challenged remark,

75

disagreed with prosecution about the remarks propriety, and defense counsel "submitted the matter after the colloquy between court and counsel"]; *People v. Brooks*, *supra*, 88 Cal.App.3d at p. 186 [no forfeiture of hearsay argument where "the court called a hearing to consider exclusion of the evidence immediately after" witness testified to challenged statement].)

We need not resolve this aspect of the People's forfeiture argument because these arguably preserved claims fail on their merits. The court did not abuse its discretion in finding that the statement was against Shyrock's penal interest when made. (See *People v. Gordon* (1990) 50 Cal.3d 1223, 1252 [determination whether declaration is against interest is reviewed for abuse of discretion].) In making this determination, the court was entitled to consider "not just the words" themselves, "but the circumstances under which they were uttered," Shyrock's "motivation," and his "relationship to" defendant. (*People v. Frierson* (1991) 53 Cal.3d 730, 745.) As the People argue, the trial court could reasonably have concluded that the statement, viewed in the context of its making – "a surreptitiously recorded meeting of Mexican Mafia members" – "marked the inception of a conspiracy to kill Dido" because he was a dropout, and that as such, "when made," it "so far subjected [Shyrock] to the risk of . . . criminal liability . . . that a reasonable man in [Shyrock's] position would not have made it unless he believed it to be true." (Evid. Code, § 1230.)

Defendant's arguments for concluding otherwise are unpersuasive. Defendant asserts that when Shyrock made the statement, "the conspiracy had not yet been conceived." However, as explained above, the trial court could have reasonably found that the statement marked the conspiracy's inception. Defendant also asserts that Shyrock would have had "no reason . . . to believe that statements he made to fellow gang members in a private hotel room would potentially expose him to criminal prosecution." However, as one federal court has explained in rejecting a similar argument: "The question as to such declarations is whether under the circumstances the declarant would have been

76

unlikely to say it had it not been true. To be against penal interest under the rule, the statement need not be made to persons who are likely to use it against the declarant in court proceedings. Declarations against penal interest are received notwithstanding that they were spoken in confidence in the expectation they would not be repeated to the authorities. [Citations.] Indeed, that makes such declarations more trustworthy." (*U.S. v. Badalamenti* (S.D.N.Y. 1986) 626 F.Supp. 658, 666-667 [rejecting argument that "the Mafia's code of silence eliminated any risk that the declarants would incur criminal liability in making the declarations'].) Finally, after noting that this hearsay exception does not apply to collateral assertions within a declaration against penal interest – i.e., any portion of a statement that is not itself specifically disserving to the declarant's interests (*People v. Duarte* (2000) 24 Cal.4th 603, 612) – defendant argues the only part of Shyrock's statement that was specifically disserving of his penal interest was the statement, "I need a silencer." However, the trial court could have reasonably found that, in context, the statement as a whole was specifically disserving of Shyrock's interest.[38] In short, defendant's arguments show "only that a court might perhaps have been able to arrive at the conclusion that [Shyrock's] statement did not so far subject him to the risk of criminal liability that a reasonable person in his position would not have made it unless he believed it to be true. [They] simply do[] *not* show that a court was unable to arrive at the opposite conclusion. Therefore, [they do] not establish an abuse of discretion." (*People v. Gordon*, *supra*, 50 Cal.3d at p. 1253.)

Also unpersuasive is defendant's prejudice argument under Evidence Code section 352. As noted above, defendant asserts the trial court should have excluded the statement under this section because it was " 'so [rife] with

---

[38] In any event, any collateral assertions the statement may have contained could not have prejudiced defendant because they did not attempt to shift blame from Shyrock to defendant or anyone else.

condemning facts against [him] that [it was] devastating or crucial to his case.' " However, the test for prejudice under Evidence Code section 352 is not whether the evidence in question undermines the defense or helps demonstrate guilt, but is whether the evidence inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction. (*People v. Doolin*, *supra*, 45 Cal.4th at p. 439.) Defendant does not even suggest how Shyrock's statement prejudiced him in this sense. Thus, the trial court did not abuse its discretion in declining to exclude Shyrock's statement under Evidence Code section 352.

### E. Failure To Instruct that Witness No. 16 Was an Accomplice

The trial court's jury instructions defined the term "accomplice" (CALJIC No. 3.10) and explained that jurors (1) should view the testimony of an accomplice with distrust (CALJIC No. 3.18) and (2) could not rely on accomplice testimony to convict absent corroborating evidence, i.e., evidence of some act or fact related to the crime which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the crime charged (CALJIC Nos. 3.11, 3.12). Defendant asked the court also to instruct the jury that Witness No. 16 was an accomplice as a matter of law. The court denied the request, finding that the evidence presented a question for the jury to determine. Consistent with its ruling, the court instructed the jurors that they had to determine whether Witness No. 16 was an accomplice and that defendant bore the burden of proving this fact by a preponderance of the evidence (CALJIC No. 3.19). Defendant claims that, in refusing to give the requested instruction, the trial court prejudicially erred and violated his due process rights under the Fourteenth Amendment. For reasons that follow, defendant's claim fails.

Section 1111 provides that "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." For purposes of this rule, an "accomplice" is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid.*) "This definition encompasses all principals to the crime [citation], including aiders and abettors and coconspirators. [Citation.]" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90.) Whether someone is an accomplice is ordinarily a question of fact for the jury; only if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial court instruct a jury that a witness is an accomplice as a matter of law. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271-1272.)

Defendant asserts that Witness No. 16 was an accomplice as a matter of law because his testimony "established his role as a principal to murder as an aider and abettor." He relies on the following testimony of Witness No. 16: During the late afternoon on April 22, 1995, Palma said he was expecting a page later that day and he wanted Witness No. 16 to drive him to Torres's house after he received the page because "they had to take care of something" and "the brothers" – i.e., the Mexican Mafia – "wanted him." Several hours later, after Palma received the page, Witness No. 16 drove Palma to Torres's house. When they arrived, a number of Sangra gang members were already in Torres's room and a shotgun was at the foot of the bed. Ortiz, who seemed to be in charge, said there was "a problem in El Monte" and they had to go there "to take care of something," which Witness No. 16 understood to mean they were going to assault or kill someone. Logan drove to El Monte with defendant, Palma, and Torres; Witness No.16 followed in his car with Ortiz and "Creepy." Upon arriving in El Monte, Logan pulled into a driveway on Maxson Road while Witness No. 16 drove a few blocks further down and pulled over. At Ortiz's direction, Witness No. 16 turned off the car and its headlights. Ortiz exited the car, went to the corner, and looked up and

79

down the street. When he returned, he said the police were behind them and stated, "Let's get out of here." At Ortiz's direction, Witness No. 16 drove first to an apartment in West Covina that he believed to be defendant's and, upon finding no one there, then to Torres's house. This testimony, defendant argues, established the elements for Witness No. 16's liability as an aider and abettor, i.e., that "he acted with knowledge of the criminal purpose of the alleged perpetrators and with the intent or purpose of encouraging or facilitating the commission of the offense."

As we have explained, "an aider and abettor's guilt 'is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state.' [Citation.]" (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) Establishing aider and abettor liability "requires proof in three distinct areas: (a) the direct perpetrator's actus reus — a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea — knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus — conduct by the aider and abettor that in fact assists the achievement of the crime." (*Ibid.*)

Under these principles, the People correctly argue that Witness No. 16's testimony, though sufficient *to permit* a jury finding that Witness No. 16 was an accomplice as an aider and abettor, did not *compel* that finding as a matter of law. Most notably, there was no direct evidence that Witness No. 16 had the intent to assist in achieving the direct perpetrators' unlawful ends. As we have explained, "an act [that] has the effect of giving aid and encouragement, and [that] is done with knowledge of the criminal purpose of the person aided, *may* indicate that the actor intended to assist in fulfillment of the known criminal purpose," and *may* therefore serve as the basis for "an inference" regarding an alleged aider and abettor's intent. (*People v. Beeman* (1984) 35 Cal.3d 547, 559, italics added.) "However, . . . the act may be done with some other purpose [that] precludes criminal liability." (*Ibid.*) Thus, Witness No. 16's actions, though sufficient to

80

permit an inference that Witness No. 16 intended to assist the perpetrators in achieving their unlawful ends, did not establish that intent as a matter of law. (See *People v. Williams* (2008) 43 Cal.4th 584, 637 [evidence of acts assisting the crimes did not establish requisite mental state as a matter of law]; *People v. Fauber* (1992) 2 Cal.4th 792, 834 (*Fauber*) [same]: *People v. Tewksbury* (1976) 15 Cal.3d 953, 960-961 [same].) The trial court therefore properly refused to instruct the jury that Witness No. 16 was an accomplice as a matter of law. (See *People v. Gordon* (1973) 10 Cal.3d 460, 467 ["where the facts are in dispute as to the knowledge and intent of the asserted accomplice, the witness' liability for prosecution is a question of fact for the jury"].)

Moreover, as the People argue, the evidence does not indisputably establish that Witness No. 16 even had knowledge of the perpetrator's unlawful purpose. During cross-examination, Witness No. 16 testified that, in earlier statements to police, he said he "had no idea" what Ortiz had meant when he said "they had to take care of something in El Monte" and, when asked what he thought the perpetrators were intending to do in El Monte, he replied: "I said I wasn't sure what they were going to do, if they were going to [box or get some money] or kill somebody." "I don't know what they were going to do." Although, given Witness No. 16's trial testimony, the jurors could have disbelieved his earlier statements, they were not required to. Because the record, though adequate to support the conclusion that Witness No 16 acted with the requisite guilty knowledge and intent, "does not dictate" that conclusion, the trial court properly found that Witness No. 16 was not an accomplice as a matter of law. (*Fauber*, *supra*, 2 Cal.4th at p. 834.)

In any event, even had the trial court erred, the error was harmless. A trial court's error in instructing on accomplice liability under section 1111 is harmless if the record contains "sufficient corroborating evidence." (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. (*People v.*

81

*Nelson* (2011) 51 Cal.4th 198, 218; *People v. Gonzales* (2011) 52 Cal.4th 254, 303.) It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. (*People v. Hayes*, *supra*, 21 Cal.4th at p. 1271; *People v. Negra* (1929) 208 Cal. 64, 69-70.) It is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." (*Fauber*, *supra*, 2 Cal.4th at p. 834.)

Under these principles, the record contains adequate corroborating evidence. Witnesses Nos. 2 and 3 testified that a Nissan Maxima pulled up in front of a driveway on Maxson Road, that three men – Hispanic men, according to Witness No. 2 – exited and went down the driveway while the driver remained inside, and that after six to eight gunshots rang out, the three men – one carrying a handgun – ran back to the car. Witness No. 16 likewise testified that Logan drove defendant, Palma, and Torres to El Monte in his Nissan Maxima, that the Maxima pulled into a driveway on Maxson Road, and that he was later told that Logan waited in the car while defendant, Palma and Torres exited and the murders occurred. Witness No. 13 and Torres's mother testified that defendant was present at Torres's house with the other Sangra gang members the night of the murders. The physical evidence at the scene of the murders – two men with fatal gunshot wounds to the head, a woman and two children shot dead – matched Witness No. 16's testimony about what defendant and Palma had told him about the shooting. As noted above, ballistics evidence connected defendant to the crimes. Finally, there was independent evidence that members of the Sangra gang had committed the murders and that defendant was a Sangra gang member. This evidence was more than sufficient to corroborate Witness No. 16's testimony. Thus, even had the trial court erred in refusing to give the proposed instruction, reversal would be unwarranted.

Finally, because the trial court's refusal to instruct that Witness No. 16 was an accomplice as a matter of law was not error, and was harmless in any event,

defendant's due process claim fails. (See *People v. Lewis*, *supra*, 26 Cal.4th at p. 371 ["[b]ecause we find no error and otherwise find any error to be harmless," we rejected claim that failure to instruct on accomplice liability violated the defendant's constitutional right to due process].)

### F. Alleged Error in Giving CALJIC No. 2.11.5 (Unjoined Perpetrators)

At the guilt phase, the trial court instructed the jurors pursuant to CALJIC No. 2.11.5 as follows: "There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which defendant is on trial. [¶] There may be many reasons why such person is not here on trial. Therefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted. Your sole duty is to decide whether the People have proved the guilt of the defendants on trial." Noting the evidence of Witness No. 16's involvement as an aider and abettor and the immunity he received in exchange for his testimony, defendant asserts the trial court, in giving this instruction, prejudicially erred and violated his constitutional rights to a fair trial and a complete defense.

The People correctly point out that defendant forfeited the claim by failing to object to the instruction in the trial court or to request a limiting instruction. As defendant acknowledges, we have held that where, as here, the instruction is properly given as to some unjoined perpetrators but not as to others, a defendant who fails to ask the trial court to give a limiting instruction may not raise the issue on appeal. (*People v. Sully* (1991) 53 Cal.3d 1195, 1218.)

In any event, the claim fails on its merits. In addition to the challenged instruction, the trial court gave instructions on considering the testimony of accomplices and other standard witness credibility instructions, including CALJIC No. 2.20, which informed the jurors to keep in mind the existence of any "bias, interest, or other motive" on the part of a witness. As we have explained in

83

connection with substantially identical facts, when a trial court gives CALJIC No. 2.11.5 "with the full panoply of witness credibility and accomplice instructions, as it was in this case," reasonable jurors will understand that although they may not consider "the separate prosecution or nonprosecution of coparticipants, and the reasons therefore," they may consider "a plea bargain or grant of immunity . . . as evidence of interest or bias in assessing the credibility of prosecution witnesses. [Citation.] Although the instruction should have been clarified or omitted [citation], we cannot agree that giving it amounted to error in this case." (*People v. Price* (1991) 1 Cal.4th 324, 446.) Because defendant offers no persuasive basis for reconsidering this issue, his claim fails.

### G. Instructions on Uncharged Conspiracy

The trial court granted the prosecution's request to present evidence of a conspiracy even though the indictment did not allege a conspiracy, and the court instructed the jury on the law of conspiracy. Defendant now asserts the trial court erred in allowing the prosecution to proceed on an uncharged conspiracy because, under the statutory definition of principal (§ 31), "participation in a conspiracy alone is not an authorized basis for finding a person guilty of any offense other than conspiracy, a crime also defined by statute. (§ 182.)" Moreover, defendant asserts, allowing an uncharged conspiracy to be the "basis for criminal liability creates" a constitutionally impermissible "mandatory conclusive presumption that a person who engages in an uncharged conspiracy to commit a substantive offense is guilty of the substantive offense later committed by others." The court's error, defendant argues, prejudiced him and violated his constitutional rights to due process and to a jury trial.

Defendant's arguments are unpersuasive. Our decisions have "long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] 'Failure to charge conspiracy as a separate offense does not preclude the People from proving that

those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations].' [Citation.]" (*People v. Belmontes* (1988) 45 Cal.3d 744 (*Belmontes*), 788-789; see also *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1134 ["It is firmly established that evidence of conspiracy may be admitted even if the defendant is not charged with the crime of conspiracy."].) Defendant acknowledges our prior decisions, but invites asks us to reexamine them. However, he offers no persuasive basis for doing so, and we decline his invitation.

Nor is defendant's "mandatory presumption" argument valid. As the People explain, "like aiding and abetting, conspiracy (as used here) is itself a *theory of liability*. . . . 'For purposes of complicity in a cofelon's homicidal act, the conspirator and the abettor stand in the same position.' (*People v. Pulido* [(1997) 15 Cal.4th 717], 724.) . . . The instructions given here did not tell the jury that it could presume any particular element of murder, including intent, based on proof of predicate facts. Instead, the instructions specified that, as an *alternative* to finding, based on the elements of murder, that [defendant] himself committed or aided in the crime, it could find him responsible for the crime based on his participation in a conspiracy to commit murder. This correctly stated the law concerning conspiracy as an alternative theory of liability. [Citations.] Accordingly, there was no error." (See *People v. Luparello* (1986) 187 Cal.App.3d 410, 438-439 [conspirator liability does not create unconstitutional presumption]; see also *In re Hardy* (2007) 41 Cal.4th 977, 1025 [conspiracy is a "theor[y] of derivative liability; under § 31, "[o]ne who conspires with others to commit a felony is guilty as a principal"]; *Belmontes*, *supra*, 45 Cal.3d at p. 789 ["There being evidence supportive of all the elements of a conspiracy, the People were entitled to proceed on that alternative theory of liability" even though it was uncharged].)

## H. Adequacy of Conspiracy Instructions

Defendant asserts the trial court's instructions on conspiracy were incomplete in several respects and that the errors violated his statutory and constitutional rights. For reasons set forth below, his claim fails.

### 1. Forfeiture

Initially, we reject the People's argument that defendant forfeited this issue on appeal by failing to object in the trial court to the conspiracy instructions. Defendant's claims — failure to instruct sua sponte and erroneous instructions affecting his substantial rights — are "of a kind . . . that required no trial court action" on his part to be preserved for appeal. (*People v. Rogers* (2006) 39 Cal.4th 826, 850, fn. 7.) Accordingly, it is appropriate to address their merits.

### 2. Failure to Identify Specific Overt Act

The trial court instructed the jury that, to find a defendant liable as a member of a conspiracy, "there must be proof of the commission of at least one overt act." The court's instructions did not, however, identify any specific overt act that the conspirators allegedly performed. Nor did the indictment allege any overt act. Defendant asserts that these omissions violated his statutory and constitutional rights and prejudiced his defense.

In *People v. Prieto* (2003) 30 Cal.4th 226, 251 (*Prieto*), we rejected a similar contention. Defendant offers no persuasive reason for reconsidering that decision.

### 3. Failure Adequately to Identify the Object of the Conspiracy

The trial court instructed the jury that "[a] conspiracy is an agreement between two or more persons with the specific intent to agree to commit a public offense *such as murder*, and with the further specific intent to commit such offense." (Italics added.) Defendant asserts that, by including the phrase "such as

86

murder," this instruction "failed to provide adequate guidance to the jury about how to determine the object or crime originally contemplated by the conspiracy" and impermissibly allowed the jury to convict him based on a "generalized belief that [he] intended to assist and/or encourage unspecified nefarious conduct."

Defendant's argument rests entirely on *People v. Prettyman* (1996) 14 Cal.4th 248, 254 (*Prettyman*), which considered the proper instructions for aiding and abetting liability under California's " 'natural and probable consequences' doctrine."   Under that doctrine, "a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime (the target crime), but also for any other offense (nontarget crime) committed by the confederate as a 'natural and probable consequence' of the crime originally aided and abetted." (*Ibid.*)  We held in *Prettyman* that "when the prosecutor relies on" this doctrine, the trial court must give an instruction "identify[ing] and describ[ing] the target crimes that the defendant might have assisted or encouraged." (*Ibid.*)  Such an instruction, we explained, "will assist the jury in determining whether the crime charged was a natural and probable consequence of some other criminal act" and "will eliminate the risk that the jury will engage in uninformed speculation with regard to what types of conduct are criminal." (*Ibid.*)  Defendant asserts that, "[w]hile the 'natural and probable consequence' doctrine in *Prettyman* involved aiding and abetting, the Court stated that the doctrine applied equally to conspiracy."  Defendant also asserts that, in failing "to identify the object of the alleged conspiracy," the instruction here was invalid under *Prettyman*.

Even were defendant correct that *Prettyman*'s holding applies to instructions on conspiracy — a question we do not answer — that holding would not aid him.  We stressed in *Prettyman* that a court's sua sponte duty to identify and describe target crimes "is quite limited." (*Prettyman*, *supra*, 14 Cal.4th at 269.)  It arises only when "*uncharged* target offenses form a part of the prosecution's theory of criminal liability and substantial evidence supports the theory." (*Id.* at pp. 266-267, italics added.)  Moreover, even when the duty arises,

87

the trial court "need not identify *all* potential target offenses supported by the evidence, but only those that the prosecution wishes the jury to consider." (*Id.* at p. 269, fn. omitted.) In this case, the *only* target offense under the prosecution's theory of criminal liability was murder, and that was a *charged* offense. The prosecution never argued any other target offense and the evidence overwhelmingly pointed only to that target offense. On this record, the trial court's instruction sufficed.

In any event, any error was harmless. As explained above, the prosecution's theory was that defendant conspired with other Sangra gang members to commit murder. The evidence amply supported this theory and, as a matter of state law, "it is not reasonably probable that the trial's outcome would have been different in the absence of the trial court's [alleged] instructional error. [Citation.]" (*Prettyman*, *supra*, 14 Cal.4th at p. 274.) Nor, as a matter of federal law, is there a reasonable likelihood the jury applied the challenged instruction in a way that violates the United States Constitution. (*Id.* at p. 272.) The prosecution never mentioned the natural and probable consequences rule or any possible target offense other than the charged offense of murder. Therefore, "it is highly unlikely that the jury relied on that rule" or on any uncharged offense when it convicted defendant. (*Id.* at p. 273.) Moreover, "there is little likelihood . . . that the trial court's [alleged] failure [adequately] to identify and describe potential target crimes caused the jury to misapply the [conspiracy] doctrine." (*Ibid.*, italics omitted.) Defendant and Palma executed their five victims with gunshots at point-blank range. There was no substantial evidence of any other possible target offense apart from murder.[39] Under these circumstances, it is unlikely that the

---

[39] The evidence and the arguments simply do not support defendant's assertion in his reply brief that jurors "reasonably" may have concluded that "the gang's purpose was [merely] to assault or take money from someone" or that the "target offense was to assault (but not murder)" Tito "in retaliation for stealing

*(footnote continued on next page)*

alleged deficiency in identifying the target offense led the jury to misapply the conspiracy doctrine by relying on some generalized belief that defendant conspired regarding unspecified nefarious conduct. For the preceding reasons, defendant's argument fails.

### 4. Failure to Instruct on Unanimity and Burden of Proof

Defendant lastly argues the trial court erred in failing to instruct the jurors that, in order to convict defendant based on conspiracy, they had to agree unanimously as to the existence of a conspiracy, the crime the conspirators conspired to commit, and defendant's joinder in the conspiracy, and that the standard of proof for these elements was beyond a reasonable doubt. These omissions, defendant argues, constitute "structural error" that is "reversible per se."

Defendant's argument fails. Under our prior decisions, "[i]t is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, [the jurors] need not decide unanimously by which theory he is guilty. [Citations.]" (*People v. Santamaria* (1994) 8 Cal.4th 903, 918.) "Not only is there no unanimity requirement as to the theory of guilt, *the individual jurors themselves need not choose among the theories*, so long as each is convinced of guilt." (*Id.* at p. 919, italics added.) Defendant acknowledges that we have applied these principles to hold that a jury "need not decide unanimously whether" a defendant is guilty "as the aider or abettor or as the direct perpetrator. [Citations.]" (*Id.* at p. 918; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 1025 [jurors presented with theories of defendant's

---

*(footnote continued from previous page)*

from drug 'connections' protected by the Mexican Mafia, or simply to recover whatever he had stolen."

liability as a direct perpetrator and aided and abettor "need not unanimously agree 'on the precise factual details of how a killing under one or the other theory occurred in order to convict defendant of first degree murder' "].) He errs, however, in arguing that these decisions are inapposite because aiding and abetting liability "is only a theory of culpability" whereas conspiracy "is a separate crime." As explained above, in this case, conspiracy functioned not as a separate crime, but as an alternative theory of liability for the charged, substantive crime of murder. (See *In re Hardy*, *supra*, 41 Cal.4th at p. 1025 [conspiracy is a "theor[y] of derivative liability"]; *Belmontes*, *supra*, 45 Cal.3d at p. 789 [prosecution could proceed on conspiracy as an "alternative," though uncharged, "theory of liability"]; *People v. Washington* (1969) 71 Cal.2d 1170, 1174-1175 [noting "distinction between a case in which conspiracy is charged and one in which a conspiracy theory is used to establish liability for the substantive offense"].) Moreover, in *Prieto*, we expressly rejected the argument that, where the prosecution seeks to show an uncharged conspiracy "as one of [its] theories of liability" for charged counts (*Prieto*, *supra*, 30 Cal.4th at p. 249), the trial court must instruct the jurors that they must "agree unanimously on specific overt acts in order to find him guilty under a conspiracy theory" (*id.* at p. 251). Under these decisions, defendant's argument fails.[40]

## I. Judicial Decorum

At several points during the guilt phase, the trial court used "monikers" to refer to the defendants, counsel, and the jurors.

___

[40] Even in cases where the prosecution charges conspiracy as a separate crime, jurors need not unanimously agree on a specific overt act. (*People v. Russo* (2001) 25 Cal.4th 1124, 1128-1136.) In such cases, "[d]isagreement as to who the coconspirators were or who did an overt act, or exactly what that act was, does not invalidate a conspiracy conviction, as long as a unanimous jury is convinced beyond a reasonable doubt that a conspirator did commit some overt act in furtherance of the conspiracy." (*Id*. at p. 1135.)

Toward the end of the day on October 29, 1996, the court said to the jurors: "I have ascertained one thing and that is that apparently one of you has now acquired a moniker. I am not going to tell you what it is but – because if I were to tell you what it is you would know who it was, but maybe by the time we're through all 18 of you will have a moniker that's assigned to you out here unbeknownst to you."

About a week later, on November 6, after announcing that it would open the day's proceedings "a little bit differently," the court stated: "The record in this instance will reflect that Character is present with his attorney Comet; Primo is present with his attorney Slippers; the District Attorney is present in the person of Windex; the jury in the person of Incognito, Booky, Ill-Bit, Fiddler, Coco, Eagle Scout, Sharpy, Rabbit, Curly, Tree, it's either V or 6, Sleepy, I know who that is, Foxy, Sharper, who didn't make it to Nordstrom's this morning, The Suit, Smiley, Snickers, and Dopey are all present along with Coach, Racer, Bambi, and Flash." The court then asked a witness who was about to testify whether he had "a moniker." The witness replied, "No, your honor." The court then stated to the prosecutor, "Mr. Monaghan, or should I say Windex, I want to make sure that the record is clear." The prosecutor responded, "Yes, we do, your Honor, we want to make sure the record is clear." The trial court then explained: "Incidentally, what you guys probably don't know why I was doing this, I got this [document] from the jury this morning signed by each of their monikers and then I found out what your monikers are." The court then commented that the document "has been marked as an exhibit 14,391," but the document was not made part of the record.

Later that day, in discussing a juror's scheduling request, the court asked "Who's Dopey." After a juror responded, the court explained: "I was getting to where I was kind of worried because for the first two weeks I had never seen people who were expressionless and not responsive to anything. I said something to Flash over here 'Were they still breathing?' And concerned because you take 18 people who are total strangers and put them in a little room without coffee and

you have real problems, but I am glad to see that you have conquered all that and really do have [a] pretty good sense of . . . humor among the collective group of you."

Defendant argues the court's "jokes at the defendants' expense" were "grossly improper" and "set an improper tone" that "undermined the jury's responsibility regarding the gravity of its task" in a death penalty case. In his view, upon receiving the note reflecting that the jurors had adopted "mock 'gang monikers,' " the court should have taken "steps to preserve an appropriately serious atmosphere in the courtroom." Instead, it "abdicated this duty" and actually "indulged and encouraged the jurors' attempt to poke fun at the defendants." It "effectively ridicul[ed] the defendants," who were known by similar nicknames, conveyed its belief that "the defendants were properly objects of ridicule and derision," and "undermine[d] the proper decorum of a death-penalty case." In these respects, defendant asserts, the court denied him his constitutional rights to a fair trial and to a reliable penalty determination.

Initially, the People correctly argue that, by failing to object in the trial court, defendant forfeited his right to raise this claim on appeal. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1177 [forfeiture of complaint about trial court's "jocular comment" to the jury]; *People v. Geier* (2007) 41 Cal.4th 555, 613 [forfeiture of complaints about trial court's jokes]; *People v. Monterroso* (2004) 34 Cal.4th 743, 761-762 [forfeiture of the complaints about trial court's " 'over 40 quips and humorous comments' "]; *People v. Melton* (1988) 44 Cal.3d 713, 753 [forfeiture of objections to two remarks the trial court made in jest].) Asserting otherwise, defendant argues that he may raise the issue notwithstanding his failure to object because (1) it relates to bias of the trial judge and the due administration of justice, (2) given "the source of" the error – the trial court – "there was no one to object to," and (3) an objection and request for admonition may have antagonized both the court and the jurors. Of course, similar arguments could have been made in the decisions cited above. Indeed, in *Geier*, *supra*, at page 613,

92

we expressly rejected similar arguments.  Defendant offers no persuasive reason for reaching a different conclusion here.

In any event, defendant's claim fails on its merits.  Although a jury trial, especially for a capital offense, is a serious matter, "[w]ell-conceived judicial humor can be a welcome relief during a long, tense trial.  Obviously, however, the court should refrain from joking remarks [that] the jury might interpret as denigrating a particular party or his attorney.  We do not condone the instant judge's [remarks].  But the remarks were relatively brief and mild . . . . These isolated instances . . . fall short of the intemperate or biased judicial conduct [that] warrants reversal." (*Melton*, *supra*, 44 Cal.3d at pp. 753-754; see also *Geier*, *supra*, 41 Cal.4th at p. 614 [same].)  "The trial as a whole . . . was conducted with appropriate solemnity." (*People v. Freeman* (1994) 8 Cal.4th 450, 512; see also *Riel*, *supra*, 22 Cal.4th at p. 1177 [same].)

## J.  Failure to Declare Mistrial When Jury Declared Impasse

Defendant asserts the trial judge prejudicially erred in refusing to declare a mistrial after the jurors declared they were at an impasse and could not reach a unanimous verdict on any count.  Defendant also asserts the trial judge's instruction directing the jury to continue deliberations was erroneous in several respects.  Defendant's claims fail.

### 1.  Factual Background

Jury deliberations for the guilt phase began on Monday, November 18, 1996, lasting only a few hours that morning.  Deliberations continued the rest of the week and, after a weekend break, resumed the following Monday, November 25.  Jury-requested readbacks of trial testimony consumed much of the deliberation period.

At 2:00 p.m. on November 25, 1996, the jurors sent the court a note stating: "We are at an impasse . . . we cannot come to a unanimous decision on any

93

count." After denying defense motions for mistrial, the trial court, over defense objection, decided to question the jurors about their deliberations. It summoned the jurors and asked the foreperson if the court could do "anything . . . by a re-reading of any testimony . . . or by any jury instructions to clarify any legal point." The foreperson responded, "no." The court posed the same question to the remaining jurors. None responded. The court then asked the foreperson, out of the other jurors' presence, whether any of the jurors was "not deliberating in a good faith attempt to reach a verdict." The foreperson replied, "I think we have all deliberated in good faith."

The court then denied another defense motion for mistrial and stated its intention to order the jurors to continue deliberating, explaining: "I just don't believe in a two-month case that the jury has put in enough time." After having the jurors returned to the courtroom, the court stated:

"I don't know how you are divided numerically and . . . it is not my place at this point to be inquiring. I am going to assume only because statistical probabilities favor[] my assumption that you are not deadlocked 6-6, that it's some other numerical division. I am not at this time going to stop this trial or declare a mistrial. I am ordering you to continue with your deliberations. I am not convinced that you have put in enough time, especially when I had been told the amount of time that has been utilized in rereads. And I am not minimizing these rereads. As a matter of fact, in this case I think it's probably very important. But it would appear we lost a half day last Monday and I understand there were two substantial days last week, Tuesday and Wednesday, in which most of the day was consumed in read back and a fair portion of the morning.

"I say this to you: those of you in the minority, if I am right that it is not just 6-6, I ask that you listen to the arguments of those in the majority, reweigh your positions, and I also ask that you, those of you in the minority, continue to argue the positions that you believe to convince those in the majority. And I say the same thing to the majority. I ask that you reweigh your positions in the light of

94

all the arguments to see whether or not those of you in the majority still feel the way you have voted and, at the same time, ask that you, each of you as a part – the deliberation process is not only listening to others with an open mind toward reevaluation, if you believe it's appropriate, but it's also taking an active part in sharing what you feel and how you feel and perhaps how you arrive at your feelings. And I say to both the majority and the minority that that's what deliberations are and I ask that both – I don't want to call it sides because then all of a sudden it becomes confrontational and it shouldn't be that way.

"At the same time, I would say this to you, this is not a labor negotiation. In a labor negotiation we always know when the baseball players go on strike there's going to come a time when somebody is going to have pressure and they're going to yield, economic pressure. There's obviously no economic pressure here. You're all well paid. But I want to emphasize that this is not a matter of compromise. One should not compromise just for the purpose of reaching a verdict. But at the same time, I expect from each one of you, we all expect that you are going to in good faith be engaging in the deliberation process, sharing your views of the evidence, and how you got there with the others with a mind toward convincing them of your position and that's whether you're in the minority or the majority, and then the opposite that you have an open mind, each of you, whichever side you're on, to reevaluating.

"At this time I order that you return to the jury deliberations room, continue your deliberations. If at any time – and I don't want anybody to be hesitant about asking even if you had it read once to have it re-read a second time the testimony or any clarification what you feel is necessary to any points of law. If you'll continue your deliberations."

After the trial court gave these instructions, defense counsel moved for a mistrial, arguing that instructing the jury to continue deliberations "invaded [its] purview." The trial court denied the motion and jury deliberations resumed.

The morning of November 27, 1996, Juror No. 128 informed the court that she was "struggling" to determine whether she was "incapable of reaching a rational decision based on [her] fear of the sentence that [she] may have to impose," that she had become "convinced" she was "incapable of sentencing another human being to death," and that she feared she "may not or could not have been totally objective in [her] interpretation of the evidence." During the court's subsequent questioning, the juror indicated she did not think she could ever vote for the death penalty no matter the facts. The court then asked the juror whether her reluctance to sentence defendant to death would cause her to refuse to find him guilty of first degree murder or to find true the alleged special circumstance, even were she convinced beyond a reasonable doubt on those issues. After first responding, "this is where I'm wrestling," the juror continued: "Yeah. I honestly am not sure what's happening in my mind and I think that it's preventing me from being able to make my judgment. So I guess my answer would be yes." Based on these responses, the trial court found "misconduct at least in the technical legal sense" and ordered that an alternate juror replace Juror No. 128.

On December 2, 1996, after the Thanksgiving break, the court instructed the jury to begin deliberations anew. The morning of December 4, the jury returned its verdicts.

### 2. *Failure to Declare Mistrial*

As noted above, defendant asserts the trial court erred in failing to declare a mistrial and instead directing the jury to continue deliberating. In his view, "the 'surrounding circumstances' " – i.e., approximately 16½ hours of deliberation over the course of six days – "demanded that the trial court give controlling weight to the jurors' unanimous judgment that further deliberations would be either futile or counterproductive." Moreover, defendant argues, the "sole basis" the court articulated for its decision – that the jury had not "put in enough time" – was

"improper" because the length of deliberations, though relevant, may not alone be determinative.

Defendant's argument fails. Section 1140 states in relevant part that, "[e]xcept as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless . . . at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." The determination under this section of whether a reasonable probability of agreement exists "rests in the discretion of the trial court." (*People v. Breaux* (1991) 1 Cal.4th 281, 319 (*Breaux*).) Thus, contrary to defendant's assertion, a court "is not bound to take as final the statement of the [jurors] that they cannot agree upon a verdict." (*People v. Greene* (1893) 100 Cal. 140, 142.)

Applying these principles under circumstances analogous to those now before us, we have upheld a trial court's refusal to declare a mistrial. In *People v. Sandoval* (1992) 4 Cal.4th 155, 195, after a little more than 14 hours of deliberation over the course of five days, the jurors informed the court they could not reach a verdict. Upon the court's inquiry, the jury foreperson indicated that, even were the court to reread the testimony and answer any questions, there was no reasonable possibility further deliberations would produce a verdict. (*Ibid*.) The other jurors then each reiterated to the court that there was no reasonable possibility of reaching a verdict. (*Ibid*.) Nevertheless, the court declined to declare a mistrial, finding that "a little more time would not be unreasonable in light of the fact that the trial had lasted five months." (*Ibid*.) After further deliberations the next morning, the jury returned verdicts. On these facts, we found no abuse of discretion. In reaching this conclusion, we expressly rejected the defendant's reliance on "the length of time the jury had been deliberating" and "the jurors' individual statements against the usefulness of further deliberations." (*Id.* at p. 196.) "None of these factors," we explained, "removed the court's discretion to require further deliberations." (*Ibid*.) "The court was not

97

unreasonable in concluding that, in light of the fact that the trial itself had taken some five months, the jury should put in a little more time than the fourteen and one-quarter hours it had deliberated up to that point." (*Id.* at pp. 196-197; see also *People v. Breaux*, *supra*, 1 Cal.4th at p. 319 [no abuse of discretion in ordering further deliberations based on length of deliberations relative to length of trial].)

The record here supports a similar conclusion. None of the factors defendant cites – the length of deliberation, the absence of questions about the law, the jurors' statements about their inability to reach a verdict – removed the trial court's discretion to require further deliberation. Nor was it unreasonable for the court to conclude that, in light of the fact the trial itself had taken two months, the jurors should put in a little more time than the 16½ hours it had deliberated. The record shows no abuse of discretion.[41]

### 3. Instruction on Further Deliberation

Defendant asserts the instruction the trial court gave in directing the jurors to continue deliberating was prejudicially erroneous in several respects. He first challenges the court's statement, "I am going to assume only because statistical probabilities favor[] my assumption that you are not deadlocked 6-6, that it's some other numerical division." He bases his challenge on the high court's decision in *Brasfield v. United States* (1926) 272 U.S. 448, 449, which held that a trial court reversibly errs in asking a jury that is unable to reach a verdict how it is divided numerically, even where the numbers for conviction and acquittal are neither

---

**41**     In *People v. Caradine* (1965) 235 Cal.App.2d 45, 50, on which defendant relies, the court held that the shortness of deliberations did not alone establish that the trial court had abused its discretion in *declaring a mistrial* and *refusing to order further deliberations*. Contrary to defendant's assertion, this decision does not establish the converse, i.e., that the shortness of deliberations in relation to the trial itself may not be the basis for *refusing to declare a mistrial* and *ordering further deliberations*. Nor could it establish that proposition, given our decisions in *Sandoval* and *Breaux*.

requested nor revealed.  According to defendant, if inquiry into numerical division is grounds for reversal, so too is the trial court's statement here that it "assume[d]" the jurors were not evenly divided numerically.

Defendant's argument fails under our prior decisions, which reject *Brasfield*'s "rule of procedure [for] federal courts" (*Breaux*, *supra*, 1 Cal.4th at p. 319) and uphold "[t]he practice of inquiring into the . . . numerical division" of a jury that has declared itself unable to reach a verdict, without finding out how many jurors are for conviction and how many are for acquittal (*ibid.*).  Defendant offers no basis for reexamining these precedents.

Defendant next challenges the court's statement:  "I say this to you:  those of you in the minority, if I am right that it is not just 6-6, I ask that you listen to the arguments of those in the majority, reweigh your positions, and I also ask that you, those of you in the minority, continue to argue the positions that you believe to convince those in the majority.  And I say the same thing to the majority.  I ask that you reweigh your positions in the light of all the arguments to see whether or not those of you in the majority still feel the way you have voted and, at the same time, ask that you, each of you as a part – the deliberation process is not only listening to others with an open mind toward reevaluation, if you believe it's appropriate, but it's also taking an active part in sharing what you feel and how you feel and perhaps how you arrive at your feelings.  And I say to both the majority and the minority that that's what deliberations are and I ask that both – I don't want to call it sides because then all of a sudden it becomes confrontational and it shouldn't be that way."  According to defendant, under our decision in *People v. Gainer* (1977) 19 Cal.3d 835 (*Gainer*), this statement constitutes reversible error insofar as it addressed the minority and majority "as distinct groups" and "essentially mandated" that each juror consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views.

In *Gainer*, we held that the trial court had reversibly erred in giving a "discriminatory admonition directed [only] to minority jurors to rethink their

99

position in light of the majority's views." (*Gainer*, *supra*, 19 Cal.3d at p. 845.) The defective instruction in *Gainer* provided in relevant part: " '[I]f much the larger of your panel are for a conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of so many men or women equally honest, equally intelligent with himself or herself, and [who] have heard the same evidence with the same attention and with an equal desire to arrive at the truth and under the sanction of the same oath. [¶] And, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows.' " (*Id*. at p. 841.) The first sentence of this instruction, we explained, improperly "direct[ed] the jurors to include an extraneous factor in their deliberations, i.e., the position of the majority of jurors at the moment. The one or more 'holdout' jurors are told that in reaching their independent conclusions as to whether or not a reasonable doubt of the defendant's guilt exists, they are to weigh not only the arguments and evidence but also their own status as dissenters – a consideration both rationally and legally irrelevant to the issue of guilt." (*Id*. at p. 848, fn. omitted.) More broadly, we reasoned, the instruction's "extraneous majoritarian appeal" was "manifestly incompatible with" the defendant's constitutional right to "independently achieved juror unanimity," because it "open[ly] encourage[d]" minority jurors to "abandon their own judgment of the case" and to " 'acquiesce in the verdict . . . simply because the verdict ha[d] been reached by the majority.' " (*Id*. at pp. 848-849.) Finally, we explained, the instruction's "admonition to minority jurors" exerted "excessive pressure on the dissenting jurors to acquiesce in a verdict. The dissenters, struggling to maintain their position in a protracted debate in the jury room, are led into the courtroom and, before their peers, specifically requested by the judge to reconsider their

100

position. No similar request is made of the majority. It matters little that the judge does not know the identity of the particular dissenters; their fellow jurors know, and the danger immediately arises that 'the . . . charge can compound the inevitable pressure to agree felt by minority jurors.' [Citation.] The charge ' "places the sanction of the court behind the views of the majority, whatever they may be, and tempts the minority juror to relinquish his position simply because he has been the subject of a particular instruction." ' [Citation.]" (*Id.* at p. 850, fn. omitted.)

As is apparent, the instruction defendant challenges here does not share the vices the *Gainer* instruction contained. It did not in any way single out minority jurors or encourage those jurors – if in fact there were any – to consider, along with the arguments and the evidence, "their own status as dissenters." (*Gainer*, *supra*, 19 Cal.3d at p. 848.) Rather, it encouraged members of *both* the majority and the minority – again, assuming there was a majority and a minority – to "reweigh [their] positions" in light of the "arguments" and to "have an open mind . . . to reevaluating."[42] Nor did the instruction either exert pressure on or in any way encourage jurors in the minority to abandon their independent judgment and acquiesce in a verdict simply because the majority had reached a verdict. On the

---

**42** Defendant asserts the trial court's instructions to jurors in the minority differed "in a significant way" from the instruction to jurors in the majority. The former instructions, he argues, essentially directed minority jurors to "reweigh" their positions in light of "the arguments *of those in the majority*," whereas the latter directed majority jurors to "reweigh" their positions "in the light of *all* the arguments to see whether or not those of you in the majority still feel the way you have voted." (Italics added.) Defendant overlooks the fact that, after instructing the jurors in the minority to reweigh their positions, the court began its instruction to the jurors in the majority by stating, "And I say the same thing to the majority." He also overlooks the fact that, in concluding its instruction, the court directed all jurors to "have an open mind, each of you, whichever side you're on, to reevaluating." Viewing the instructions as a whole, there is little, if any, likelihood the jurors understood that the court was asking jurors in the minority to do something different from jurors in the majority.

101

contrary, the instruction "emphasize[d] that this is not a matter of compromise" and that "[o]ne should not compromise just for the purpose of reaching a verdict." In this regard, the instruction supplemented a standard instruction (CALJIC No. 17.40) the court gave before deliberations began, which stated in relevant part: (1) "the People and the defendants are entitled to the individual opinion of each juror"; (2) "each of you must decide the case for yourself"; and (3) "do not decide any question in a particular way because a majority of the [jurors], or any of them, favor such a decision." Nor did the court, through its instructions, in any way indicate or suggest that it favored a particular verdict or even that it had an opinion as to the proper verdict under the evidence. Thus, the instruction defendant challenges bears little resemblance to the *Gainer* instruction.

Nevertheless, defendant contends that *Gainer* requires reversal because, after emphasizing that the instruction there at issue asked only the jurors in the minority to reconsider their position, we stated in a footnote: "Since recognition of the existence of a majority or minority faction on the jury is irrelevant to the issue of guilt, such reference is erroneous, even if contained in an arguably noncoercive, 'balanced' . . . charge which explicitly admonishes the majority as well as the minority to reconsider their views." (*Gainer*, *supra*, 19 Cal.3d at p. 850, fn. 12.) Relying on this statement, defendant argues the instruction here was erroneous because it "expressly addressed 'the minority' and 'the majority' as distinct groups, introducing the 'rationally and legally irrelevant' consideration identified in *Gainer*."

Although *Gainer*'s statement appears to support defendant's position, several reasons exist for questioning its persuasive force. First, the statement was dictum, inasmuch as the instruction at issue in *Gainer* was *not* balanced; as our opinion emphasized, only "the dissenters" in *Gainer* were "led into the courtroom and, before their peers [in the majority], specifically requested by the judge to reconsider their position." (*Gainer*, *supra*, 19 Cal.3d at p. 850.) Second, the dictum is somewhat perplexing given the express endorsement later in the *Gainer*

102

opinion of the 1970 version of CALJIC No. 17.40, which advised that jurors "should not be influenced to decide any question in a particular way *because a majority of the jurors*, or any of them, favor such a decision." (Italics added; see *Gainer*, *supra*, at p. 856) It seems inconsistent to condemn in the abstract instructions that recognize the existence of a majority or minority faction on the jury while simultaneously endorsing a standard instruction that does just that. Third, in support of the dictum, *Gainer* cited only *People v. Carter* (1968) 68 Cal.2d 817 (*Gainer*, *supra*, 19 Cal.3d at pp. 850-851, fn. 13), but nothing in that opinion appears to support the dictum. Fourth, it appears that *Gainer* has never been followed on this point in any reported decision. Indeed, in cases where the facts have actually presented the issue, many state and federal courts have held that a balanced instruction asking both majority and dissenting jurors to reconsider their positions is not error. (See, e.g., *U.S. v. Boone* (3d Cir. 2006) 458 F.3d 321, 331; *U.S. v. Hylton* (4th Cir. 2003) 349 F.3d 781, 788; *U.S. v. Wills* (4th Cir. 2003) 346 F.3d 476, 494-495; *U.S. v. Clark* (6th Cir. 1993) 988 F.2d 1459, 1468-1469; *U.S. v. Nichols* (1st Cir. 1987) 820 F.2d 508, 511-512; *Sanders v. U.S.* (5th Cir. 1969) 415 F.2d 621, 630-631; *Miller v. State* (Ala.Crim.App. 1994) 645 So.2d 363, 365–366; *State v. M.L. Jr.* (La. Ct. App. 2010) 35 So.3d 1183, 1194-1195; *State v. Williams* (S.C. 2010) 386 S.C. 503, 513-516.) For all of these reasons, we disapprove *Gainer*'s dictum.

In any event, even were we to find that the trial court in this case erred in giving a balanced instruction, reversal would be unwarranted. In *Gainer*, we held that a discriminatory admonition that directs only minority jurors to rethink their position in light of the majority's views is prejudicial because it "skews the deliberative process . . . toward the result favored by the majority," making it "very likely" that prejudice occurred. (*Gainer*, *supra*, 19 Cal.3d at p. 854-855.) However, we also explained that, as to an erroneous instruction that "does not threaten to distort the process of jury decision-making to the same degree," reversal is appropriate only if the reviewing court, considering "all the

103

circumstances under which the charge was given," finds it "reasonably probable" the defendant would have obtained a more favorable result absent the error. (*Id.* at p. 855.) Here, no such reasonable probability exists. As previously explained, the instructions here did not exert pressure on or in any way encourage jurors in the minority to abandon their independent judgment and acquiesce in a verdict simply because the majority had reached a verdict. On the contrary, the instructions — which included a version of CALJIC No. 17.40 substantively identical to the version we expressly endorsed in *Gainer* — told jurors that "this is not a matter of compromise," that they "should not compromise just for the purpose of reaching a verdict," that defendants were "entitled to the individual opinion of each juror," that "each of you must decide the case for yourself," and that they should "not decide any question in a particular way because a majority of the [jurors], or any of them, favor such a decision." Given all of the circumstances under which the charge was given, any error in the court's reference to the minority and the majority as distinct groups was harmless.

### K. Restricted Voir Dire

Defendant asserts the trial judge prejudicially erred in restricting voir dire of prospective jurors regarding the effect on their ability to perform their duties of two circumstances: (1) there were five murder victims; and (2) two of the victims were children. He argues the error violated his constitutional rights to a fair and impartial jury, a reliable penalty determination, and due process. For reasons explained below, defendant's argument fails.

"Prospective jurors may be excused for cause when their views on capital punishment would prevent or substantially impair the performance of their duties as jurors. [Citation.]" (*People v. Cash* (2002) 28 Cal.4th 703, 719 (*Cash*).) " 'A prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is

104

therefore subject to challenge for cause, whether or not the circumstance that would be determinative for that juror has been alleged in the charging document. [Citations.]" (*Id*. at p. 720, italics omitted.)

Accordingly, defendants are entitled to "probe the prospective jurors' attitudes" as to any fact or circumstance in the case that "could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances." (*Cash*, *supra*, 28 Cal.4th at p. 721.) They may not, however, pose questions so specific that they require prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence the parties are likely to present at trial. (*Id.* at pp. 721-722.)

Our prior decisions indicate that, under the above standards, a trial court would err in categorically prohibiting a defendant from asking prospective jurors whether they could vote for life without parole for a defendant convicted of "multiple murder." (*People v. Vieira* (2005) 35 Cal.4th 264, 286.) As defendant acknowledges, however, the trial court here imposed no such prohibition. On the contrary, it distributed a questionnaire to prospective jurors asking them, among other things, to indicate whether, *in a case involving multiple murders*, they would always impose the death penalty, never impose the death penalty, or base their punishment decision on the evidence introduced at the trial's guilt phase and penalty phases. Moreover, before distributing the questionnaire, the court informed prospective jurors that the death penalty was potentially at issue because the prosecution had alleged as a special circumstance that defendant "has been convicted in the instant proceeding of more than one murder."

Insofar as defendant asserts that questioning about "multiple murders" was too general and that the trial court erred in refusing to allow more specific questioning about the precise number of alleged murders, his argument fails. To begin with, defendant cites no case holding that a trial court must allow such specific questioning. "In deciding where to strike the balance in a particular case, trial courts have considerable discretion. [Citations.]" (*Cash*, *supra*, 28 Cal.4th at

105

p. 722.) It is not clear a court would abuse its discretion in allowing questioning regarding "multiple murder" while precluding questioning regarding the precise number of murders.

In any event, even would such a ruling have been an abuse of discretion, defendant would not be entitled to relief on the record here. "The gravamen of" our decisions in this area "is that the defense cannot be categorically denied the opportunity to inform prospective jurors of case-specific factors that could invariably cause them to vote for death at the time they answer questions about their views on capital punishment." (*Carasi*, *supra*, 44 Cal.4th at p. 1287.) Here, although initially precluding disclosure of the number of murder victims, the trial court, pursuant to agreement among counsel, prefaced the live examination of prospective jurors by reading the indictment, including the five separate murder counts. Later, in addressing pretrial publicity, the trial court noted that the case "involves five counts of murder" based on "five homicides occurring at a location on Maxson Road in the City of El Monte" on April 22, 1995. After conveying this information, the trial court asked each prospective juror during individual questioning whether, in a penalty phase where the special circumstance is more than one murder, he or she would always vote to impose the death penalty no matter what the evidence was, or would be open to returning either the death penalty or life without parole depending on what the evidence was. It is logical to assume that, when they answered these questions, the prospective jurors had in mind the circumstance of which the trial court had informed them at the outset of the questioning, i.e., that defendant had allegedly murdered five people. (See *ibid.* [where court instructs jurors on case-specific factors before death qualification begins, "[i]t is logical to assume that when prospective jurors are thereafter asked . . . whether they would automatically vote for life or death regardless of the aggravating and mitigating circumstances, they have answered the question with those case-specific factors in mind, and are aware of the factual context in which the exchange occurs"].)

106

Moreover, the record further discloses that both defendant's counsel and the prosecution, while questioning prospective jurors in open court before other prospective jurors, discussed the circumstance that there were five alleged murder victims in the case.[43] This record establishes that the voir dire procedures were adequate to enable defense counsel to determine whether that circumstance would affect the prospective jurors' ability to perform their duty.

Defendant's claim presents a closer question insofar as he argues that the trial court erred in precluding mention of the circumstance that two of the victims were children. We have never directly held that the age of a murder victim is a circumstance that could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances, but dicta in several of our decisions suggests as much. For example, in *People v. Roldan* (2005) 35 Cal.4th 646, 694, we rejected the defendant's claim that the trial court had erred in precluding additional voir dire of certain prospective jurors, commenting: "[The] defendant identifies no fact about his case that is comparable in relevance to the prior murders in [*Cash*], facts that could potentially have prejudiced even a reasonable juror. There were in this case no prior murders, no sensational sex

---

[43]     During questioning of a prospective juror, defendant's counsel asked: "Do you have any notions now, my God, there's five murders?" The prospective juror responded, "Well, that's been going through my head, yes." Defendant's counsel then asked, "And what has been going through your head." The prospective juror replied, "How would you weigh that if it did come to that part of the case, the judgment part." During general questioning, the prosecution stated: "This is a very, very serious case. I know you don't know about the facts but you do know that the defendants are charged with killing five people." Later, in probing the possible effect of Witness No. 16's immunity, the prosecutor commented: "I know that if I had been seated on the jury and someone said to me in the case where five people were murdered, . . . that someone had been given immunity, . . . I know that my feeling would probably be somewhat negative." The prosecution also asked one of the prospective jurors whether, despite being acquainted with defendant's counsel, he could impose the death penalty if "at the conclusion of the case" he believed that defendant "was shown guilty of the five murders."

crimes, *no child victims*, no torture. [Citation.]" (Italics added.) In *People v. Zambrano* (2007) 41 Cal.4th 1082, 1122 (*Zambrano*), we rejected a similar claim, explaining: "The sole fact as to which the defense unsuccessfully sought additional [voir dire] inquiry — the [dismembered] condition of the adult murder victim's body when found — was not one that could cause a reasonable juror — i.e., one whose death penalty attitudes otherwise qualified him or her to sit on a capital jury — invariably to vote for death, regardless of the strength of the mitigating evidence. *No child victim*, prior murder, or sexual implications were involved." (Italics added, original italics omitted.) Defendant relies on this dicta in support of his argument.

However, under the circumstances of this case, the trial court did not abuse its discretion in precluding mention of the circumstance that two of the murder victims were children. Our recent decisions in this area indicate that, in assessing whether a trial court erred in refusing to allow questioning about a particular circumstance, we look not to the circumstance in isolation, but to the entire factual context, including "what the prospective jurors [actually] knew about the case." (*People v. Solomon* (2010) 49 Cal.4th 792, 840 (*Solomon*).) For example, in *Solomon*, we found that the trial court had not abused its discretion in prohibiting the defendant from questioning prospective jurors about the fact that he had been to prison for sexually assaulting women and had sexually assaulted some of the six women he had previously murdered. (*Ibid*.) These circumstances, we reasoned, did " 'not appear [to be] so potentially inflammatory as to transform an otherwise death-qualified juror' " — who knew from reading the juror questionnaire that seven women, some of whom were believed to be prostitutes, had been found buried in backyards and in abandoned houses, and that the defendant had been convicted of murdering six of them — " 'into one who could not deliberate fairly on the issue of penalty.' [Citation.]" (*Ibid*.) Notably, in *Solomon*, we expressly found that *Roldan,* insofar as it mentioned " 'sensational sex crimes' " and " 'child victims' " as circumstances comparable in relevance to the prior murders in *Cash*

that could potentially prejudice a reasonable juror, did not require a different result: "The dictum in *Roldan* suggests that, *in an appropriate case*, evidence of 'sensational sex crimes' might cause an otherwise death-qualified juror to automatically vote for death, regardless of the mitigating facts. As we have explained, however, this is not such a case." (*Solomon*, *supra*, at p. 840, fn. 21.)

We also stressed context in *Zambrano*, *supra*, 41 Cal.4th at page 1123, in finding that the trial court had not erred in precluding voir dire regarding the fact that the murder victim had been dismembered. We explained: "[I]nsofar as the defense sought to restrict examination to the abstract issue of dismemberment, the question posed was not entirely fair in the context of this case. As jurors would later learn, the *circumstances* surrounding the dismemberment of [the victim's] body were hotly disputed. The prosecution urged that defendant used dismemberment to commit, or cover up, a cold-blooded murder. But defendant's version was that after pulling a gun on defendant, [the victim] died accidentally during a struggle for the weapon, and that defendant, acting in a panic, dismembered [the victim's] body only to delay its discovery and identification while he sought legal help. Jurors' attitudes toward the dismemberment thus might well be affected by which version they believed. [¶] Accordingly, were the defense allowed to broach the dismemberment issue in voir dire, the prosecutor could strongly argue he should be permitted to explore in more detail how prospective jurors might react to *all* the anticipated evidence on that issue. This, in turn, could have led to a lengthy examination of prospective jurors about specific details of the case." (*Ibid*.)

Based on similar considerations, we find that, on the record here, the trial court did not err in precluding mention of the circumstance that two of the victims were children. First, as to defendant, a question about the effect of this circumstance would not have been "entirely fair in the context of this case." (*Zambrano*, *supra*, 41 Cal.4th at p. 1123.) As jurors would later learn, the evidence showed that Palma, not defendant, shot the children, that the Mexican

109

Mafia had not ordered the killing of the children, and that the killing of the children actually violated Mexican Mafia policy.  Insofar *as defendant* was concerned, this evidence might well have affected the prospective jurors' attitudes regarding the age of the two child victims.  Indeed, defendant's counsel stressed this evidence at trial, first at the guilt phase as a basis for not convicting defendant of the three murders Palma committed, and again at the penalty phase as a basis for not imposing the death penalty.  Thus, had the court allowed defendant to raise the victims' ages during voir dire, the prosecutor could have strongly argued that he should be permitted to explore in more detail how prospective jurors might react to all the anticipated evidence on that issue.  "This, in turn, could have led to a lengthy examination of prospective jurors about specific details of the case." (*Ibid*.)  Second, as noted above, prospective jurors were told that defendant and Palma were charged with using firearms to willfully, unlawfully, and with malice aforethought kill five people — three males and two females — at the same place and on the same day, for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by the gang members.  One of the questionnaires prospective jurors completed during the selection process contained more than 10 questions relating to gangs and specifically asked whether prospective jurors had heard of the Sangra and El Monte Flores "street gang[s]" and the Mexican Mafia "prison gang."  Given what the prospective jurors knew about the case, the circumstance that two of the victims *codefendant Palma* shot and killed were children " 'does not appear so potentially inflammatory as to transform an otherwise death-qualified juror into one who could not deliberate fairly on the issue of penalty.' [Citation.]" (*Solomon*, *supra*, 49 Cal.4th at p. 840.)  Defendant's claim therefore fails.

**L. Testimony of Anthony France**

As noted above, after defendant introduced his penalty phase evidence, the prosecution presented testimony from Anthony France regarding a 1991 incident at San Gabriel High School. According to France, defendant, after being detained in connection with a campus fight, said he was "going to put a bullet in [France's] head," called another supervisor "his bitch," and said he was going to "kick" the other supervisor's "ass."

When the prosecution first proposed calling France, defendant objected that France's testimony was not proper rebuttal evidence. The court disagreed and overruled the objection. Defendant renewed his objection after France's testimony, again arguing that it was improper rebuttal. The trial court overruled the objection, finding that (1) the evidence would have been admissible in the prosecution's case-in-chief as "factor b" evidence under section 190.3, which permits jurors to consider in determining penalty "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence," and (2) admitting the evidence during rebuttal would not prejudice defendant. Defendant now renews his objections to France's testimony.

*1. The testimony was proper rebuttal evidence.*

Rebuttal evidence is relevant and admissible if it tends to disprove a fact of consequence on which the defendant has introduced evidence. (*People v. Loker* (2008) 44 Cal.4th 691, 709.) The scope of proper rebuttal depends on "the breadth and generality of the direct evidence." (*Ibid.*) "[E]vidence presented or argued as rebuttal must relate directly to a particular incident or character trait [the] defendant offers in his own behalf." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 792, fn. 24.) When a defendant places his character at issue during the penalty phase of a capital trial, the prosecution may respond by introducing character evidence to undermine the defendant's claim that his good character weighs in

111

favor of mercy and to present a more balanced picture of the defendant's personality. (*People v. Loker*, *supra*, 44 Cal.4th at p. 709.) The trial court has broad discretion to determine the admissibility of rebuttal evidence and, absent palpable abuse, an appellate court may not disturb the trial court's exercise of that discretion. (*People v. Gurule* (2002) 28 Cal.4th 557, 656.)

Here, the trial court did not abuse its discretion in initially determining that France's testimony was admissible rebuttal evidence. As noted above, during the penalty phase, defendant introduced evidence regarding his intelligence, his positive performance in school, and other positive aspects of his background, including his religious upbringing, his participation in youth sports, his participation in the Navy Reserves, his work history, and his efforts to care for his grandfather and to support his younger brother. He also offered evidence that he could make a positive contribution in prison by helping other inmates. The trial court did not abuse its discretion in finding that, to counter this evidence and to present a more balanced picture of defendant's personality, the prosecution could introduce through France's testimony evidence that, in a structured school setting, defendant had physically threatened school personnel who detained him after breaking up a campus fight. (See *People v. Clark* (1993) 5 Cal.4th 950, 1026-1027 [evidence of school suspensions admissible to rebut the defendant's evidence of his good character, including testimony that he was an excellent Boy Scout and a good student]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1071-1072 [evidence of juvenile misconduct was admissible to rebut the defendant's evidence of his character, including testimony that he was a good student].)

The closing argument of defendant's counsel at the penalty phase reinforces this conclusion. Counsel argued that the evidence of defendant's positive school performance, his "good background," and his demonstrated willingness to assist other inmates showed that defendant could and would atone for his crimes were the jury to spare his life and impose a life sentence. Counsel explained: "[Y]ou have put everything in a structured situation, everything, all of his training of his

112

parents and our society invested because he went most of the time to school where he can do some good inside" by helping other inmates. To reinforce his argument, counsel stressed that the prosecution had offered no evidence defendant had been arrested before committing the murders in this case. In fact, defense counsel argued that the *only* evidence defendant had even previously been in trouble was France's testimony about the high school incident. Thus, France's testimony not only enabled the prosecution to counter defendant's argument for mercy based on his positive school performance, his "good background," and his demonstrated willingness to assist other inmates, it prevented defendant from arguing there was *no* evidence defendant had even been in trouble before committing the murders. On this record, the trial court did not abuse its discretion in admitting France's testimony.

### 2. *Admission Under Factor (b) Was Harmless*

Defendant makes several challenges to admission of France's testimony under section 190.3, factor (b) (factor (b)). He argues the testimony was not admissible on this basis because his conduct "did not constitute 'criminal activity' in violation of any penal statute." He also argues the trial court erred in failing to give sua sponte CALJIC No. 8.87, which instructs jurors they may not consider as an aggravating circumstance a criminal act involving the threat of force or violence unless they find beyond a reasonable doubt that the defendant committed the act. These errors, defendant contends, were prejudicial because they "allowed the jury to consider evidence in aggravation even though [his] conduct did not constitute a violation of a penal statute," and the evidence "was not cumulative of any other properly admitted factor (b) evidence."

We agree with the People that any error in admitting France's testimony as factor (b) evidence was harmless under any standard. As explained above, the trial court properly admitted France's testimony as rebuttal evidence. Thus, regardless of whether the evidence was admissible under factor (b), the jury

113

properly learned about the high school incident. It is true, as defendant notes, that during argument, the prosecution told the jurors they could consider the evidence of the high school incident with respect to factor (b). However, after this brief mention of factor (b), the prosecutor did not focus on the incident as evidence of a prior crime; indeed, he noted several times that France had not even taken the threat seriously. Instead, the prosecutor argued that defendant's statement during the incident "tells you . . . quite a bit about Mr. Valdez," that it showed "the true," "the real," and "the manipulative Mr. Valdez," who "wants to intimidate" and who "means business" when he "makes that kind of statement." The prosecutor could have made the same arguments based on the evidence's admission as rebuttal evidence. Thus, as the People explain, despite the prosecutor's brief mention of factor (b) before discussing France's testimony, that testimony was, in essence, "actually presented to the jury" as rebuttal evidence.

Second, the properly admitted aggravating evidence in this case – specifically, the circumstances of the crime (§ 190.3, factor (a)) – was simply overwhelming. From that evidence, the jury found that defendant participated in five execution-style shootings of unarmed and unresisting victims. Defendant personally executed two of the victims by pressing a gun to their heads and firing at point-blank range. France's testimony about the high school incident paled in comparison to the seriousness and excessive violence of the charged offenses. As defendant's counsel emphasized to the jury during cross-examination, defendant's threat was no different from threats other students had made and France had not taken it seriously. Thus, the jurors no doubt viewed the incident the same way defendant's counsel characterized it to the court: just "a hot-headed student after a fight making idle threats." To rebut the overwhelming aggravating evidence, defendant offered little evidence in mitigation. Notably, his own witness, Dr. Fairbanks, testified that he could find no mitigating circumstances "of any major significance" here. Given all of the circumstances, "[i]t would require capricious speculation for us to conclude" that any error in admitting France's testimony

114

under factor (b) "affected the penalty verdict." (*Belmontes*, *supra*, 45 Cal.3d at p. 809 [erroneous admission of factor (b) evidence was harmless given that "[t]he properly admitted aggravating evidence," i.e., "the circumstances of the crime," was "overwhelming"]; see also *People v. Silva* (1988) 45 Cal.3d 604, 636 [finding harmless error because erroneously admitted factor (b) evidence was " 'trivial when compared to [defendant's] crimes and the other proper evidence adduced at the penalty phase' "].)

### M.  Failure to Reread Guilt Phase Instructions

During discussions with counsel about the penalty phase jury instructions, the court, after indicating that all of the guilt phase instructions applied to the penalty phase except those telling jurors they could not consider sympathy or penalty, stated:  "My belief is that all the other instructions to the extent that they apply, there may be some that don't, but I don't think it's confusing to just tell the jury that all the previous instructions do apply with those . . . exceptions."  The prosecutor replied that the reasonable doubt and circumstantial evidence instructions from the guilt phase also were inapplicable to the penalty phase, and then added:  "I would have no objections to the court just simply telling the [jurors] . . . that they certainly can now consider sympathy and they certainly can consider penalty or punishment and that they can consider the rest of the instructions that have previously been given as they feel they apply."  The court responded, "All right," and the prosecutor interjected, "If no one else has an objection to it."  Counsel for both defendant and Palma responded, "I agree with that."

Based on counsel's agreement, the court instructed the jury as follows: "Generally speaking, all of the instructions I gave you in the first phase you may consider to the extent that they're applicable in this phase and I am not going to re-read all of those instructions.  There are several areas that don't apply.  For instance, I told you in the first phase that you could not consider sympathy for a

115

defendant in determining guilt. In this phase you may if you deem it to be appropriate, consider sympathy in selecting your verdict. [¶] In the first phase I told you that you could not in determining the guilt or innocence of a defendant consider or . . . any way take into consideration punishment. Obviously, that's the whole focus of your attention in this case. [¶] And I also told you of the standard of proof in the first case was proof beyond a reasonable doubt. That instruction does not apply to this phase. And there may be a couple of others that you'll find by just applying common sense or are just not applicable." After giving this instruction, the court also gave CALJIC Nos. 8.84 (penalty phase introduction), 8.85 (penalty phase factors to consider), 9.20 (assault with a deadly weapon on a peace officer), 9.02 (great bodily injury), 8.88 (penalty phase concluding instruction), and special instructions regarding sympathy, lingering doubt and deterrence.

Defendant now claims the penalty phase instructions were inadequate because the court failed to reread instructions from the guilt phase that also applied to the penalty phase and failed to give CALJIC No. 8.84.1, which states in part that jurors "must neither be influenced by bias nor prejudice against the defendant, nor swayed by public opinion or feelings." The court compounded these errors, defendant asserts, by instructing jurors it was their job to determine which instructions from the guilt phase applied during the penalty phase.

For several reasons, defendant's claims fail. Procedurally, defendant forfeited appellate review of the issue by failing to raise it in the trial court and, through counsel, expressly agreeing that the court could simply tell jurors they could "consider the rest of the instructions that have previously been given as they feel they apply." (See *People v. Rundle* (2008) 43 Cal.4th 76, 188.) As to the merits, a trial court's failure to specify which previously given guilt phase instructions apply at the penalty phase is error only if a reasonable likelihood exists that the omission misled the jury. (*People v. Romero* (2008) 44 Cal.4th 386, 424 (*Romero*).) In *Romero*, we found "[n]o such reasonable likelihood,"

116

emphasizing that the trial court had "told the jury that many of the guilt phase instructions would not apply at the penalty phase" and had "specifically singled out punishment and sympathy as matters 'obviously' to be considered by the jury at the penalty phase." (*Ibid*.) We reach the same conclusion in this case, which involves substantially similar circumstances.

Ignoring these authorities, defendant argues the jurors "might reasonably have concluded" under the trial court's instructions that CALJIC No. 2.60, which directs jurors not to infer guilt from a defendant's failure to testify, "did not apply to their penalty determination." He reasons that the principle CALJIC No. 2.60 states, though "commonly understood" to apply "to a determination of guilt," would not necessarily also be understood to apply "to a determination of penalty."

Defendant's argument fails because, as the People correctly explain, nothing in CALJIC No. 2.60's language suggests the instruction is inapplicable to the penalty phase. On the contrary, the instruction plainly and categorically states that "[a] defendant in a criminal trial has a constitutional right not to be compelled to testify," that jurors "must not draw any inference from the fact that a defendant does not testify," and that jurors "must neither discuss this matter nor permit it to enter into [their] deliberations in any way." [44] (CALJIC No. 2.60.)

Finally, given that the trial court did not err in directing the jury to apply the guilt phase instructions, it also did not err in failing to give CALJIC No. 8.84.1. That instruction would have contradicted the instructions the trial court gave pursuant to the parties' agreement by directing jurors to "accept and follow the law" as set forth in the penalty phase instructions and to "[d]isregard all other

---

[44] Moreover, as we have observed, this instruction "is of only questionable value to the defense" because it "draws attention" to the defendant's failure to testify at the same time it cautions the jury not to draw an adverse inference from that failure. (*People v. Stanley* (2006) 39 Cal.4th 913, 966.) Thus, defendant's failure to request rereading of the instruction at the penalty phase may "reflect a reasoned tactical decision. [Citation.]" (*Ibid*.)

instructions given to you in other phases of this trial." (See *People v. Harris*, *supra*, 43 Cal.4th at pp. 1319-1320 ["it was confusing for the jury to hear first that it was to '[d]isregard all other instructions given to you in other phases of this trial,' and then that it should 'be guided by the previous instructions given in the first phase of this case which are applicable and pertinent to the determination of penalty' "].) For the above reasons, defendant's claims fail.

### N. Automatic Motion To Modify The Death Verdict

After receiving the jury's penalty verdicts on December 13, 1996, Judge Trammell, who presided over the guilt and penalty phases of defendant's trial, set sentencing proceedings for February 19, 1997. Before that date, Judge Trammel retired. Judge Robert Armstrong took over the case and, at defense counsel's request, continued sentencing proceedings to June 11, 1997. On June 4, Judge Armstrong denied defense counsel's request for another continuance. Two days later, and only five days before the scheduled June 11 hearing, Palma filed a motion for a new trial and an application under Penal Code section 190.4, subdivision (e), for modification of the death verdict to life imprisonment without the possibility of parole.

Judge Armstrong began the June 11 hearing by denying defense counsel's request for yet another continuance and Palma's new trial motion, and then took up Palma's modification application. After noting that Palma's written application highlighted the court's obligation to review the special circumstance findings, Judge Armstrong, addressing Palma's counsel, stated: "The Court has read the transcript of the proceedings in which the – on penalty phase of the trial, and I've also read the material that's been submitted by [Palma]. [¶] And the factors that [Palma] suggested were either neutral or mitigating factors. [¶] Do you have anything to add to what you filed in this regard . . . ." Palma's counsel submitted the matter on the written application. After the prosecutor responded, defendant's counsel indicated that defendant wanted to join Palma's application. Judge

118

Armstrong then denied the motion, explaining: "The principal thrust of the argument seems to be that because the defendants were members of the Mexican Mafia, that they were acting under duress. [¶] But, of course, that contention would be better supported if there were people there so that if they didn't carry out this hit that they were supposed to, that they would immediately be executed themselves. And that simply isn't supported. [¶] They're obviously – this was a Mexican Mafia situation, but the defendants had free will. And particularly the killing of the baby just seems to be so outside of the pale of anything, that showed a wantonness, as far as these defendants were concerned, to wipe out a family. The baby and the child were certainly not the objects of the wrath of the Mexican Mafia people. [¶] So I think that reviewing all of the evidence that was taken at the hearing, it just seems to the Court that it would be almost impossible for any responsible jury in this situation to come to any other verdict other than the verdict of death. [¶] And the Court finds no basis for setting aside or for modifying the finding to life without possibility of parole in keeping with the special circumstances."

On appeal, defendant asserts that Judge Armstrong, who did not preside at trial, failed to review the record of the trial's guilt phase in making his ruling. Because of this failure, defendant argues, Judge Armstrong "was unfamiliar with" the evidence that the Mexican Mafia did not want the children killed. According to defendant, this was the "most important" mitigating evidence, in that it "suggest[ed]" that Palma's execution of the children contravened, rather than furthered, the conspiracy. Because Judge Armstrong did not know of this evidence, defendant asserts remand for a new modification hearing is required.

Procedurally, by failing to make a contemporaneous objection in the trial court, defendant forfeited his right to raise this issue on appeal. As to modification rulings made after 1992, appellate review of a claimed deficiency in the ruling is not available unless the defendant brought the deficiency "to the trial court's attention by a contemporaneous objection." (*People v. Mungia* (2008) 44 Cal.4th

119

1101, 1141.)  The purpose of this rule — "to give the court an opportunity to correct the error" (*ibid.*) — fully applies in this case.  Defendant bases his claim that Judge Armstrong failed to review the guilt phase record entirely on Judge Armstrong's statements at the modification hearing.  Had defendant raised his claim at the hearing, Judge Armstrong could have reviewed the guilt phase record if, in fact, he had not already done so.  Defendant therefore forfeited his claim.  (See also *People v. Wallace* (2008) 44 Cal.4th 1032, 1096 [by failing to object "when the trial court ruled on" the modification application, defendant forfeited claim that court erred in failing to consider as mitigation his age, mental state, alcoholism, and intoxication at the time of the offense, and in finding that section 190.3, factor (k) was the only mitigating factor].)

In any event, the claim lacks merit.  In reviewing modification rulings, as a general rule, we presume the trial court properly followed established law.  (*People v. Crew*, *supra*, 31 Cal.4th at p. 859; see Evid. Code, § 664 ["[i]t is presumed that official duty has been regularly performed"].)   As here relevant, section 190.4, subdivision (e), provides that, "[i]n ruling on the [modification] application, the judge *shall review the evidence*, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in [s]ection 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented."  (Italics added.)  We have construed this section as requiring the court in ruling on a modification application independently to reweigh the evidence of aggravating and mitigating circumstances and to determine in its independent judgment whether the weight of the evidence supports the jury's verdict.  (*People v. Burgener* (2003) 29 Cal.4th 833, 890.)  Thus, a presumption exists here that Judge Armstrong performed his duty and reviewed the evidence in deciding the modification application.  (Cf. *People v. Coddington*, *supra*, 23 Cal.4th at pp. 644-645 [applying presumption that "judicial duty is properly performed" in finding that court complied with duty

120

to base modification ruling "solely on the evidence before the jury"].) "This presumption 'affect[s] the burden of proof' (Evid. Code, § 660), meaning that the party against whom it operates — here, the defendant — has 'the burden of proof as to the nonexistence of the presumed fact.' (Evid. Code, § 606; [citation].)'" (*People v. Martinez* (2000) 22 Cal.4th 106, 125.)

Defendant has failed to meet his burden. To begin with, in several ways, the record affirmatively supports the presumption that Judge Armstrong properly reviewed the evidence. First, at a June 4 hearing on defense counsel's request for a further continuance, Judge Armstrong reminded defense counsel that he had earlier asked them to direct his attention to any alleged trial error because he "ha[d] the full transcript of the proceedings, some thousands of pages of the trial itself." Second, at the June 11 hearing on Palma's new trial motion, Judge Armstrong demonstrated his familiarity with the guilt phase record by correctly challenging the assertion of Palma's counsel that Judge Trammell, upon being informed of the jury deadlock, told the jurors to "compromise" if necessary to reach a verdict. Third, when Palma's counsel asked during the discussion of this issue whether the court had "read the transcripts in this matter," Judge Armstrong replied, "I have reviewed them." Fourth, Palma's written modification motion emphasized the court's "duty" under section 190.4, subdivision (e), "to review the evidence," to "make findings on its sufficiency to support the verdicts," and "to "independently weigh the evidence of aggravating and mitigating circumstances" in "determin[ing] whether, in [its] independent judgment, [the] weight of the evidence supports the jury's verdict." Fifth, Judge Armstrong began his consideration of the modification application at the June 11 hearing by noting that Palma's written material "point[ed] out that the court has the obligation to review the special circumstances, the findings." Sixth, Judge Armstrong next noted that he had read "the [written] material that's been submitted by" Palma, including "the factors that [Palma] suggested were either neutral or mitigating factors." Notably, the first factor Palma's written material discussed was the "circumstances

121

of the crime." Regarding this factor, Palma, after noting that the court had "presumably reviewed the transcripts as to the facts of the case," argued that because "any crime involving murder and special circumstances is horrible," "[t]his should be considered a neutral factor." These aspects of the record support the presumption that Judge Armstrong carried out his duty to review the evidence.

Also supporting that presumption are some of Judge Armstrong's remarks at the modification hearing. As noted above, in announcing his ruling, Judge Armstrong explained in part: "[The] contention [about duress] would be better supported if there were people there so that if they didn't carry out this hit . . . they would immediately be executed themselves. And that simply isn't supported." The parties never mentioned whether people were present to execute defendant and Palma if they failed to commit the murders, so Judge Armstrong's comment appears to reflect his own view of the evidence based on his review of the record. Judge Armstrong also explained that the child victims "were certainly not the objects of the wrath of the Mexican Mafia people." This comment, which appears to reference the evidence that the Mexican Mafia did not want the children killed, is significant because nothing in the record indicates the parties mentioned this evidence or this circumstance to Judge Armstrong during posttrial proceedings. Although not definitive, these comments further suggest that Judge Armstrong reviewed the guilt phase record before denying the modification application.

The isolated snippets of the record defendant cites in support of his contrary conclusion are insufficient to meet his burden to show otherwise. Defendant cites Judge Armstrong's statement to Palma's counsel during the hearing on the new trial motion that he had "read the parts [of the record] that had to do with penalty, and . . . the parts that had to do with deliberation." However, Judge Armstrong immediately prefaced this statement, which was part of his response to Palma's counsel's question about whether the court had "read the transcripts in this matter," by stating: "I have reviewed them. I haven't read them line by line." Read together, Judge Armstrong's comments may reasonably be understood as

122

indicating that he had "reviewed" *all* of the transcripts and had closely "read" –
i.e., read "line by line" – the parts dealing with penalty and deliberations.
Defendant also cites Judge Armstrong's statement at the beginning of the hearing
on Palma's modification motion that "[t]he Court has read the transcript of the
proceedings in which the – on penalty phase of the trial, and . . . the material that's
been submitted by" Palma. However, as noted above, Judge Armstrong explained
that the "submitted" material he reviewed included "the factors that [Palma]
suggested were either neutral or mitigating factors," and the first factor Palma's
application discussed was the "circumstances of the crime." Thus, read in context,
Judge Armstrong's statement may be reasonably understood as indicating that he
reviewed the parts of the record relevant to the factors Palma had discussed,
including the circumstances of the crime. In neither instance did Judge Armstrong
affirmatively state that he had *not* reviewed the guilt phase record insofar as it
pertained to the circumstances of the crime. Moreover, that counsel for both
defendant and Palma, who heard the court's comments in context, failed to object
suggests they understood those comments as indicating that Judge Armstrong had,
in fact, reviewed the guilt phase record. (Cf. *People v. Hooton* (1959) 53 Cal.2d
85, 88 [defendant's failure to object that court had overlooked its power to impose
a life sentence suggests defendant "understood" the court's remarks as indicating
that court was exercising its power].) At most, the comments defendant cites are
ambiguous on this question. As such, they are insufficient to overcome the
presumption that Judge Armstrong performed his duty to review the guilt phase
record and the circumstances discussed above supporting that presumption.[45]

Nor has defendant overcome that presumption by citing Judge Armstrong's
comment in making his ruling that defendant and Palma "were members of the
Mexican Mafia." According to defendant, had Judge Armstrong read the

---

[45] Of course, defendant could have easily clarified the meaning of the court's
comments simply by objecting when Judge Armstrong made them.

123

transcripts of the guilt phase, he would have known that defendant and Palma were not Mexican Mafia members. Judge Armstrong's contrary understanding, defendant reasons, "apparently reflected the fact that he was only familiar with the penalty phase portion of the trial record," because Palma's counsel, in arguing duress to the jury during that phase, "made repeated references to the Mexican Mafia, but none to the Sangra gang." However, defendant's reasoning is faulty because other parts of the penalty phase record, which Judge Armstrong stated he had reviewed, clarified that defendant and Palma were members of the Sangra gang, rather than the Mexican Mafia. Judge Armstrong also would have learned this fact in denying Palma's new trial motion, which was based in part on the court's orders restricting disclosure of witnesses' identities. As noted above, those orders were based in part on evidence that Sangra gang members had committed the murders at the Mexican Mafia's behest. Thus, as the People argue, Judge Armstrong's misstatement, rather than reflecting a failure to review the guilt phase record, more likely reflects that the precise gang affiliation of defendant and Palma "was not directly pertinent to the point the court was making," i.e., "that even though the defendant's had been ordered [by the Mexican Mafia] to commit the killings, there was no duress in the sense of an immediate physical threat." In any event, any ambiguity Judge Armstrong's comment created regarding the extent of his record review is insufficient to overcome the presumption that he performed his duty and the circumstances discussed above supporting that presumption. For all of the above reasons, defendant's claim fails.

## O. Constitutionality of California's Death Penalty Scheme

Defendant makes numerous constitutional challenges to California's death penalty scheme. He acknowledges we have previously rejected these challenges, but asks that we reconsider our prior decisions. We reject his request.

In permitting jurors to consider the "circumstances of the crime," section 190.3, factor (a), does not result in the arbitrary and capricious imposition of the death penalty. (*People v. Kennedy* (2005) 36 Cal.4th 595, 641.)

The trial court need not instruct jurors that (1) they must find beyond a reasonable doubt that aggravating circumstances exist, that the aggravating factors outweigh the mitigating factors, and that the aggravating factors are so substantial as to make death the appropriate punishment (*People v. Mendoza* (2007) 42 Cal.4th 686, 707); (2) the prosecution has the burden of persuasion regarding these matters (*People v. Lenart* (2004) 32 Cal.4th 1107, 1136-1137); (3) they should presume life imprisonment without the possibility of parole is an appropriate sentence (*People v. Arias* (1996) 13 Cal.4th 92, 190); (4) their findings regarding aggravating factors must be unanimous (*People v. Prieto*, *supra*, 30 Cal.4th at p. 275); (5) they may not consider acts of prior unadjudicated criminality as an aggravating circumstance unless they unanimously find that defendant committed those criminal acts (*People v. Ward* (2005) 36 Cal.4th 186, 221-222); (6) the central determination is whether death is the appropriate penalty (*People v. Boyette* (2002) 29 Cal.4th 381, 465); (7) they should impose life imprisonment without the possibility of parole if they find that the mitigating circumstances outweigh the aggravating circumstances (*People v. Catlin* (2001) 26 Cal.4th 81, 174); (8) they may impose life imprisonment without the possibility of parole even if they find that the aggravating factors are " 'so substantial in comparison with the mitigating factors that it warrants death instead of life without parole' " (*People v. Smith* (2005) 35 Cal.4th 334, 370); (9) their findings regarding mitigating circumstances need not be unanimous or beyond a reasonable doubt (*People v. Lewis*, *supra*, 43 Cal.4th at p. 534); or (10) certain sentencing factors are only relevant as mitigating (*People v. Farnam* (2002) 28 Cal.4th 107, 191).

The instructions were not impermissibly broad or vague in directing jurors to determine whether the aggravating factors were "so substantial in comparison

with the mitigating factors that it warrants death instead of life without parole."
(See *People v. Carter* (2003) 30 Cal.4th 1166, 1226.)

Jurors need not make written findings in determining penalty. (*People v. Cook* (2006) 39 Cal.4th 566, 619.)

Including in the list of potential mitigating factors adjectives such as "extreme" (§ 190.3, factors (d), (g)) and "substantial" (*id.* factor (g)) does not erect an impermissible barrier to the jury's consideration of mitigating evidence. (*People v. Avila* (2006) 38 Cal.4th 491, 614.)

The trial court need not delete factually inapplicable sentencing factors from the instructions. (*People v. Cook*, *supra*, 39 Cal.4th at p. 618.)

The absence of intercase proportionality review is not unconstitutional. (*Prieto*, *supra*, 30 Cal.4th at p. 276.)

The death penalty scheme, insofar as defendant alleges it affords capital defendants fewer procedural protections than the law affords noncapital defendants, does not violate constitutional guarantees of equal protection. (*People v. Manriquez* (2005) 37 Cal.4th 547, 590.)

International law does not bar imposing a death sentence rendered in accord with state and federal constitutional and statutory requirements. ((*People v. Cook*, *supra*, 39 Cal.4th at p. 620.)

### P. Cumulative Error

Defendant contends the errors he alleges cumulatively amounted to reversible error. To the extent there are a few instances in which we have found error or assumed its existence, no prejudice resulted. The same conclusion is appropriate after considering their cumulative effect.

## IV. DISPOSITION

We affirm the judgment.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CORRIGAN, J.**
**LIU, J.**

**CONCURRING OPINION BY LIU, J.**

I join today's opinion and write separately to add two comments concerning the trial court's restriction on voir dire of prospective jurors. (See maj. opn., *ante*, at pp. 104-110.)

## I.

As the court notes, we said in *People v. Cash* (2002) 28 Cal.4th 703 that "death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. [Citation.] In deciding where to strike the balance in a particular case, trial courts have considerable discretion. [Citations.]" (*Id*. at pp. 721-722.)

In exercising such discretion, trial courts should be mindful that the risks on the two sides of the balance are not symmetrical. If voir dire is too abstract, it may fail to identify a prospective juror whose views on the death penalty prevent him or her from impartially weighing the facts and following the law. (See *Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188 ["Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be

1

fulfilled."].)  As a result, an unqualified juror may end up serving on the jury.
That was the basis for reversal of the conviction in *Cash.*  By restricting voir dire
with respect to the defendant's commission of prior murders, the trial court in
*Cash* "created a risk that a juror who would automatically vote to impose the death
penalty on a defendant who had previously committed murder was empanelled
and acted on those views, thereby violating defendant's due process right to an
impartial jury."  (*Cash, supra,* 28 Cal.4th at p. 723.)

　　　If voir dire is too specific, the risk is that prospective jurors will be asked to
prejudge the case.  A prospective juror may have no categorical biases such as "I
will automatically vote for the death penalty where the murder victim is a child."
But a prospective juror's answers to questions about the specifics of a case may
suggest how he or she is likely to vote upon hearing the evidence to be presented
at trial.  Those answers may lead the prosecution or the defense to peremptorily
challenge a prospective juror who is in fact impartial and qualified to serve.

　　　For obvious reasons, we do not want the conduct of voir dire to encourage
the parties to ask prospective jurors to prejudge the case.  But asking a prospective
juror too many questions about the particular circumstances of a case does not
have the same potential for mischief as asking too few questions.  Asking a
potential juror too many questions may tip the juror's hand as to how the juror
might actually vote in the case, which might lead to a peremptory challenge
against a qualified juror.  Yet peremptory challenges are usually exercised against
qualified jurors in any event.  By contrast, not asking enough questions leaves a
dearth of information which may result in the empanelment of an unqualified juror
— a juror whose death penalty views will substantially impair his or her ability to
impartially apply the law to the facts.  The latter implicates the fairness of the trial
in a manner that the former does not.

This asymmetry does not by itself suggest a general rule for achieving the balance required by *Cash*. Because the facts of each case are integral to determining the proper scope of voir dire, trial courts have broad discretion in this area, and in a given case, there may be several approaches to death-qualification voir dire that are reasonable and not reversible for abuse of discretion. However, in exercising discretion, trial courts should take into account the important distinction between the risk of empanelling an unqualified juror and the risk of subjecting a qualified juror to peremptory challenge. This distinction may be consequential to a trial court's judgment not only as to what is a reasonable approach to voir dire, but also as to what is the most fair approach among several possible reasonable approaches.

## II.

The court rejects defendant's claim that the trial court should have allowed death-qualification voir dire on the fact that two of the murder victims were children. (See maj. opn., *ante*, at pp. 107-110.) I agree that the trial court's handling of voir dire was not unreasonable in light of the circumstances here — most notably, the fact that defendant did not personally kill the child victims. But this conclusion must be understood as a fact-bound exception to a more general rule.

As the court explains (maj. opn., *ante*, at pp. 107-108), we have repeatedly suggested, albeit in dicta, that the murder of a child falls within the category of circumstances that have the potential to "cause a *reasonable* juror — i.e., one whose death penalty attitudes *otherwise* qualified him or her to sit on a capital jury — *invariably* to vote for death, regardless of the strength of the mitigating evidence." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1122, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *People v. Roldan* (2005) 35 Cal.4th 646, 694, disapproved on another ground in *Doolin,*

3

*supra,* 45 Cal.4th at p. 421, fn. 22; see also *People v. Tate* (2010) 49 Cal.4th 635, 658 [quoting *Roldan*].)

In *People v. Alfaro* (2007) 41 Cal.4th 1277, we recognized that the age of a minor victim is an important circumstance on which the parties should be allowed to question prospective capital jurors. The defendant in *Alfaro*, who was charged with killing a nine-year-old girl, claimed error in the trial court's refusal to allow her to voir dire prospective jurors with specific questions regarding the minor victim's age. We rejected the claim under the circumstances there, noting that "[a]lthough the trial court rejected [the] defendant's specific questions concerning whether the victim's age would impair the prospective jurors' ability to remain fair and impartial, it nonetheless permitted extensive questioning on this subject." (*Id.* at p. 1311, fn. omitted.) *Alfaro* concluded: "All of the prospective jurors repeatedly were made aware of the unusual circumstances of this case, and numerous prospective jurors revealed that the victim's young age would prevent their serving as fair and impartial jurors. Numerous other prospective jurors candidly told the court that this circumstance would weigh heavily on them, but maintained they nonetheless could retain an open mind, and defense counsel was permitted to fully examine each of those jurors regarding the sincerity of those stated beliefs. In light of the exhaustive examination of the issue during the penalty retrial, we discern no prejudicial error in the trial court's rejection of defendant's specific proposed question regarding the victim's age." (*Id.* at pp. 1312-1313.) Our observation in *Alfaro* that "numerous prospective jurors revealed that the victim's young age would prevent their serving as fair and impartial jurors" confirms that when a defendant stands accused of personally killing a child, that fact by itself is a circumstance with *demonstrated* potential to cause otherwise reasonable jurors to invariably vote for death regardless of the mitigating circumstances.

4

Decisions from other states support this conclusion. In *State v. Jackson* (Ohio 2005) 836 N.E.2d 1173, the Ohio Supreme Court reversed a death judgment for failure to allow voir dire regarding a three-year-old murder victim's age. *Jackson* explained: "Protecting children from harm is a common human characteristic, and many people harbor strong feelings and emotions whenever a child is a victim of a violent crime. Some prospective jurors, when presented with this fact, may have been unable to remain dispassionate and impartial when deciding whether the death sentence should be imposed. The possibility that one juror might not have fairly considered sentencing options and may have voted for the death penalty solely because appellant murdered a three-year-old child is a risk too great to ignore. 'If even one such juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence.' [Citation.]" (*Id*. at pp. 1191-1192.)

Other decisions have recognized that informing prospective jurors that the murder victim was a child is important to ensuring the selection of an impartial jury. In *People v. Terrell* (Ill. 1998) 708 N.E.2d 309, the Illinois Supreme Court found no abuse of discretion in the trial court's refusal to ask a specific voir dire question proposed by the defendant regarding the minor victim's age, reasoning that the trial court had "informed the venire that the victim involved was a child" and had "asked each venireperson whether he or she would automatically vote to impose death without consideration of the mitigating evidence." (*Id.* at p. 318.) In *State v. Moore* (N.J. 1991) 585 A.2d 864, the New Jersey Supreme Court reached the conclusion that "as a whole, the *voir dire* was sufficiently probing in its attempt to weed out" unqualified jurors in part on the ground that the prosecutor and defense counsel had asked prospective jurors about the fact that one of the murder victims was a child. (*Id.* at p. 878.) The court in *Moore* explained that "*voir dire* should allow more open-ended questioning on the issue of the status of

5

the victims as it relates to any prejudice or predisposition affecting the juror's ability to adjudge fairly in the guilt phase or the ability to consider mitigating evidence in any penalty phase." (*Id.* at p. 880.)

Our conclusion that "on the record here, the trial court did not err in precluding mention of the circumstance that two of the victims were children" (maj. opn., *ante*, at p. 109) rests on the unique facts of this case — in particular, the fact that defendant did not personally kill the child victims. Nothing we say today erodes the general rule, apparent in the decisions of our court and others, that where a capital defendant stands accused of personally killing a child, that fact by itself is so potentially inflammatory as to cause an otherwise qualified juror to invariably vote for death, rendering the preclusion of voir dire on that fact an abuse of discretion. With that understanding, I concur in the court's opinion.

LIU, J.

6

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Valdez

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S062180
**Date Filed:** August 9, 2012

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** George W. Trammell III and Robert W. Armstrong

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Raoul Schonemann and Gary D. Garcia, Deputy State Public Defenders, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Michael R. Johnsen, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gary D. Garcia
Deputy State Public Defender
221 Main Street, 10th Floor
San Frnacisco, CA  94105
(415) 904-5600

Michael R. Johnsen
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90012
(213) 897-2268